1  Philip J. Perry (CA Bar No. 148696)
2  Richard P. Bress
   Andrew D. Prins
3  Alexandra P. Shechtel (CA Bar No. 294639)
   LATHAM & WATKINS LLP
4  555 Eleventh Street NW, Suite 1000
   Washington, DC 20004
5  Tel: (202) 637-2200
   philip.perry@lw.com
6  (*additional counsel on signature page*)

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11 | NATIONAL ASSOCIATION OF WHEAT
   | GROWERS; NATIONAL CORN GROWERS
12 | ASSOCIATION; UNITED STATES DURUM
   | GROWERS ASSOCIATION; WESTERN
13 | PLANT HEALTH ASSOCIATION;
   | MISSOURI FARM BUREAU; IOWA
14 | SOYBEAN ASSOCIATION; SOUTH
   | DAKOTA AGRI-BUSINESS
15 | ASSOCIATION; NORTH DAKOTA GRAIN
   | GROWERS ASSOCIATION; MISSOURI
16 | CHAMBER OF COMMERCE AND
   | INDUSTRY; MONSANTO COMPANY;
17 | ASSOCIATED INDUSTRIES OF
   | MISSOURI; AND AGRIBUSINESS
18 | ASSOCIATION OF IOWA,

19                         Plaintiffs,

20            v.                                     Civil Action No.

21 LAUREN ZEISE, IN HER OFFICIAL                    **COMPLAINT FOR DECLARATORY**
   CAPACITY AS DIRECTOR OF THE                      **AND INJUNCTIVE RELIEF**
22 OFFICE OF ENVIRONMENTAL HEALTH
   HAZARD ASSESSMENT; AND XAVIER
23 BECERRA, IN HIS OFFICIAL CAPACITY
   AS ATTORNEY GENERAL OF THE STATE
24 OF CALIFORNIA,

25

26                         Defendants.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

Plaintiffs seek declaratory and injunctive relief against Defendants Lauren Zeise and Xavier Becerra, in their official capacities as Director of the California Office of Environmental Health Hazard Assessment (OEHHA) and Attorney General of the State of California, respectively, and allege as follows:

**PRELIMINARY STATEMENT**

1.     Plaintiffs National Association of Wheat Growers, National Corn Growers Association, United States Durum Growers Association, Western Plant Health Association, Missouri Farm Bureau, Iowa Soybean Association, South Dakota Agri-Business Association, North Dakota Grain Growers Association, Missouri Chamber of Commerce and Industry, Monsanto Company, Associated Industries of Missouri, and Agribusiness Association of Iowa bring this suit to prevent Defendants from mandating false, misleading, and highly controversial cancer warnings concerning the herbicide glyphosate on a wide variety of food, agricultural, industrial, and lawn and garden products.

2.     Glyphosate is a broad-spectrum herbicide approved by the federal government for use in more than 250 agricultural crop applications in all U.S. States.  Glyphosate has been subject to scientific review by the federal government repeatedly for multiple decades.  It is widely utilized worldwide, including throughout the U.S., in cultivation of many major crops (such as corn, soybeans, canola, wheat, and oats), and in California, in cultivation of almond, citrus, and cotton crops, among others.  Glyphosate is regarded as one of the safest herbicides ever developed.  For several decades, the federal government has approved the use of glyphosate under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), based on extensive scientific analyses of each specific use of the herbicide.[1]  Likewise, the Federal Food, Drug, and Cosmetic Act (FDCA) establishes scientifically-set safe food tolerance levels for herbicide residues in food, and forbids misbranding food products with any false or misleading label.

3.     EPA has repeatedly concluded under FIFRA that use of glyphosate in accordance

---

[1] This Complaint uses the term "herbicide" for clarity because glyphosate is an herbicide, but under federal law, herbicides, insecticides, rodenticides, and pesticides are all referred to under the definitional term "pesticide."  7 U.S.C. § 136(u).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

with federal label instructions does not present any unreasonable adverse effects on human health or the environment, and specifically that glyphosate *is not a carcinogen*. *See infra* ¶¶ 35, 36, 44. Likewise, California itself has *twice* examined glyphosate in its own reviews—in 1997 and in 2007—and on both occasions concluded that glyphosate is "unlikely to pose a cancer hazard to humans." *Infra* ¶ 41. The same is true for every other regulatory body worldwide that has evaluated glyphosate, including regulatory agencies in Europe, Canada, New Zealand, Australia, Japan, and South Korea, and the International Programme on Chemical Safety (the recognized authoritative body on these issues in the World Health Organization), as well as the Joint Food and Agricultural Organization and World Health Organization Meeting on Pesticide Residues (JMPR). *See infra* ¶¶ 34-41, 45-48 (listing more than a dozen regulatory and scientific agencies that have reviewed glyphosate and found that it is not likely to be a carcinogen).

4.      Under California's Proposition 65, businesses must warn Californians about the presence of chemicals that are "known to the state to cause cancer." Despite the overwhelming scientific consensus that glyphosate is *not* a carcinogen, OEHHA issued a determination on July 7, 2017 that glyphosate has been added to the list of chemicals "known to the state to cause cancer" that are subject to Proposition 65. OEHHA did not issue its Proposition 65 determination because OEHHA or any other California agency conducted a scientific or regulatory review and reached the conclusion that glyphosate was actually carcinogenic—in fact, OEHHA had previously reached the opposite conclusion. Instead, under what California refers to as its "Labor Code" listing mechanism under Proposition 65, certain determinations by a foreign non-governmental entity known as the International Agency for Research on Cancer (IARC) *automatically* require a Proposition 65 cancer listing no matter whether the IARC determination is supported by the consensus of worldwide scientific bodies or not. Indeed, a listing under the Labor Code mechanism is automatically required *even if IARC is absolutely alone in its views*, as is the case here where IARC's conclusion is opposed by every global regulatory body that has examined the issue, including OEHHA itself.

5.      Under this framework, California has designated glyphosate as a chemical "known" to cause cancer based solely on IARC's conclusion that glyphosate is "*probably*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

carcinogenic."  Not only does the scientific community firmly disagree with IARC's substantive conclusion, IARC's internal process for reviewing glyphosate has also been roundly criticized. *See infra* ¶¶ 49-52 (identifying multiple published reports that IARC purposely declined to share critical data with its glyphosate review panel).

6.    California has no administrative or regulatory mechanism for reviewing the validity of an IARC conclusion before a Proposition 65 listing is made.  Once IARC designates a substance as carcinogenic, OEHHA takes the position that Proposition 65 listing is then a "ministerial" task.  That listing then triggers Proposition 65's compelled speech requirements in the form of consumer "warnings."  And any relevant product without an appropriate warning—including consumer products, foods, and crops—will be subject to Proposition 65's enforcement mechanisms, including private strike suits filed by so-called bounty hunters, who are entitled to retain one-fourth of the $2,500 per violation per day in civil penalties that are potentially available under California Health & Safety Code section 25249.12(d).  Such suits are already threatened regarding numerous food products that allegedly contain trace residues of glyphosate.

7.    California's listing of glyphosate as a carcinogen and the attendant warning requirement violate the First Amendment of the U.S. Constitution by compelling Plaintiffs and other entities to make false, misleading, and highly controversial statements about their products. The listing and warning requirement also conflict with, and are preempted by, the FDCA, and violate the Due Process Clause of the Fourteenth Amendment.

8.    In addition to being illegal, California's treatment of glyphosate under Proposition 65 threatens significant disruption to multiple of the nation's supply chains, including the nation's food production and processing supply chains.  As set forth herein, the listing threatens to change the way of life for many farmers who currently rely on glyphosate herbicides as a mainstay of their farming practices.  It is no surprise, then, that Plaintiffs—a national coalition of farming interests, food producers, glyphosate manufacturers, and others—have coalesced to bring this suit.  Had California conducted any sort of reasonable scientific review before taking the action challenged here, it would have determined—as more than a dozen other global regulatory and scientific agencies already have—that the cancer listing at issue is false and

1  inappropriate.  This suit, accordingly, should be unnecessary.  In addition to being enjoined,

2  Defendants should be assessed Plaintiffs' fees and costs under 42 U.S.C. § 1988(b).

3  **PARTIES**

4      9.      Plaintiff National Association of Wheat Growers is a federation of twenty state

5  associations whose members are wheat farmers.  The mission of the National Association of

6  Wheat Growers is to mobilize wheat farmers to advocate for beneficial policies, cultivate

7  productive relationships with partners and the public, and champion opportunities through

8  research, innovation, education, and stewardship.  Members of the National Association of

9  Wheat Growers—many of whom sell their wheat into California or sell their wheat to milling

10 facilities that in turn sell into California—depend on glyphosate as a critical tool in their farming

11 practices.

12     10.     Plaintiff National Corn Growers Association is a 501(c)(5) trade association

13 chartered in Iowa, with 40,000 members across the country.  Most of its members are farmers

14 who use glyphosate as an important means for weed control.  Members of the National Corn

15 Growers Association deliver their crops to elevators, feed mills, corn processing plants, and

16 ethanol plants, a portion of which makes its way to California.

17     11.     Plaintiff United States Durum Growers Association is a national organization

18 comprised of around 175 durum wheat producers, most of which are located in North Dakota and

19 Montana, and other businesses that use and rely on durum.  Durum is a specialty wheat product

20 that is used primarily for the production of semolina, the primary ingredient in pasta.  The

21 purpose of the United States Durum Growers Association is to promote and address the issues

22 that affect producers of durum.  Many members of the United States Durum Growers

23 Association sell their durum for incorporation into products that are sold into California.

24 Glyphosate is an integral tool for the sustainable harvesting of durum and the preservation of

25 soil.

26     12.     Plaintiff Western Plant Health Association is a California based association that

27 represents the interests of fertilizer and crop protection manufacturers, distributors, and

28 agricultural retailers (including those that sell and use glyphosate) in California, Arizona, and

Hawaii. The Western Plant Health Association's mission is to promote agronomically sound and environmentally safe use and handling of plant health products and services for the production of safe and high quality food. The association's members comprise more than 90% of all companies marketing plant nutrients, soil amendments, agricultural minerals, and crop protection products in California, Arizona, and Hawaii, including glyphosate products.[2]

13.     Plaintiff Missouri Farm Bureau is a collective of about 126,000 families that have organized together with the goals of improving the quality of life for rural Missourians and protecting Missouri's agricultural economy. Missouri Farm Bureau has numerous members that cultivate corn, soybeans, wheat, and other crops that are treated with glyphosate and sold into California. Glyphosate is an integral tool in their farming activities because, among other reasons, it is cost effective and facilitates environmentally friendly no-till farming that reduces soil erosion.

14.     Plaintiff Iowa Soybean Association has the mission of expanding opportunities and delivering results for Iowa soybean farmers. In that capacity, the Iowa Soybean Association advocates for farmers, works to increase soybean exports out of Iowa, and helps build consumer confidence in today's farm and food system. Members of the Iowa Soybean Association use glyphosate on their crops, and consider the herbicide to be a critical part of their farming toolkit. The crops of members of the association are incorporated into products that are sold in California.

15.     Plaintiff South Dakota Agri-Business Association is an organization of crop input professionals including retailers, distributors, and manufacturers of equipment, fertilizer, pesticides, and seed. For its pesticide members, Monsanto Company's glyphosate-based product Roundup® is a huge part of their market. Many clients of the association's members apply Roundup® to their pre-plant young corn and pre-harvest wheat, some of which ends up in California.

16.     Plaintiff North Dakota Grain Growers Association is the premier voice for North

---

[2] Plaintiffs Western Plant Health Association and Monsanto Company join only Claim I of this Complaint.

Dakota's wheat and barley producers.  The association's mission is to educate its members and represent them to increase profitability.  Many of the association's members use glyphosate on their wheat products (including right before harvest), a portion of which makes its way into California.

17.     Plaintiff Missouri Chamber of Commerce and Industry is Missouri's largest business organization.  The Missouri Chamber works with all of its member organizations to protect their interests and address their concerns regarding economic and policy issues.  Its members include entities involved in farming and food production.  Glyphosate-treated crops that are produced, processed, and stored by its members are milled and refined into food, a portion of which is sold in California.  Further, the Missouri Chamber has members that are involved in the processing and storage of crops treated with glyphosate.

18.     Plaintiff Monsanto Company (Monsanto) is a corporation headquartered in St. Louis, Missouri and incorporated in Delaware.  Monsanto is the leading manufacturer of the herbicide glyphosate, which is a main ingredient in Monsanto's Roundup® branded line of products.  Monsanto also maintains patents covering many varieties of glyphosate-tolerant crops, which Monsanto has obtained federal approval to plant and market along with glyphosate itself. Monsanto distributes multiple glyphosate-tolerant crops, including soybeans, corn, canola, alfalfa, sugar, beets, and cotton throughout California and the United States.  Monsanto and its business partners also distribute glyphosate-based herbicides in California and throughout the United States, including to municipal, county, and other government agencies, to control vegetation in utility right-of-ways, along roadsides and railways, in aquatic environments, in residential home and garden settings, and to reduce the risk associated with the rapid spread of wildfires.

19.     Plaintiff Associated Industries of Missouri is the oldest general business trade association in Missouri.  Its mission is to promote a favorable climate for business, manufacturing, and industry by empowering its members through communications, education, and advocacy.  More than half of this association's members are manufacturers, many of whom are in the direct business of manufacturing products that contain glyphosate.  The Associated

1   Industries of Missouri also has many food producer members who produce products with trace

2   amounts of glyphosate residues, a portion of which are sold in California.

3        20.     Plaintiff Agribusiness Association of Iowa is an Iowa-based organization with

4   over 1,100 members.  Among other things, this organization protects the reputation of its

5   members and advances their business interests.  More than half of this organization's members

6   are agricultural retailers, such as cooperatives and independent retailers who sell agronomy

7   products or who have grain storage facilities or are in the business of manufacturing.  Glyphosate

8   is very important to this organization's members, many of whom sell the herbicide or use it as

9   their primary weed control product.

10        21.     Defendant Lauren Zeise is the Director of OEHHA and is its highest-ranking

11   administrative officer.  Director Zeise is sued in her official capacity.  She performs her official

12   duties in Sacramento.  Director Zeise shall be referred to as OEHHA.

13        22.     Defendant Xavier Becerra is the Attorney General of the State of California and

14   the highest-ranking officer in the California Department of Justice.  Attorney General Becerra is

15   sued in his official capacity.  He performs his official duties in Sacramento and throughout the

16   State of California.

17   **JURISDICTION AND VENUE**

18        23.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, which confers

19   original jurisdiction on federal district courts over actions arising under the Constitution or laws

20   of the United States.

21        24.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2), because Defendants are

22   located within this district and a substantial part of the events giving rise to Plaintiffs' claims

23   occurred in this district.

24   **FEDERAL REGULATORY FRAMEWORK**

25        25.     Federal law comprehensively regulates the sale and use of herbicides, including

26   their labeling and permissible presence on food.  Likewise, the federal government extensively

27   regulates the labeling of food products.

28

A.    **FIFRA**

26.    Under FIFRA, all commercial herbicides must be "registered" with EPA. 7 U.S.C. § 136a(a).  Before EPA grants a registration, it must determine that the herbicide will not cause "unreasonable adverse effects on the environment" or "human dietary risk." *Id*. §§ 136(bb), 136a.  EPA's review extends not only to the herbicide itself, but to formulations and particular uses of the herbicide.  *See generally id.* § 136a; 40 C.F.R. pt. 152.  EPA also evaluates each specific use of the herbicide (*i.e.*, its use on each particular type of crop) and, when necessary, prescribes use restrictions to protect human health and the environment.  *See* 7 U.S.C. §§ 136(bb), 136a(a).  EPA's extensive scientific safety review includes an evaluation of whether the herbicide is potentially carcinogenic.  *See, e.g.*, EPA, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005), https://www.epa.gov/sites/production/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf.

B.    **The FDCA**

27.    The FDCA prohibits "misbranding" of food products.  21 U.S.C. § 331(a).  A food product is misbranded if, among other things, "its labeling is false or misleading in any particular."  *Id.* § 343(a).  "Many statements," including those that are "incomplete" or even "true" can "be misleading."  *United States v. Watkins*, 278 F.3d 961, 967 (9th Cir. 2002).

28.    The FDCA also regulates the presence of herbicides on foods.  The FDCA deems "unsafe foods" to be "adulterated," 21 U.S.C. § 342(a), and renders their distribution in interstate commerce unlawful, *id.* § 331(b).  The statute specifically provides, however, that a food will not be deemed "unsafe" due to the presence of herbicide residue in a quantity within the limits of an EPA-established "tolerance for such pesticide chemical residue in or on such food." *Id.* § 346a(a)(1)(A).  In evaluating appropriate tolerances, EPA specifically evaluates the human health impact of the presence of an herbicide residue, including potential carcinogenicity. *Id.* § 346a(b)(2)(A)(ii).  EPA has set comprehensive tolerances for glyphosate, covering relevant U.S. crops and food inputs.  40 C.F.R. § 180.364.

29.    While the FDCA comprehensively regulates permissible herbicide residues in food for safety, it also explicitly provides that disclosure of such safe residue amounts to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1    consumers purchasing food products is *not* required.  21 U.S.C. § 343(l), (k).  States are barred

2    under the FDCA from "prohibit[ing] or penaliz[ing] the production, processing, shipping, or

3    other handling of a food because it contains a pesticide residue."  *Id.* § 346a(n)(4).  And States

4    may not "enforce any regulatory limit on the *level* of a pesticide chemical residue that may

5    appear in or on any food if, at the time of the application of the pesticide that resulted in such

6    residue, the sale of such food with such residue level was lawful" under the FDCA.

7    *Id.* § 346a(n)(7) (emphasis added).

8                              **FACTUAL BACKGROUND**

9         **A.    Overview Of Glyphosate**

10        30.    Glyphosate is a broad-spectrum herbicide that is used to control weeds in a

11   variety of agricultural, residential, aquatic, and other settings.  Since it was first introduced in

12   1974, glyphosate has become the world's most widely used herbicide because it is efficacious,

13   economical, and environmentally benign.  Glyphosate is marketed under a number of trade

14   names and is registered for use as an herbicide in more than 160 countries, including the United

15   States.  The "environmentally benign" glyphosate has, over the past several decades,

16   substantially displaced other herbicides which were perceived to pose environmental, health, or

17   safety risks.  *See* Jorge Fernandez-Cornejo et al., U.S. Dep't of Agric., *Pesticide Use in U.S.*

18   *Agriculture:    21    Selected    Crops,    1960-2008*,    at    21    (May    2014),

19   https://www.ers.usda.gov/webdocs/publications/43854/46734_eib124.pdf.

20        31.    Glyphosate is approved for use in more than 250 agricultural crop applications in

21   California and elsewhere.  It is used on the vast majority of corn, soybean, and canola crops

22   across the United States.  It is also widely used on Canadian crops—including oats—and in

23   conjunction with the cultivation of wheat, beans, peas, and other crops in many locations.  It is

24   also used in conjunction with cultivation of almond, citrus, cotton, and other crops in California.

25   Glyphosate-based herbicides are particularly desirable in the agricultural setting because of their

26   broad-spectrum effectiveness, which allows farmers to control weeds with minimal tilling of soil

27   (a practice known as conservation tilling), thereby conserving valuable topsoil, reducing soil

28   movement into streams and other surface water, and retaining soil moisture.  The scientific

literature has expressly recognized these environmental benefits of using glyphosate, and has explained why these practices are preferable to traditional means of cultivation, which involve multiple other potentially significant impacts.  *See*, *e.g.*, Stephen O. Duke & Stephen B. Powles, *Mini-Review Glyphosate: A Once-in-a-Century Herbicide*, 64 Pest Mgmt. Sci. 319, 322 (2008).

32.     Glyphosate-based herbicides are also widely used—including by municipal, county, and California government agencies—to control vegetation in utility right-of-ways, along roadsides and railways, in aquatic environments, in residential home and garden settings, and to reduce the risk associated with the rapid spread of wildfires.  In addition, glyphosate-based herbicides are used by wildlife organizations to protect and restore wildlife habitats threatened by invasive, non-native vegetation.  For example, a glyphosate-based herbicide is used to control arundo donax (giant reed) in central California's river valleys; arundo donax is a highly invasive weed that threatens California's riparian ecosystems by competing with native species, such as willows, for water.

33.     For many applications, glyphosate is the most effective and reliable weed control option.  Indeed, very few herbicides other than glyphosate are approved by EPA for use in aquatic environments.

**B.     Glyphosate Has Been Widely Recognized To Be Non-Carcinogenic**

34.     Glyphosate has been recognized as a safe herbicide for over 40 years by EPA, regulators across the globe, and even OEHHA.  Because of its immense popularity, glyphosate is one of the most extensively studied herbicides in the world and has been subject to hundreds of safety studies by the world's most prominent and authoritative sources.

35.     Glyphosate was first registered in the United States as an herbicide in 1974.  In 1991, EPA conducted a peer review of glyphosate under FIFRA and, in 1993, approved the renewal of its registration.  At the time EPA concluded that:

> Several chronic toxicity/carcinogenicity studies . . . resulted in no effects based on the parameters examined, or resulted in findings that glyphosate was not carcinogenic in the study.  In June 1991, EPA classified glyphosate as a Group E oncogen—one that shows evidence of non-carcinogenicity for humans—based on the lack of convincing evidence of carcinogenicity in adequate studies.

1    EPA, Reregistration Eligibility Decision (RED): Glyphosate, EPA-738-F-93-011, at 2 (1993).

2        36.     EPA has reaffirmed this conclusion more recently.  In relevant part:

3
4
5
6

> [In 2014], EPA reviewed over 55 epidemiological studies conducted on the possible cancer and non-cancer effects of glyphosate.  Our review concluded that this body of research does not provide evidence to show that glyphosate causes cancer and it does not warrant any change in EPA's cancer classification for glyphosate.

7    Statement of Carissa Cyran, Chem. Review Mgr., EPA Office of Pesticide Programs (2015).

8        37.     This view of glyphosate's safety is widely shared by the international community.

9 In 2002, for instance, the Health and Consumer Protection Directorate-General of the European

10 Commission conducted a review of glyphosate for its re-registration for use in Europe and

11 likewise concluded there was "[n]o evidence of carcinogenicity."  Health & Consumer Prot.

12 Directorate – Gen., European Comm'n, *Report for the Active Substance Glyphosate*, Directive

13 6511/VI/99, at 12 (Jan. 21, 2002).  The same agency reaffirmed that conclusion on July 11, 2016.

14        38.     Germany's Federal Institute for Risk Assessment—BfR—also recently reviewed

15 glyphosate.  In December 2013 it submitted a glyphosate Renewal Assessment Report to the

16 European Food Safety Authority recommending re-approval of glyphosate for use in Europe.

17 The Report was revised in 2014 and again in 2015 in response to comments, and in it BfR

18 concluded that glyphosate was "unlikely to pose a carcinogenic risk in humans."  *See* BfR,

19 *Renewal Assessment Report and Proposed Decision – Volume 1*, at 35 (Mar. 31, 2015).  More

20 emphatically, BfR found that:

21
22
23

> In epidemiological studies in humans, there was no evidence of carcinogenicity and there were no effects on fertility, reproduction and development or of neurotoxicity that might be attributed to glyphosate.

*Id.* at 36.

24
25        39.     The European Food Safety Authority (EFSA) concurred with BfR's assessment.

26 It evaluated BfR's findings and "concluded that glyphosate is unlikely to pose a carcinogenic

27 hazard to humans and the evidence does not support classification with regard to its carcinogenic

28 potential."  EFSA, Abstract, *Conclusion on the Peer Review of the Pesticide Risk Assessment of*

*the   Active   Substance   Glyphosate*,   at   1   (Nov.   12,   2015), http://onlinelibrary.wiley.com/doi/10.2903/j.efsa.2015.4302/epdf.

40.   Other similar conclusions abound.   Canada's Pest Management Regulatory Agency concluded *in April 2017* that "Glyphosate is not genotoxic and is unlikely to pose a human cancer risk."   The European Chemical Agency Committee for Risk Assessment concluded *in March 2017* that "the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen, as a mutagen or as toxic for reproduction."   Korea's Rural Development Administration observed that "animal testing found no carcinogenic association and health risk of glyphosate on farmers was low."   Australia's Pesticides and Veterinary Medicines Authority found that "Glyphosate does not pose a cancer risk to humans when used in accordance with the label instructions."   New Zealand's Environmental Protection Authority concluded that "Glyphosate is unlikely to be genotoxic or carcinogenic."   And when Japan's Food Safety Commission studied the substance, "[n]o neurotoxicity, carcinogenicity, reproductive effect, teratogenicity or genotoxicity was observed."   Similarly, in May 2016, the Joint FAO/WHO Meeting on Pesticide Residues (JMPR) found that "[g]lyphosate is unlikely to pose a carcinogenic risk to humans from exposure through the diet."   JMPR, *Summary Report* (May 16, 2016), http://www.who.int/foodsafety/jmprsummary2016.pdf.   *In sum, no regulatory agency, domestic or international, has found over its decades of safe use that glyphosate causes cancer*.

41.   Indeed, e*ven California itself, through OEHHA*, has concluded that glyphosate is non-carcinogenic.   In 1997 and 2007, OEHHA conducted risk assessments for glyphosate in drinking water in order to set public health goals, including evaluation of glyphosate's potential carcinogenicity.   OEHHA reviewed several studies in which glyphosate was administered to rats and mice, including the *same* studies (or reviews of those studies) IARC later used to reach its own conclusion.   Based on its review of those studies and other data, OEHHA concluded that there was no evidence demonstrating that glyphosate causes cancer.   *See, e.g.*, OEHHA, *Public Health Goal for Chemicals in Drinking Water: Glyphosate*, at 1 (June 2007) ("Based on the weight of the evidence, glyphosate is judged unlikely to pose a cancer hazard to humans.").   In

1   short, it is definitively untrue that glyphosate "is known to the State of California to cause

2   cancer."

3      **C.     IARC**

4          42.   IARC is an international organization based in Lyon, France.  It is not a regulator.

5   Instead, IARC prepares so-called informational "Monographs" regarding the possibility that

6   everyday products and substances may be carcinogenic.  IARC is perhaps most famous (or

7   infamous) for its conclusions that substances like coffee, aloe vera, pickled vegetables, and food

8   exposed to "high temperatures"—such as French fries—are probably or possibly carcinogenic.

9   *See, e.g.*, Akshat Rathi & Gideon Lichfield, *Why it Sometimes Seems Like Everything Causes*

10  *Cancer*, Quartz (June 23, 2016) ("[O]f all the things the IARC has looked at, there is just *one* it is

11  pretty sure *doesn't* cause cancer." (emphases added)), https://qz.com/708925/why-it-sometimes-

12  seems-like-everything-causes-cancer/.

13         43.   IARC's pronouncements have been factually controversial among the scientific

14  and public health communities.  This is certainly the case for glyphosate, which IARC classified

15  as "probably carcinogenic to humans" in March 2015.  Among toxicology and regulatory

16  experts, who take great care not to exaggerate or inflame public understanding of cancer risks,

17  there has been extensive public criticism of IARC's recent glyphosate conclusions.

18         44.   For example, following IARC's determination, EPA Deputy Director for

19  Pesticide Programs, William Jordan, testified before the U.S. Senate Committee on Agriculture,

20  Nutrition and Forestry and reaffirmed EPA's longstanding non-carcinogenic conclusion for

21  glyphosate.  In that same Committee hearing, the Chief Physician at MassGeneral Hospital for

22  Children observed that IARC's recent contrary conclusion was "not supported by the data," and

23  "flies in the face of comprehensive assessments from multiple agencies globally."  More

24  recently, EPA "reviewed and analyzed the results of 15 rodent bioassays and concluded that the

25  results as a whole do not indicate carcinogenicity of glyphosate."  FIFRA Sci. Advisory Panel,

26  EPA, *Meeting      Minutes      and      Final      Report      No.      2017-01*,      at      17

27   (Mar. 16, 2017), https://www.epa.gov/sites/production/files/2017-03/documents/december_13-

28  16_2016_final_report_03162017.pdf.

45.    Germany's national regulator BfR also publicly stated that, despite IARC's contrary designation, it continued to assess "glyphosate as non-carcinogenic."  BfR, *Does Glyphosate Cause Cancer?*, BfR Communication No. 007/2015, at 1 (Mar. 23, 2015).  In rebutting IARC's assessment, BfR noted that it "has compiled the most comprehensive toxicological database, presumably worldwide, for glyphosate" and "BfR thinks that the entire database must be taken into account for toxicological evaluation and risk assessment of a substance and not merely a more or less arbitrary selection of studies," as was the case with IARC. *Id.*

46.    The European Union's regulatory agency, EFSA, likewise rebutted IARC's contrary classification and set forth several reasons similar to BfR's for its disagreement.  EFSA, Abstract, *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, at 11 (Nov. 12, 2015), http://onlinelibrary.wiley.com/doi/10.2903/j.efsa.2015.4302/epdf.

47.    Indeed, although IARC is part of the World Health Organization (WHO), the WHO itself has separately, and repeatedly, concluded that "glyphosate is *unlikely* to pose a carcinogenic risk to humans," including in a 2016 review and conclusion after the IARC classification.  *See supra* at ¶ 40; *see also* FAO/WHO, *Pesticide Residues in Food – 2004, Part II:  Toxicological*, at 158 (2004) (emphasis added), http://apps.who.int/iris/bitstream/10665/43624/1/9241665203_eng.pdf; WHO, *Glyphosate and AMPA in Drinking Water: Background Document for Development of WHO Guidelines for Drinking-Water Quality*, at 5 (June 2005) ("[n]o effect on survival" in glyphosate "carcinogenicity study"); WHO/Int'l Programme on Chem. Safety, *Environmental Health Criteria 159: Glyphosate*, at 15 (1994) ("The available studies do not indicate that technical glyphosate is mutagenic, carcinogenic or teratogenic.").  In other words, of the four subgroups within WHO that have looked at the carcinogenicity of glyphosate, three of them have determined glyphosate is *not carcinogenic*; IARC stands alone in its opinion otherwise.

48.    Most recently, a report was published just last week in the Journal of the National Cancer Institute on the largest and longest study to *ever* analyze human glyphosate exposure and

1    cancer—the Agricultural Health Study (AHS), sponsored by the U.S. National Institutes of

2    Health, National Cancer Institute, and the National Institute of Environmental Health Science,

3    among others.  *See* Gabriella Andreotti et al., *Glyphosate Use and Cancer Incidence in the*

4    *Agricultural Health Study*, JNCI: Journal of the National Cancer Institute (Nov. 9, 2017),

5    https://academic.oup.com/jnci/article/doi/10.1093/jnci/djx233/4590280.  The AHS has analyzed

6    health effects—including multiple cancers—in over 54,000 pesticide applicators (one of if not

7    the most highly exposed human populations to glyphosate) over the course of three decades.  As

8    first reported from that study in 2005 and confirmed again just now in 2017 with additional data

9    support, the study found "*no evidence of any association* between glyphosate use and risk of any

10   solid tumors or lymphoid malignancies, including NHL (non-Hodgkin lymphoma) and its

11   subtypes."  *Id.* (emphasis added).

12        49.    Not only is there widespread disagreement with IARC's controversial glyphosate

13   conclusions, there has also been significant and widespread criticism of IARC's internal

14   processes and potential conflicts of interest.  In addition to the regulatory agencies, discussed

15   *supra*, who have noted that IARC arbitrarily refused to review certain highly relevant studies

16   about glyphosate, there are recent reports that IARC's own scientists purposely withheld key

17   data from the IARC team addressing glyphosate.

18        50.    For example, according to recent articles in Reuters and many other publications,

19   court documents reflect that Aaron Blair—the chair of the IARC "working group" that produced

20   the glyphosate finding—knew about unpublished research (notably, a 2013 draft report of the

21   AHS study) finding no evidence of a link between glyphosate and cancer, but concealed this

22   evidence from his colleagues.  According to these reports, Blair also admitted that the research, if

23   presented, would have undercut IARC's cancer classification.  Kate Kelland, *Cancer Agency Left*

24   *in   the   Dark   over   Glyphosate   Evidence*,   Reuters   (June   14,   2017),

25   https://www.reuters.com/investigates/special-report/glyphosate-cancer-data/.   And   another

26   scientist who was advising IARC when it published its dubious finding, Christopher Portier,

27   reportedly concealed that he was paid $160,000 from law firms bringing claims by cancer

28   victims against glyphosate manufacturers.  *See* Ben Webster, *Weedkiller Scientists Was Paid*

*£120,000 by Cancer Lawyers*, The Times (Oct. 18, 2017), https://www.thetimes.co.uk/article/weedkiller-scientist-was-paid-120-000-by-cancer-lawyers-v0qggbrk6.  In deposition testimony for other litigation Portier reportedly conceded that this might present "a conflict of interest" and that even *he* "would have concern" stating that glyphosate "100 percent" causes cancer.  And others have reported that IARC conspicuously and inexplicably removed "multiple scientists' conclusions that their studies had found no link between glyphosate and cancer" between a draft version of IARC's report and the final version.  *See* Kate Kelland, *In Glyphosate Review, WHO Cancer Agency Edited out "Non-Carcinogenic" Findings*, Reuters (Oct. 19, 2017), https://www.reuters.com/investigates/special-report/who-iarc-glyphosate/.

51.     In light of these revelations, it is no wonder that even the progressive periodical, *Mother Jones*, which frequently champions strict regulation of materials posing environmental and health risks, has questioned the integrity of IARC's practices.  Kiera Butler, *A Scientist Didn't Disclose Important Data – and Let Everyone Believe a Popular Weedkiller Causes Cancer*, Mother Jones (June 15, 2017), http://www.motherjones.com/environment/2017/06/monsanto-roundup-glyphosate-cancer-who/.

52.     Indeed, in the past, OEHHA personnel have themselves raised concerns about the IARC process: "IARC *Monographs* do not undergo public review and are designed to reflect the opinion of convened experts, there is no opportunity to correct errors in judgment."  Other independent scientists have made similar claims.  *See, e.g.*, Joseph K McLaughlin et al., *Problems with IARC's 'Expert' Working Groups*, 40 Int'l J. Epidemiology 1728, 1728 (Nov. 2011) ("They are clearly not disinterested evaluators of the research evidence being considered, as much of it represents their own work.").

D.     **Proposition 65 & IARC**

53.     In 1986, the California voters, by initiative, enacted the Safe Drinking Water and Toxic Enforcement Act of 1986—commonly known as Proposition 65.  In general, Proposition 65 prohibits businesses from both exposing California residents to chemicals known to the State to cause cancer without providing required warnings, and from knowingly discharging a

1  chemical known to the state to cause cancer into the environment where the chemical passes or

2  will probably pass into a source of drinking water.  Cal. Health & Safety Code §§ 25249.5,

3  25249.6.

4         54.    Mechanically, the Proposition 65 process works as follows:

5         55.    OEHHA is required to maintain "a list of those chemicals known to the state to

6  cause cancer." *Id.* § 25249.8(a).

7         56.    Proposition 65 then provides a number of mechanisms by which OEHHA is

8  directed to perform this listing function and, as relevant here, provides that OEHHA's "list shall

9  include at a minimum those substances identified by reference in Labor Code Section

10  6382(b)(1)." *Id.*   Section 6382(b)(1) of the Labor Code in turn references—as it did when

11  Proposition 65 was enacted—"[s]ubstances listed as human *or animal* carcinogens by the

12  International Agency for Research on Cancer."  Cal. Labor Code § 6382(b)(1) (emphasis added).

13  It is not clear whether, when Proposition 65 was passed, this cross-reference was designed to

14  incorporate only those substances IARC had *already* listed, or to force continual updating to

15  incorporate all chemicals IARC might at some future time designate (if and until the organization

16  dissolves).  By regulation, however, OEHHA has taken the latter approach.  27 Cal. Code Regs

17  § 25904.  This approach has been approved as a matter of statutory interpretation but without

18  considering its constitutionality.  *See Cal. Chamber of Commerce v. Brown*, 196 Cal. App. 4th

19  233 (2011).

20         57.    OEHHA has described its process for listing a chemical found by IARC to be

21  potentially carcinogenic as "ministerial" and essentially automatic.  OEHHA publishes a "Notice

22  of Intent to List" a chemical and provides a 30-day period for comment on whether or not the

23  chemical "has been identified by reference in Labor Code section 6382(b)(1)," 27 Cal. Code

24  Regs § 25904(c)—in other words, whether IARC has determined that the chemical is potentially

25  carcinogenic.  The regulations make plain that the scope of comments is limited: OEHHA "shall

26  not consider comments related to the underlying scientific basis for classification of a chemical

27  by IARC as causing cancer."  *Id.*  Thus, there is no opportunity to contest IARC's findings, no

28  matter how clearly erroneous.

58.     Once a chemical is listed and after a 12-month grace period, the statute requires that any "person in the course of doing business" provide a "clear and reasonable warning" before "expos[ing] any individual to" the listed chemical.   Cal. Health & Safety Code § 25249.10(b).  As a practical matter, this means that affected entities must take action far earlier than the warning's effective date.  *See infra* ¶¶ 71-87 (discussing impacts of listing).

59.     Although Proposition 65 does not define precisely what content suffices to convey a "clear and reasonable warning," OEHHA's regulations have for almost 30 years provided what the cancer warning should convey: "WARNING: This product contains a chemical known to the State of California to cause cancer."  27 Cal. Code Regs § 25603.2. Indeed, no matter what words are used, "[t]he message must clearly communicate that the chemical in question is known to the state to cause cancer." *Id.* § 25601.

60.     Proposition 65 also provides an affirmative defense in an enforcement action to enforce the warning requirement if "the person responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer."  Cal Health & Safety Code § 25249.10(c).  For some listed substances, OEHHA will make its own determination of a "No Significant Risk Level" (NSRL), commonly referred to as a "safe harbor."  But the NSRL provides only an "affirmative defense" to liability under Proposition 65, it does not immunize industry from enforcement actions in the first instance.  *See DiPirro v. Bondo Corp.*, 153 Cal. App. 4th 150, 185 (2007).  No NSRL for glyphosate is in place at this time.

61.     Proposition 65 has a multi-faceted enforcement scheme.  First, the Attorney General, a district attorney, or a variety of local government attorneys may bring an enforcement action under Cal. Health & Safety Code § 25249.7(c).  The statute imposes penalties up to $2,500 *per day* for *each* violation, and provides for recovery of attorneys' fees.  In addition to these penalties, the statute also provides that any person who "*threatens* to violate" the warning requirement may be "enjoined in a court of competent jurisdiction." *Id.* § 25249.7(a) (emphasis added).  The Attorney General of California and other California public officials have a long history of enforcing Proposition 65's warning requirement.

62. Second, any *person* (even with no injury in fact) may bring a private enforcement action for an alleged failure to provide an adequate warning. *Id.* § 25249.7(d). The same civil penalties and attorneys' fees scheme applies in these suits, creating very strong incentives for private enforcement.

63. Indeed, the private enforcement mechanism allows any person or law firm to act as a "bounty hunter" and prosecute any alleged violations of Proposition 65. Wide-scale abuse of the Proposition 65 regime through "strike suits" by bounty hunters is broadly recognized. *See, e.g.*, Anthony T. Caso, *Bounty Hunters and the Public Interest—A Study of California Proposition 65*, 13 Engage 30, 31 (Mar. 2012) (describing case in which "law firm created an 'astroturf' environmental group to be a plaintiff in Proposition 65 litigation," which group "consisted of partners from the law firm" and which "sent out hundreds of demand letters charging businesses with failure to provide warnings" and "extort[ing] payments of attorney fees or contributions to the front group").

64. Significantly, even when OEHHA has set a "safe harbor" NSRL purporting to set a State-based tolerance or limit for chemical residues and exposure, the risk of enforcement persists. Even with such a safe harbor in place, the defendant still bears the burden of establishing as an affirmative defense that the exposure fell within the safe harbor. Cal. Health & Safety Code § 25249.10(c). A Proposition 65 plaintiff need only allege possible exposure to a listed substance, he need *not* prove that an established NSRL is not satisfied. *Consumer Cause, Inc. v. SmileCare*, 91 Cal. App. 4th 454, 474 (2001). And litigating this defense is a costly and time-consuming endeavor. *See, e.g.*, *Envtl. Law Found. v. Beech-Nut Nutrition Corp.*, 235 Cal. App. 4th 307, 314 (2015) (safe harbor defense litigated at trial); *Council for Educ. & Research on Toxics v. Starbucks Corp.*, No. BC435759 (Cal. Super. Ct., June 2, 2017) (rejecting Starbucks's "no significant risk level" defense at summary judgment). In other words, a safe harbor does not effectively deter a private party with significant financial incentives from initiating suit in the hopes of collecting a settlement.

65. The California courts have recognized how onerous strike suits can be for industry. "[L]awsuits under Proposition 65 can be filed and prosecuted by any person against

1  any business based on bare *allegations* of a violation unsupported by any evidence of an actual

2  violation—or even a good faith belief that a defendant is using an unsafe amount of a chemical

3  known by the state to cause cancer." *SmileCare*, 91 Cal. App. 4th at 477 (Vogel, J., dissenting)

4  (emphasis in original).  This burden-shifting regime results in "judicial extortion" where bounty-

5  hunting plaintiffs bring Proposition 65 claims, admitting they have no specific evidence of any

6  danger, and force the defendant to settle to avoid legal fees and the costs of performing an

7  expensive expert scientific assessment.  *Id*. at 477-79.

8      66.   A long history of these strike suits demonstrates what typically happens in

9  practice: in the face of this litigation threat, businesses are forced to simply acquiesce and post a

10  warning, regardless of the fact that those businesses know the warning is affirmatively false and

11  misleading.  *See* All. for Nat. Health, *Proposition 65: Evaluating Effectiveness and a Call for*

12  *Reform*, at 7, https://www.anh-usa.org/wp-content/uploads/2015/09/Prop-65.pdf (last accessed

13  Nov. 9, 2017); *see also,* LATIMES, *Warning: Too Many Warning Signs are Bad for Your Health*

14  (Sept. 30, 2017), (noting "Starbucks, Whole Foods and about 80 other places in California that

15  sell coffee" are exposed under Proposition 65 even though "research increasingly" indicates

16  coffee does *not* cause cancer), http://beta.latimes.com/opinion/editorials/la-ed-proposition-65-

17  warning-coffee-20170930-story.html; Richard Berman, *Thanks to a Poorly-Designed Law,*

18  *California Classifies Soft Drinks as a Cancer Risk*, Forbes (Feb. 20, 2014) (compelling warnings

19  for soda drinks on the basis that if consumers drink "over 1,000 sodas a day" they would have

20  increased cancer risk); Greg Ryan, *Rice Sellers Threatened with Prop 65 Suits over Lead,*

21  *Arsenic*, Law360 (Feb. 20, 2014).

22      67.   Many hundreds of Proposition 65 strike suits have been filed in the past.  Such

23  suits are often filed against defendants regarding a given chemical immediately after the

24  Proposition 65 warning requirement for that chemical goes into effect.

25      **E.**   **Proposition 65 Listing Of Glyphosate**

26      68.   Despite the overwhelming contrary views of the U.S. government, the

27  international community, and even OEHHA that glyphosate is not carcinogenic, on July 7, 2017,

28  California finalized its listing of glyphosate under Proposition 65 as a chemical "known to the

1  state to cause cancer."   As the basis for the listing, California relied exclusively on IARC's

2  flawed determination, discussed *supra* at ¶¶ 42-52, that glyphosate is a "*probabl[e]*

3  *carcinogen[].*"   OEHHA explained that glyphosate met the requirements for listing simply

4  because (1) *IARC* classified glyphosate as a "probabl[e] carcinogen[]," and (2) *IARC* concluded

5  that there was "sufficient evidence" of carcinogenicity in experimental animals.   IARC

6  Monograph Vol. 112 at 398; *see also* 27 Cal. Code Regs § 25904(b).   That is, California—

7  through Proposition 65—is now requiring industry to state that glyphosate is "**known**" to cause

8  cancer even though (a) *no one* has ever reached that conclusion and (b) even IARC concluded

9  only that it is "**probably**" carcinogenic, a conclusion which IARC itself admits has "no

10  quantitative significance" and should not be viewed (and hence used) as a recommendation for

11  legislation or regulation.  *See* IARC, *IARC Monographs on the Evaluation of Carcinogenic Risk*

12  *to       Humans:       Preamble*,       at       22       (2006),

13  http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

14       69.   Despite 9,183 comments being filed—many of which informed OEHHA that the

15  IARC determination was flawed and should not be relied upon—OEHHA disclaimed any ability

16  to address the underlying scientific dispute or reassess "the weight or quality of the evidence

17  considered by IARC."  *See* OEHHA, *Notice of Intent to List: Tetrachlorvinphos, Parathion,*

18  *Malathion, Glyphosate* (Sept. 4, 2015), https://oehha.ca.gov/proposition-65/crnr/notice-intent-

19  list-tetrachlorvinphos-parathion-malathion-glyphosate.

20       70.   Past Proposition 65 litigants are already threatening new Proposition 65 lawsuits

21  regarding glyphosate, "urg[ing]" companies to "phas[e] out the use of glyphosate," and

22  highlighting the "risk of legal action."  *See, e.g.*, Letter from Austin Wilson, Environmental

23  Health Program Manager of 'As you Sow,' to Denise Morrison, CEO, Campbell Soup Company

24  (Oct. 5, 2016).

25       **THREATENED IMPACTS OF CALIFORNIA'S LISTING OF GLYPHOSATE**

26       71.   Without relief, California's listing of glyphosate and its attendant false warning

27  requirement threaten widespread impacts in California and across the U.S.  These impacts would

28  be felt in multiple different contexts.

72.     Under federal law, foods made with crops treated with glyphosate are permitted to contain certain trace levels of glyphosate residues.  For entities that sell into California finished food products made with glyphosate-treated crops—like members of Plaintiffs Missouri Chamber of Commerce and Industry and Associated Industries of Missouri—California's listing of glyphosate as a carcinogen will force them to take one of three courses of action: (1) include the false and disparaging glyphosate warning for their products, which likely will diminish demand for those products; (2) engage in costly testing to demonstrate that exposure from any glyphosate residues in their products invariably falls below any established NSRL safe harbor (or impose those testing requirements on their suppliers) and even so still face the likely prospect of expensive enforcement actions; or (3) stop using glyphosate-treated crops as inputs for their food products sold to California.  Food producers need to begin making these decisions and communicating them through the supply chain imminently.

73.     Entities that farm and process crops for integration into finished food products that are sold into California face similar burdens from California's listing of glyphosate.  With the threat of enforcement under Proposition 65, a number of grain handlers and finished food producers will require that farmers providing inputs for food products destined for California either not use glyphosate on their crops or certify that their crops do not contain glyphosate residues beyond particular levels, which will in turn require expensive testing, segregation of glyphosate-treated crops from non-glyphosate-treated crops, or a halt on using glyphosate at all—each an undesirable option and one that comes at considerable expense.  This will dramatically affect the practices of farmers across the country, including members of Plaintiffs National Association of Wheat Growers, National Corn Growers Association, United States Durum Growers Association, Missouri Farm Bureau, Iowa Soybean Association, North Dakota Grain Growers Association, and Missouri Chamber of Commerce and Industry.  These entities and their members need to begin planning for the impacts of Proposition 65 immediately.

74.     The issues facing food producers and farmers are not merely hypothetical, but in fact are already being borne out in the supply chain.  For example, Plaintiff National Association of Wheat Growers' members sell their crops to common elevators or milling facilities, which

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1   then turn the wheat into flour that is incorporated into products sold in California.   The

2   association's members have already been told by millers that because millers do not want to test

3   for glyphosate residues themselves, this requirement will be imposed on the farmers.   Testing for

4   glyphosate residues is very expensive.

5       75.   The listing of glyphosate under Proposition 65 and the compelled glyphosate

6   warning requirement also broadly disparage Plaintiffs, Plaintiffs' members, and Plaintiffs'

7   members' food products and food inputs, by creating the false impression among consumers that

8   those products are unsafe.

9       76.   The listing of glyphosate under Proposition 65 will also impact sellers and

10  manufacturers of glyphosate.   Major municipal applicators, for example, have already expressed

11  that they will cease using glyphosate-based products.   *See* City of Burbank, 2017 City Council

12  Meeting – Joint, at 3:01:05 (July 11, 2017), *available at* http://burbank.granicus.com/—

13  MediaPlayer.php?view_id=6&clip_id=7943&meta_id=325562.

14      77.   Plaintiff Western Plant Health Association has members that sell glyphosate-

15  based products in California and that have already experienced reduced demand in California for

16  glyphosate-based products on account of the Proposition 65 listing, even though the false

17  warning requirement is not yet in effect.   And once that requirement goes into effect, such

18  members must either take action to communicate a false and highly controversial health warning

19  to consumers about the glyphosate products they sell, or face potential enforcement actions

20  seeking civil monetary penalties for failing to do so.   And even if OEHHA ultimately establishes

21  an NSRL, they would need to ensure that any exposures to glyphosate from their products fall

22  below that level, and even then would need to also prepare to defend against costly suits.

23      78.   Plaintiff Monsanto has already suffered—and will continue to suffer—significant

24  harm from the listing of glyphosate under Proposition 65.   Monsanto supplies glyphosate to

25  public and private entities in California, as well as California consumers, through multiple sales

26  channels.   Monsanto divides these sales channels into three market segments:   (i) Agricultural,

27  (ii) Industrial, Turf and Ornamental, and (iii) Lawn and Garden.   Monsanto sells glyphosate both

28  directly and through distributors and business partners.   All of these sales channels will be

1   impacted by glyphosate's listing and the false warning requirement.

2          79.     In the Agricultural segment, Monsanto sells glyphosate to agricultural wholesalers

3   which either re-sell glyphosate directly to farmers (to the extent they maintain retail locations) or

4   re-sell glyphosate to retailers who in turn sell the product to farmers.

5          80.     In the Industrial, Turf, and Ornamental (IT&O) segment, Monsanto sells

6   glyphosate through a joint venture to wholesale distributors, which in turn re-sell glyphosate to

7   California end users.   These distributors include both major, national distributors, including

8   "landscape supply" companies with storefronts across California, as well as small, independent

9   distributors.  Glyphosate is sold through this segment for use by professionals that perform weed

10  control activities in office parks, golf courses, residential areas, and other landscaped or grass-

11  covered areas.  Monsanto also sells glyphosate to professionals responsible for controlling weeds

12  on railroad rights of way, highways, roadside medians, and other rights of way and public

13  spaces.  Monsanto also sells glyphosate for aquatic applications in the control of weeds at the

14  edge of California water bodies.  Monsanto also sells glyphosate for use at California tree farms

15  and plant growth nurseries.

16         81.     In the Lawn and Garden segment, Monsanto sells glyphosate (through its agent)

17  to retailers in California, including hardware stores, home and garden stores, and independent

18  nurseries, as well as to distributors that re-sell glyphosate to retailers.  California retailers sell

19  Monsanto-produced glyphosate through storefronts directly to consumers, principally as

20  Roundup® branded products.   These retail storefronts stock glyphosate on shelves alongside

21  other consumer products, such as fertilizers and mulch.

22         82.     Also in the Lawn and Garden segment, Monsanto (through its agent) sells

23  glyphosate directly to California consumers over the Internet.  California consumers place orders

24  online, and have glyphosate, including Roundup® branded products, shipped directly to their

25  doors for home lawn and garden use.

26         83.     Because of California's listing of glyphosate, Monsanto must either take action to

27  provide false and highly controversial health warnings to California consumers about glyphosate

28  in its products, and work with its distributors and customers to do so, or face potential

enforcement actions seeking civil money penalties for failing to do so.  Even if OEHHA ultimately establishes an NSRL, Monsanto will still be injured because it will be forced to choose between applying, and working with its distributors and customers to apply, a false and highly controversial warning on its products, or undertaking costly risk assessments for all of its many glyphosate products to demonstrate that glyphosate exposures will invariably fall below the NSRL.  Monsanto would need to engage in this expensive risk assessment process for each anticipated use of glyphosate and glyphosate products.  And regardless of whether Monsanto's risk assessment indicates that a product or use will invariably fall below the NSRL, unless Monsanto complies with Proposition 65's false warning requirements, Monsanto would need to prepare to defend against likely enforcement actions, including private strike suits brought by rent-seeking litigants.

84.     Moreover, California's Proposition 65 listing of glyphosate and the false warning requirement broadly disparage Monsanto's glyphosate products and glyphosate tolerant seed products, causing harm to the company, its reputation, and the company's hundreds of millions of dollar investments in these products.

85.     Both the glyphosate Proposition 65 listing itself, and the required warning, are affirmatively and destructively misleading.  They create a misimpression among consumers that glyphosate is dangerous when all relevant regulators have found that it indisputably is *not*.  The disparagement of all products that contain glyphosate and all food products that may legally contain trace glyphosate residues—and the legal jeopardy hanging over retailers who carry them—has already adversely affected and unless enjoined will continue to adversely affect both the supply and demand for glyphosate and glyphosate-exposed products at all levels of the national distribution chain.

86.     All of Plaintiffs and Plaintiffs' members who sell products that contain glyphosate that ultimately end up in California desire that those products continue to be sold in California. None of those entities, however, wants to be forced to engage in false speech about products that contain glyphosate, or to have false warnings provided about products that contain glyphosate.

87.     An order enjoining and declaring invalid California's listing of glyphosate under

1    Proposition 65 and its attendant false warning requirement would redress the harms described

2    above.

**CLAIMS FOR RELIEF**

**CLAIM I: VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES**

**CONSTITUTION**

6        88.     The foregoing Paragraphs are incorporated by reference as if set forth in full

7    herein.

8        89.     The Free Speech Clause of the First Amendment of the United States Constitution

9    provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const.

10   amend. I.  The Fourteenth Amendment of the United States Constitution made this proscription

11   applicable to the States and their political subdivisions.  *See id.* amend. XIV, § 1.

12       90.     In addition to providing protections against restrictions on speech, the First

13   Amendment provides protection against the government *compelling* individuals or entities to

14   engage in speech.

15       91.     Under the First Amendment, laws compelling speech ordinarily receive strict

16   scrutiny.  *See Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977).  Laws regulating commercial

17   speech generally receive at least intermediate scrutiny, *i.e.*, they are prohibited if they do not

18   directly and materially advance the government's interest, or are more extensive than necessary.

19   *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).  And even

20   laws that require disclosure of information in connection with commercial transactions are

21   permissible only if the compelled disclosure is of information that is purely factual,

22   uncontroversially accurate, reasonably related to a substantial government purpose, and not

23   unduly burdensome or chilling.  *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626,

24   651 (1985); *Am. Beverage Ass'n v. City & Cty. of S.F.*, 871 F.3d 884, 892-93 (9th Cir. 2017);

25   *CTIA – Wireless Ass'n v. City & Cty. of S.F.*, 494 F. App'x 752, 753 (9th Cir. 2012).

26       92.     Contrary to the warning mandated by Proposition 65, glyphosate does not cause

27   cancer.

28       93.     Nor does California "know" that glyphosate causes cancer.  To the contrary, the

pertinent California agency—OEHHA—has twice determined that it does not, and California conducted no independent analysis to verify IARC's outlier contrary conclusion.   In fact, California, through OEHHA, affirmatively disclaimed the ability to conduct any such analysis.

94.   Every major and credible scientific body to consider the issue disagrees with IARC's determination.

95.   Moreover, even IARC itself has not said that it "knows" that exposure to glyphosate causes cancer in humans.   The most it has said is that glyphosate is "*probably carcinogenic*."

96.   The Proposition 65 glyphosate warning mandate thus compels speech that is false and misleading.

97.   At the very least, the Proposition 65 glyphosate warning mandate compels speech that is factually controversial.

98.   Because Proposition 65's compelled glyphosate warning is false, misleading, or factually controversial, it cannot survive any level of constitutional scrutiny.  *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009) ("[T]he State has no legitimate reason to force retailers to affix false information on their products.").

99.   Proposition 65's glyphosate warning mandate constitutes impermissible compelled speech under the First Amendment to the U.S. Constitution.

100.   Plaintiffs consist of entities and members who have already been harmed by California's false, misleading, and highly controversial listing of glyphosate as a known carcinogen, and will be injured further if forced to either comply with Proposition 65's compelled false warning requirement, or incur other costly burdens and face the threat of bounty hunter suits or other enforcement actions.

**CLAIM II: VIOLATION OF THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION**

101.   The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

102.   Article VI, Clause 2 of the United States Constitution provides that "the laws of

1   the United States . . . shall be the supreme law of the land."  Under the Supremacy Clause, state

2   laws that conflict with federal law are preempted and are thus without effect.  Preemption can be

3   express, as when a federal law declares that it preempts state laws, or implied.  State laws are

4   impliedly preempted whenever they conflict in their operation with federal law.  Conflict

5   preemption can arise when a state law "stands as an obstacle to the accomplishment and

6   execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67

7   (1941).  In addition, state law is conflict preempted "where compliance with both federal and

8   state regulation is a physical impossibility."  *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373

9   U.S. 132, 142-43 (1963).

10          103.    Proposition 65's mandated glyphosate warning is false, because glyphosate does

11   not cause cancer.

12          104.    Nor does California "know" that glyphosate causes cancer.  To the contrary, the

13   pertinent California agency—OEHHA—has twice determined that it does not, and California

14   conducted no independent analysis to verify IARC's outlier contrary conclusion.   In fact,

15   California, through OEHHA, affirmatively disclaimed the ability to conduct any such analysis.

16          105.    At the very least, Proposition 65's mandated glyphosate warning is misleading,

17   insofar as it states definitively that glyphosate causes cancer when every other pertinent expert

18   regulatory agency worldwide has concluded otherwise.

19          106.    The FDCA prohibits misbranding a food product, including where "its labeling is

20   false or misleading in any particular."  21 U.S.C. § 343(a).

21          107.    Selling a food product with Proposition 65's false mandated glyphosate warning

22   would render that product misbranded under federal law.  As a result, a food product producer

23   and/or seller cannot reasonably comply with both federal law and Proposition 65, giving rise to

24   conflict preemption.

25          108.    Plaintiffs consist of members who must comply with Proposition 65's compelled

26   glyphosate warning requirement for products that contain glyphosate to avoid the prospect of

27   costly enforcement actions and other burdens, and must also comply with the FDCA's labeling

28   requirements.

109.   It would be impossible to comply with the FDCA ban on mislabeling a product (the product label cannot be false or misleading in any particular) and simultaneously comply with California's requirement to put a false, misleading, and highly controversial Proposition 65 warning on relevant products.

110.   The FDCA also provides that pesticide residues on food may not exceed EPA-established limits but that labeling shall *not* be required for such foods.  *See id.* §§ 346a(a)(1)(A), 343(k), (l).

111.   States are generally prohibited from "establish[ing'] or enforc[ing] any regulatory limit on a qualifying pesticide chemical residue," including any "prohibit[ion] or penal[ty]" on the "production, processing, shipping, or other handling of a food because it contains a pesticide residue."  *Id.* § 346a(n)(4), (5), (6).

112.   Proposition 65's glyphosate listing and any related safe harbor effectively establish or enforce a regulatory limit on a pesticide chemical residue.  And Proposition 65's mandated glyphosate warning on food products is a "penalty" on the production, processing, shipping, or handling of food because it contains a pesticide residue.  California has neither sought nor received an exemption from EPA to impose that penalty or prohibition.  Thus, Proposition 65's glyphosate listing and mandated glyphosate warning are expressly preempted by the FDCA's tolerance regime.

113.   Even if Proposition 65's mandated glyphosate warning is not expressly preempted by the FDCA's tolerance regime, it is impliedly preempted as an obstacle to the accomplishment of the purposes and objectives of federal law.  The legislative history underlying the pesticide residue tolerance regime reflects that Congress affirmatively rejected labeling on foods that contained a permissible pesticide residue quantity.  And EPA, the regulatory agency tasked with administering the pesticide residue tolerance regime, has found in its most recent analyses that glyphosate is non-carcinogenic and that its presence on food up to the tolerance level poses no public health risks.  Thus, Proposition 65's listing of glyphosate and its attendant glyphosate warning mandate directly undermine this federal tolerance regime.

1    **CLAIM III:  VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH**

2    **AMENDMENT TO THE UNITED STATES CONSTITUTION**

3         114.    The foregoing Paragraphs are incorporated by reference as if set forth in full

4    herein.

5         115.    The Due Process Clause of the Fourteenth Amendment provides that "[n]o state

6    shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S.

7    Const. amend. XIV, § 1.  At a minimum, the Clause requires that every state law "be rationally

8    related to legitimate government interests."  *Washington v. Glucksberg*, 521 U.S. 702, 728

9    (1997).

10        116.    California does not *know* that glyphosate *causes* cancer.

11        117.    California's sole basis for listing glyphosate under Proposition 65 as a chemical

12   known to the state to cause cancer is IARC's March 2015 Monograph.  California made no effort

13   to examine any of the mass of studies that contradict IARC's controversial finding, including

14   California's own prior analyses, it conducted no new assessment itself, and it made no attempt

15   whatsoever to reconcile IARC's findings with the contrary views of every government regulatory

16   body that has examined the question and concluded that glyphosate is unlikely to cause cancer.

17        118.    Even IARC's Monograph does not support the warning that Proposition 65 will

18   require, because IARC did not conclude that glyphosate *causes* cancer in humans.  Instead, it

19   concluded that "there is limited evidence in humans for the carcinogenicity of glyphosate" and

20   that glyphosate is "probably carcinogenic in humans."

21        119.    California has no rational basis for listing glyphosate as a chemical known to the

22   State of California to cause cancer, or for compelling a warning that glyphosate is known to the

23   State of California to cause cancer as a result of that listing.

24        120.    Listing glyphosate falsely as a known carcinogen and requiring a warning that

25   misleadingly states that California knows glyphosate is a carcinogen are not actions rationally

26   related to any legitimate state interest.

27        121.    California's listing of glyphosate and the attendant warning requirement are

28   therefore invalid under the Fourteenth Amendment's Due Process Clause.

1

## **PRAYER FOR RELIEF**

2    WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

3    (1)    A declaration, pursuant to 28 U.S.C. § 2201, that the listing of glyphosate under

4  Proposition 65 and its attendant glyphosate warning mandate violate the First Amendment of the

5  United States Constitution.

6    (2)    A declaration, pursuant to 28 U.S.C. § 2201, that the listing of glyphosate under

7  Proposition 65 and its attendant glyphosate warning mandate violate the Supremacy Clause of

8  the United States Constitution.

9    (3)    A declaration, pursuant to 28 U.S.C. § 2201, that the listing of glyphosate under

10  Proposition 65 and its attendant glyphosate warning mandate violate the Due Process Clause of

11  the Fourteenth Amendment to the United States Constitution.

12    (4)    Preliminary and permanent injunctions prohibiting Defendants or any of their

13  officers, employees, or agents, and all those in privity with those entities or individuals, from

14  enforcing or threatening to enforce Proposition 65 or any of its implementing regulations with

15  regard to glyphosate.

16    (5)    All costs, attorneys' fees, and expenses that Plaintiffs reasonably incur, *see* 42

17  U.S.C. § 1988; and

18    (6)    Such other and further relief as this Court deems just and proper.

19

20

21

22

23

24

25

26

27

28

Dated: November 15, 2017

Respectfully submitted,

|  | _/s/_ Philip J. Perry |
|---|---|
| Catherine L. Hanaway | Philip J. Perry (CA Bar No. 148696) |
| Matthew T. Schelp | Richard P. Bress (*pro hac vice* to be filed) |
| Christopher C. Miles (CA Bar No. 268774) | Andrew D. Prins (*pro hac vice* to be filed) |
| Natalie R. Holden | Alexandra P. Shechtel (CA Bar No. 294639) |
| HUSCH BLACKWELL | LATHAM & WATKINS LLP |
| The Plaza in Clayton | 555 Eleventh Street NW, Suite 1000 |
| 190 Carondelet Plaza Suite 600 | Washington, DC 20004 |
| St Louis, Missouri 63105 | Tel: (202) 637-2200 |
| Tel. (314) 480-1903 | philip.perry@lw.com |
| catherineine.hanaway@huschblackwell.com | |

*Attorneys for All Plaintiffs except Plaintiff Western Plant Health Association*

Ryan S. Baasch (*pro hac vice* to be filed)
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022-4834
Tel:  (212) 906-1368

Ann M. Grottveit (CA Bar No. 256349)
KAHN, SOARES & CONWAY, LLP
1415 L Street, Suite 400
Sacramento, CA  95814
Tel: (916) 448-3826
agrottveit@kscsacramento.com

Trenton H. Norris (CA Bar No. 164781)
ARNOLD  &  PORTER  KAYE  SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Tel:  (415) 471-3303

*Attorney for Plaintiff Western Plant Health Association*

*Attorneys for Plaintiff Monsanto Company*