1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF CALIFORNIA

3

4    NATIONAL ASSOCIATION OF WHEAT
     GROWERS; NATIONAL CORN GROWERS
     ASSOCIATION; UNITED STATES
5    DURUM GROWERS ASSOCIATION;
     WESTERN PLANT HEALTH
6    ASSOCIATION; MISSOURI FARM
     BUREAU; IOWA SOYBEAN
7    ASSOCIATION; SOUTH DAKOTA AGRI-
     BUSINESS ASSOCIATION; NORTH
8    DAKOTA GRAIN GROWERS
     ASSOCIATION; MISSOURI CHAMBER
9    OF COMMERCE AND INDUSTRY;
     MONSANTO COMPANY; ASSOCIATED
10   INDUSTRIES OF MISSOURI;
     AGRIBUSINESS ASSOCIATION OF
11   IOWA; CROPLIFE AMERICA; AND
     AGRICULTURAL RETAILERS
12   ASSOCIATION,

13

14              Plaintiffs,

15        v.                              Civil Action No. 2:17-cv-
                                          02401-WBS-EFB
16   XAVIER BECERRA, IN HIS OFFICIAL      **DECLARATION OF DAVID C.
     CAPACITY AS ATTORNEY GENERAL OF      HEERING IN SUPPORT OF
17   THE STATE OF CALIFORNIA,             PLAINTIFFS' MOTION FOR
                                          SUMMARY JUDGMENT**
18
                Defendant.
19

20

21              **DECLARATION OF DAVID C. HEERING**

22        I, David C. Heering, Ph.D., do hereby declare under penalty

23   of perjury that:

24        1.  I submit this Declaration in support of Plaintiffs'

25   Motion for Summary Judgment.  I have personal knowledge of the

26   facts stated herein.  If called as a witness in this matter, I

27

28

1   could and would competently testify to each of the facts set forth

2   below.

3                              **Background**

4       2.   I have a Bachelor of Science in Entomology from

5   Mississippi State University (1984), a Master of Science in Plant

6   Pathology and Weed Sciences from Mississippi State University

7   (1987), and a Ph.D. in Crop Science from Oklahoma State University

8   (1990).

9       3.   I have worked at Monsanto Company ("Monsanto") for more

10  than 20 years.[1]   I am currently the Global Glyphosate

11  Sustainability Lead.  Prior to my current role, I have held various

12  other positions at Monsanto, including as the Roundup® Technical

13  Lead in the U.S. Technology Development organization.

14      4.   As part of my responsibilities as Global Glyphosate

15  Sustainability Lead, I oversee Monsanto's glyphosate

16  sustainability efforts around the globe and address questions

17  related to product use and safety.  In connection with my current

18  and past roles at Monsanto, I have become personally familiar with

19  Monsanto's glyphosate products and their uses, the sales and

20  marketing of those products, the legal framework for bringing those

21  products to market, and the available scientific literature about

22  glyphosate.

23      5.   In support of my Declaration, I attach a number of bolded

24  **Exhibits**.  Each of these **Exhibits** represents a true and correct

25  copy of the cited document.

26

27  _____

28  [1] Monsanto is an indirect, wholly-owned subsidiary of Bayer AG.

                                2

**Monsanto And Glyphosate**

6.    Monsanto is an agricultural company that produces products that help farmers grow food more sustainably.  From seed to software, to fiber, to pesticides, Monsanto develops tools to help growers protect natural resources while providing food and other agricultural products to the world.

7.    For farmers, weeds are a significant potential problem.  Along with insects and plant disease, weeds can damage crops and *significantly* reduce crop yields.  Weeds are problematic in large part because they compete with crops for critical resources—*e.g.*, water, sunlight, and nutrients.

8.    To help farmers protect their crops from weeds, Monsanto offers a variety of solutions.  As relevant here, most of Monsanto's Roundup® branded herbicide products contain the active ingredient glyphosate, which is a broad-spectrum herbicide that is used to control weeds in a variety of agricultural, residential, aquatic, and other settings.

9.    Farmers, as well as homeowners and others, have been using Roundup® and other glyphosate products safely and effectively for more than 40 years.  Since it was first introduced in 1974, glyphosate has become the world's most widely used herbicide because it is efficacious, economical, and environmentally benign.  Glyphosate is marketed under a number of trade names and is registered for use as an herbicide in more than 160 countries, including the United States.

10. Monsanto scientists first discovered glyphosate's potential application as an herbicide multiple decades ago.  Monsanto patented the use of glyphosate to kill weeds shortly

thereafter, and was the first company to bring glyphosate to market in the United States. Monsanto retains patents and other intellectual property rights protecting certain applications of glyphosate, including for use in its Roundup® branded products. Monsanto also maintains patents covering many varieties of glyphosate-tolerant crops, which Monsanto has obtained USDA approval to plant and market, along with glyphosate itself. In reliance on its intellectual property rights for its various products, Monsanto re-invests more than $2.6 million per day in research and development that ultimately benefits farmers and consumers.

11. Phosphorous is used in the production of glyphosate and Monsanto owns and operates a phosphorous mine in Idaho. The glyphosate manufacturing process takes place at two plants in the United States, located in Muscatine, Iowa and Luling, Louisiana. Monsanto has invested hundreds of millions of dollars in these plants, as well as in Monsanto's nationwide infrastructure for the production, marketing, shipping, and distribution of glyphosate and development of glyphosate-based products. For example, in March 2010, Monsanto completed a nearly $200 million expansion of its Luling glyphosate plant, which currently employs over 600 workers. Monsanto's Muscatine plant currently employs approximately 400 full-time workers. As described in detail below, these facilities supply glyphosate into California through a complex supply chain of wholesalers, distributors, and retailers.

12. Glyphosate has, over the past several decades, substantially displaced other herbicides, many of which were perceived to pose environmental, health, or safety risks. *See*

4

**Exhibit A**, Jorge Fernandez-Cornejo et al., USDA, EIB No. 124, Pesticide Use in U.S. Agriculture: 21 Selected Crops, 1960-2008 at 21 (May 2014).

13. Glyphosate is approved by the Environmental Protection Agency (EPA) for use in more than 250 agricultural crop applications in the United States, and glyphosate is now the most widely applied herbicide in the United States and in California. It is used in the cultivation of the vast majority of corn, soybean, and canola crops across the United States, and frequently used in conjunction with cultivation of almond, citrus, cotton, and other crops in the United States. It is also widely used in the cultivation of Canadian crops—including oats—and in conjunction with the cultivation of wheat, beans, peas, and other crops in many locations.

14. For more than two decades, glyphosate has been marketed and sold for use over crops genetically engineered to be tolerant of the herbicide. When farmers apply glyphosate to fields planted with these crops, it kills the weeds without harming the crops.

15. Glyphosate-based herbicides are particularly desirable in the agricultural setting because of their broad-spectrum effectiveness, which allows farmers to control weeds with minimal tilling of soil (a practice known as conservation tilling), thereby conserving valuable topsoil, reducing soil movement into streams and other surface water, and retaining soil moisture. The scientific literature has expressly recognized these environmental benefits of using glyphosate, and has explained why these practices are preferable to traditional means of cultivation, which involve multiple other potentially significant impacts. *See, e.g.,*

1  **Exhibit B,** Stephen O. Duke & Stephen B. Powles, *Glyphosate: a Once-*
2  *in-a-Century Herbicide*, 64 Pest Mgmt. Sci. 319, 322 (2008).

3     16.   Glyphosate-based herbicides are also widely used in the
4  United States—including by municipal, county, and other government
5  agencies—to control vegetation in utility right-of-ways, along
6  roadsides and railways, in aquatic environments, in residential
7  home and garden settings, and to reduce the risk associated with
8  the rapid spread of wildfires.   In addition, glyphosate-based
9  herbicides are used by wildlife organizations to protect and
10  restore wildlife habitats threatened by invasive, non-native
11  vegetation.

12     17.   For many applications, glyphosate is the most effective
13  and reliable weed control option.   Indeed, very few herbicides
14  other than glyphosate are approved by EPA for use in aquatic
15  environments.

16                    **The Federal Regulatory Framework**

17     18.   Federal law comprehensively regulates the sale and use
18  of herbicides like glyphosate, including their labeling and
19  permissible presence on food.   Monsanto has invested significant
20  resources and time in seeking and obtaining regulatory approval
21  for glyphosate uses, as well as for crops that are genetically
22  engineered to be resistant to glyphosate.

23     19.   For several decades, the federal government has approved
24  the use of glyphosate under the Federal Insecticide, Fungicide,
25  and Rodenticide Act (FIFRA), based on extensive scientific
26  analyses of each specific use of the herbicide.[2]

27  _____
28  [2] This Declaration uses the term "herbicide" for clarity because
    glyphosate is an herbicide, but under federal law, herbicides,

6

20. Under FIFRA, all commercial herbicides must be "registered" with EPA. 7 U.S.C. § 136a(a) (2012). Before EPA grants a registration, it must determine that the herbicide will not cause "unreasonable adverse effects on the environment" or "human dietary risk." *Id.* §§ 136(bb), 136a. EPA's review extends not only to the herbicide itself, but to formulations and particular uses of the herbicide. *See generally id.* § 136a; 40 C.F.R. pt. 152 (2017). EPA also evaluates each specific *use* of the herbicide (*i.e.*, its use on each particular type of crop) and, when necessary, prescribes use restrictions to protect human health and the environment. *See* 7 U.S.C. §§ 136(bb), 136aa. EPA's extensive scientific safety review includes an evaluation of whether the herbicide is potentially carcinogenic. *See, e.g.*, 40 C.F.R. § 716.21 (2017) (requiring reports on carcinogenicity); *see also* **Exhibit C**, U.S. EPA, EPA/630/P-03/001F, Guidelines for Carcinogen Risk Assessment (Mar. 2005)*.* In addition, through its Registration Review Process, EPA will review each registered pesticide at least every 15 years to determine whether it continues to meet the FIFRA standard for registration. *See* **Exhibit D**, U.S. EPA, Registration Review Process, *available at* https://www.epa.gov/pesticide-reevaluation/registration-review-process.

21. Under FIFRA, an herbicide cannot be registered, sold, or distributed if it is "misbranded." *See, e.g.*, 40 C.F.R. § 152.112(f); 7 U.S. Code § 136j(a)(1)(E). 7 U.S.C. § 136(q)(1)(A) provides that an herbicide is "misbranded" if, *inter alia*, "its

---

insecticides, rodenticides, and pesticides are all referred to under the definitional term "pesticide." 7 U.S.C. § 136(u).

labeling bears any statement … relative thereto or to its ingredients which is false or misleading in any particular." Similarly, 40 C.F.R. § 156.10(a)(5) provides that an herbicide is "misbranded" "if its labeling is false or misleading in any particular…."

22. On August 7-8, 2019, the EPA's Office of Pesticides Program issued a letter determination to Monsanto and all other registrants of glyphosate products, stating that "[g]iven EPA's determination that glyphosate is 'not likely to be carcinogenic to humans,' EPA considers the Proposition 65 warning language based on the chemical glyphosate to constitute a false and misleading statement" which would render a product carrying that label "misbranded;" accordingly, "EPA will no longer approve labeling that includes the Proposition 65 warning statement for glyphosate-containing product," and "[t]he warning statement must be removed from all product labels where the only basis for the warning is glyphosate." **Exhibit E**, Letter from Michael L. Goodis, P.E., Director, Registration Division, Office of Pesticide Programs, to Monsanto (Aug. 7, 2019).

23. The Federal Food, Drug, and Cosmetic Act (FDCA) regulates the presence of herbicides on food products. 21 U.S.C. §§ 342(a), 331(b) (2012). Under the FDCA, EPA is charged with evaluating the human health impact of the presence of the herbicide's residue, including its potential carcinogenicity. *Id.* § 346a(b)(2)(A).

24. EPA may not register an herbicide under FIFRA for use on food or animal feed, or which may leave residues on food or feed unless a "tolerance" for the herbicide, or exemption from the

tolerance requirement, has been established under the FDCA. 40 C.F.R. § 152.112(g); *see also* 21 U.S.C. § 346a(a)(1)(A), 21 U.S.C. § 342(a)(2)(B). A "tolerance" is the maximum amount of herbicide residue that may remain in or on food products, based on the EPA's finding that "there is a reasonable certainty that no harm will result" from aggregate exposure to that residue. 21 U.S.C. § 346a(b)(2)(A). EPA establishes tolerances for each use of an herbicide on each type of crop after developing a risk assessment that considers, among other things, (i) "any toxic effect" of that herbicide; (ii) aggregate exposure through diet and other non-occupational sources; and (iii) whether children have increased susceptibility to that herbicide. *Id.* § 346a(b)(2)(A)-(D).

25. EPA established tolerances for glyphosate, allowing the presence of glyphosate residues on all relevant United States commodities. 40 C.F.R. § 180.364.

26. FIFRA's labeling and misbranding provisions specifically require that product labels accompanying an herbicide contain directions for use that, if complied with, are adequate to "protect health and the environment," *i.e.* protect against any human dietary risk from residues that result from a use of an herbicide in or on any food that would be inconsistent with the tolerance standards under 21 U.S.C. § 346a. *See* 7 U.S.C. §§ 136(q)(1)(F) & (G), 136(x), 136(bb), 136d(b).

27. FIFRA regulations also expressly require that if a proposed label bears instructions for use of an herbicide on food or feed crops, the registrant must submit with its application a statement affirming whether such residues are authorized by a

1  tolerance (or an exemption), and, if not, an application for

2  establishment of appropriate tolerances (or an exemption). *See* 40

3  C.F.R. § 152.50(i).

4      28. In short, federal law requires that, when used in

5  accordance with label directions, the application of an herbicide

6  will not result in an exposure that exceeds the relevant

7  "tolerance" for a given crop. As a consequence, application of an

8  herbicide like glyphosate over an agricultural crop in accordance

9  with an approved FIFRA product label will not risk violating the

10 EPA tolerance levels. Farmers can and do rely on application

11 conditions on FIFRA labels to ensure that they are in compliance

12 both with FIFRA and with the EPA tolerance thresholds.

13     29. The federal government ensures the safety of genetically

14 engineered crops through a detailed multi-agency regulatory regime

15 (the "Coordinated Framework") that coordinates the scientific

16 safety standards of multiple federal statutes under the

17 supervision of three expert federal agencies: the Food and Drug

18 Administration (FDA), the EPA, and the USDA Animal and Plant Health

19 Inspection Service (APHIS). *See* 49 Fed. Reg. 50,856, 50,856-57

20 (Dec. 31, 1984). When a new genetically engineered crop does

21 complete federal scientific review, the crop is deemed the same as

22 its conventional counterpart for federal regulatory purposes. *See*

23 *generally* 7 C.F.R. Part 340 (2017).

24     30. Under the Coordinated Framework, Monsanto has received

25 regulatory clearance to distribute throughout California and the

26 United States seed for multiple crops that have been genetically

27 engineered to tolerate glyphosate, including soybeans, corn,

28 canola, alfalfa, sugar beets, and cotton. Today, 89% of corn, 91%

1  of cotton, and 94% of soybean crops produced in the United States

2  are genetically engineered to tolerate herbicides, such as

3  glyphosate. *See* **Exhibit F**, USDA Economic Research Service,

4  Adoption of Genetically Engineered Crops in the U.S., Genetically

5  Engineered Varieties of Corn, Upland Cotton, and Soy-Beans, by

6  State and for the United States, 2000-2019, *available at*

7  https://www.ers.usda.gov/data-products/adoption-of-genetically-

8  engineered-crops-in-the-us.aspx.

9  **Use Of Glyphosate In California**

10  31. Glyphosate is widely applied by farmers in California,

11  where it is approved for use in more than 250 agricultural crop

12  applications. It is used, for example, in conjunction with the

13  cultivation of corn, soybean, canola, almond, citrus, cotton and

14  other crops in California. In the previous year, Monsanto sold

15  approximately 3 2.695 million Roundup® Equivalent Gallons (REGs)

16  of glyphosate into California for agricultural purposes, which is

17  equivalent to approximately 2 million standard gallons of the

18  product.

19  32. Glyphosate is also extensively applied by home gardeners

20  in California. Glyphosate is used in California to control weeds

21  and undesired grasses in garden beds and landscaped areas.

22  California homeowners also use glyphosate to control weed growth

23  in their lawns, and on their patios and driveways. Glyphosate is

24  also used to control the growth of undesired vines and brush in

25  California gardens.

26  33. Glyphosate-based herbicides are also widely used by

27  California government agencies for a variety of purposes,

28  including those discussed in paragraph 33.

34. In addition, glyphosate-based herbicides are used by wildlife organizations in California to protect and restore wildlife habitats threatened by invasive, non-native vegetation. For example, a glyphosate-based herbicide is used to control arundo donax (giant reed) in central California's river valleys; arundo donax is a highly invasive weed that threatens California's riparian ecosystems by competing with native species, such as willows, for water.

35. Glyphosate is also used by the California Department of Transportation as an economical and effective tool to control weeds along highways and other roadways.  And municipalities across California utilize glyphosate to control weeds in sidewalks, medians, alleys, and other public spaces.  Such weeds not only harm the growth of desired plants, but also intrude into cracks in pavement and asphalt and degrade infrastructure as a result.

**Monsanto's Sales Of Glyphosate**

36. Monsanto supplies glyphosate to public and private entities in California, as well as California consumers, through multiple sales channels.  Monsanto divides these sales channels into three market segments:  (i) Agricultural, (ii) Industrial, Turf and Ornamental, and (iii) Lawn and Garden.  Monsanto sells glyphosate both directly in some instances, and through distributors and business partners in many others.

37. In the Agricultural segment, Monsanto sells glyphosate through two principal sales channels within California: sales to (i) agricultural wholesalers that also own retail storefronts, and (ii) agricultural wholesalers that do not engage in the retail business.  In either case, Monsanto sells glyphosate to these

1 distributors, which either re-sell glyphosate directly to farmers

2 (to the extent they maintain retail locations), or re-sell

3 glyphosate to retailers who in turn sell the product to farmers.

4   38.   In the Industrial, Turf and Ornamental (IT&O) segment,

5 Monsanto sells glyphosate to wholesale distributors, which in turn

6 re-sell glyphosate to California end users.   These distributors

7 include both major, national distributors, including "landscape

8 supply" companies with storefronts across California, as well as

9 small, independent distributors.   The bulk of the IT&O segment

10 consists of "Turf" sales, which are sales for use by professionals

11 that perform weed control activities in office parks, golf courses,

12 residential areas, and other landscaped or grass-covered areas.

13 Monsanto also sells glyphosate to professionals responsible for

14 controlling weeds on railroad rights of way, highways, roadside

15 medians, and other rights of way and public spaces.   The California

16 Department of Transportation is a major purchaser of glyphosate

17 for such purposes.   The Industrial segment also includes buyers of

18 glyphosate for aquatic applications in the control of weeds at the

19 edge of California water bodies.   A modest portion of IT&O segment

20 also consists of "Ornamental" uses, including in California tree

21 farms and plant growth nurseries.

22   39.   In the Lawn and Garden segment, Monsanto sells

23 glyphosate to consumers through its marketing and distribution

24 agent, Scotts, which in turn re-sells glyphosate to retailers in

25 California, including hardware stores, home and garden stores, and

26 independent nurseries, as well as to distributors that re-sell

27 glyphosate to such retailers.   California retailers sell Monsanto-

28 produced glyphosate through storefronts directly to consumers,

13

1 principally as Roundup® branded products. These retail

2 storefronts stock glyphosate on shelves alongside other consumer

3 products, such as fertilizers and mulch.

4     40. Also in the Lawn and Garden segment, Monsanto sells

5 glyphosate directly to California consumers over the Internet,

6 with Scotts again acting as Monsanto's agent. California consumers

7 place orders online, and have glyphosate, including Roundup®

8 branded products, shipped directly to their doors for home lawn

9 and garden use.

10     **Impacts Of Glyphosate Listing & Warning Requirement**

11     41. As a result of the listing of glyphosate under

12 Proposition 65 and its attendant warning requirement, Monsanto

13 must either provide the prescribed false, misleading, and highly

14 controversial warnings, with which Monsanto vehemently disagrees,

15 to consumers about glyphosate in its products, and work with its

16 distributors and customers to do so, or face the risk of being

17 sued and incurring penalties under California law for failing to

18 do so.

19     42. As a result of the listing of glyphosate under

20 Proposition 65, to avoid the prospect of a costly lawsuit, any

21 product containing glyphosate (including glyphosate residues) sold

22 in California will be required to bear a false warning pursuant to

23 CAL. CODE REGS. tit. 27, § 25603(a), (b), stating:

24

25     ⚠ **WARNING:** This product can expose you to chemicals including glyphosate,

26 which is known to the State of California to cause cancer. For more information go to www.P65Warnings.ca.gov.

27

28

or, alternatively:

⚠ **WARNING**: Cancer - www.P65Warnings.ca.gov [3]

43.   These warnings convey a clear message: that glyphosate causes cancer. I understand that any compliant Proposition 65 warning would convey exactly that, because to avoid liability under Proposition 65, "products must carry a warning that 'this product contains [chemical], a chemical known to the state of California to cause reproductive harm [or cancer],' or words to that effect." *Dowhal v. Smithkline Beecham Consumer Healthcare*, 32 Cal. 4th 910, 918 (2004).  I believe that (i) these warnings convey the false message that glyphosate causes cancer, and (ii) any other warning that conveyed that glyphosate causes cancer would be false as well.

44.   I understand that the reason that such a false warning requirement is not currently in effect under California law is because a preliminary injunction has been entered in this case, but that the California Attorney General continues to oppose the preliminary injunction and has conveyed his intent to request that the Court enter summary judgment in his favor. *See* Joint Status Report, ECF No. 100 at 2.

45.  Due to the unreasonable litigation risk created by Proposition 65, in the event the warning requirement comes into effect, multiple major retailers of Monsanto's glyphosate products in California have determined that they will not sell glyphosate-

---

[3] OEHHA has amended its regulations to allow substitution of the word "ATTENTION" or "NOTICE" for "WARNING" on a pesticide label if such a pesticide label is regulated by EPA under FIFRA. *See* Cal. Code Regs. Tit. 27, § 25603(d) (effective Jan. 1, 2019).

based products unless those products contain a Proposition 65 warning on the products' labels. As a result, any glyphosate-based products that do not contain a Proposition 65 warning will be removed from their California stores' shelves and their inventory weeks or months in advance of the applicable date of the warning requirement, to ensure that no unlabeled product remains on the shelves at the time the warning requirement goes into effect. The only reason this has not already occurred is because a preliminary injunction has been entered in this case.

46. I understand that OEHHA has recently issued a regulation that establishes a "No Significant Risk Level" (NSRL) of 1100 micrograms per day for glyphosate. But this safe harbor does nothing to remedy the problems I have identified.

47. The NSRL does not remove the immediate prospect of costly lawsuits if the warning requirement comes into effect. Even if some of Monsanto's products, or Monsanto's customers' products were tested and found to contain concentrations of glyphosate below the NSRL, enforcement action could still be brought based on the presence of glyphosate in or on those products. I know that private plaintiffs have previously brought long and costly enforcement actions based on various chemicals under Proposition 65, notwithstanding that defendants had a defense of compliance with the NSRL for those chemicals.

48. Even now that California has set an NSRL, several major retailers will nonetheless require a warning in the event the warning requirement comes into effect because they are concerned about the likelihood of Proposition 65-related litigation or other Proposition 65-related costs. Other major retailers will only

16

carry the products without a warning if Monsanto proves that its products are in compliance with any NSRL.  Because of interstate distribution and logistics limitations, stores in states surrounding California may also receive glyphosate-based products that contain a Proposition 65 warning.  This would magnify the harms to Monsanto described in this Declaration, which would be sustained not only in California, but in surrounding states as well, wherever the false Proposition 65 warning is disseminated.

49.  If Monsanto were forced to re-label its glyphosate-based products, the re-labeling process likely would cause significant disruption in the retail channel and could interfere with Monsanto's relationships with its large, retail customers. Monsanto's glyphosate-based products are sold at thousands of retail stores in California, and these retail stores would have to sweep their shelves of Monsanto's glyphosate-based products to accommodate the re-labeling process.  In addition, larger retail stores that operate outside of California would have to (at a minimum) create separate stockkeeping units ("SKUs") to differentiate between glyphosate-based products sold in California (carrying the Proposition 65 warning) and those sold outside California (which would not).  This process would be extremely disruptive to the retailers, damaging Monsanto's reputation and goodwill with them.

50.  Even now that OEHHA has established an NSRL, that does not eliminate the harm to Monsanto from the improper glyphosate warning requirement.  Monsanto would still be injured in the event the warning requirement comes into effect because it would, at a minimum, be forced to choose between applying, and working with

its distributors and customers to apply a factually inaccurate and highly controversial warning on its products or, in the lawsuits that will inevitably follow a decision not to warn, incur the significant costs of defending its glyphosate products as invariably falling within the NSRL. Monsanto would need to engage in an expensive exposure assessment process for each anticipated use of glyphosate and glyphosate product to evaluate and prepare affirmative defense(s) under the NSRL in a suit to enforce Proposition 65. Monsanto anticipates that it would incur significant expense on these efforts. None of this expense would be necessary but for Proposition 65's mandated warning.

51. Unless it provides the warnings required by Proposition 65, Monsanto would need to prepare for enforcement actions under Proposition 65, including through private strike suits brought by bounty hunters. Monsanto would need to expend substantial resources in anticipation of such suits, to prepare experts, witnesses, and evidence, and incur all the costs related to preparation for and implementation of such costly litigation defenses. A long history of Proposition 65 strike suits demonstrates what typically happens in practice: in the face of this litigation threat, businesses are forced by litigation costs and the risk of statutory damages to simply acquiesce and post a warning, even if those businesses know the warning is affirmatively false and misleading. *See* **Exhibit G**, All. for Nat. Health, *Proposition 65: Evaluating Effectiveness and a Call for Reform* at 7 (2015).

52. If it does not re-label its glyphosate-based products, Monsanto is almost certain to be sued under Proposition 65. Even

1   putting aside the financial incentives that make such a suit highly
2   likely to occur, past Proposition 65 litigants have already
3   threatened new Proposition 65 lawsuits regarding glyphosate,
4   "urg[ing]" companies to "phas[e] out the use of glyphosate," and
5   highlighting the "risk of legal action."  *See, e.g.*, **Exhibit H**,
6   Letter from Austin Wilson, Environmental Health Program Manager of
7   'As you Sow,' to Denise Morrison, CEO, Campbell Soup Company (Oct.
8   5, 2016).  In addition, multiple bounty hunters submitted comments
9   to OEHHA in support of the glyphosate listing, including the
10  notoriously litigious bounty hunter the Center for Environmental
11  Health.  Notably, *two days* after the Proposition 65 listing for
12  coconut oil became operative, the Center for Environmental Health
13  filed pre-suit notice against 22 companies alleging warning
14  violations.

15       53.  In addition to significant litigation risk from bounty
16  hunters, numerous activist groups are likely to sue Monsanto under
17  Proposition 65.  For example, the Center for Food Safety—an
18  "advocacy" organization that is dedicated to halting the use of
19  genetically engineered crops and herbicides—submitted comments to
20  OEHHA in support of glyphosate's listing under Proposition 65.
21  The Center for Food Safety routinely participates in litigation
22  against Monsanto or involving Monsanto's regulatory approvals.
23  *See*, *e.g.*, *Nat'l Family Farm Coal. v. EPA*, Case No. 17-70196 (9th
24  Cir. Jan. 20, 2017) (challenge to approval of Monsanto's dicamba-
25  based herbicide); *Robert Ito Farm, Inc. v. County of Maui*, 842
26  F.3d 681 (9th Cir. 2016) (involving attempt by Center for Food
27  Safety to intervene in litigation); *Ctr. for Food Safety v.*
28  *Vilsack*, 718 F.3d 829 (9th Cir. 2013) (challenge to deregulation

1  of Monsanto's Roundup Ready Alfalfa); *Ctr. for Food Safety v.*

2  *Vilsack*, 636 F.3d 1166 (9th Cir. 2011) (challenge to deregulation

3  of Monsanto's Roundup Ready sugar beets); *In re: Monsanto Co.*

4  *Genetically-Engineered Wheat Litig.*, 978 F. Supp. 2d 1373 (MDL

5  2013) (involving Monsanto's Roundup Ready wheat).  The significant

6  risk of litigation persists even though OEHHA has established an

7  NSRL.  Because the NSRL merely establishes an affirmative defense,

8  there are almost always disputes in Proposition 65 litigation about

9  whether a particular product or exposure falls within the NSRL.

10  Monsanto must prepare for litigation by preparing a fact- and

11  science-based litigation defense to these lawsuits, sufficient to

12  establish that any exposure is nonetheless occurring at a safe

13  level, all again at significant expense.  None of this would be

14  necessary but for Proposition 65's illegal warning requirement for

15  glyphosate.

16      54.  In short, as a practical matter, even now that an NSRL

17  has been set for glyphosate by OEHHA, the only way that Monsanto

18  can avoid the prospect of expensive strike suits and potential

19  penalties under California law is to make a disparaging, factually

20  inaccurate, and at best, highly controversial warning about its

21  products, with which Monsanto vehemently disagrees, thereby

22  abandoning its First Amendment rights and creating unfounded fears

23  and misleading and/or confusing the public.

24      55.  Many of Monsanto's customers, including farmers who

25  purchase glyphosate for use on their crops which are sold in

26  California, face a similar choice between (a) giving a false and

27  misleading warning, (b) incurring significant expense to test

28  their products and to defend their products against bounty hunter

1  lawsuits, and (c) discontinuing selling products exposed to

2  glyphosate in California to avoid these harms.

3      56.  It would be incorrect to assume that farmers routinely

4  already test for glyphosate residues in agricultural crops in order

5  to comply with federal law.  I am not aware of any law, much less

6  any federal law, that either mandates or contemplates that persons

7  or entities who apply glyphosate or other herbicides to foodstuffs,

8  or produce, distribute, process, or sell foodstuffs exposed to

9  herbicides, should separately test those foodstuffs to ensure

10 compliance with federally mandated glyphosate tolerances.

11 Moreover, as part of my professional responsibilities, I have

12 interacted with farmers, herbicide applicators, and other

13 participants in the farm-to-table supply chain, concerning their

14 uses of glyphosate and related agricultural practices, and I am

15 not aware of any person or entity that engages in such testing to

16 ensure compliance with EPA tolerances.  As discussed in detail

17 above (¶¶ 24-28), EPA-mandated FIFRA herbicide application

18 restrictions are intended to ensure compliance with the EPA

19 herbicide tolerances.

20     57.  Even now that California has adopted an NSRL level for

21 glyphosate of 1,100 µg/day, compliance with EPA-mandated

22 tolerances would not assure that foodstuffs have glyphosate

23 content levels that fall below that NSRL.

24     58.  California's Proposition 65 listing of glyphosate itself

25 has already broadly disparaged Monsanto's glyphosate and

26 glyphosate tolerant seed products, causing harm to the company and

27 the company's hundreds of millions of dollar investments in these

28 products.   In the event the Proposition 65 warning requirement

1    comes into effect, that will multiply these existing harms by

2    disparaging Monsanto's products even more broadly, by requiring

3    that products containing glyphosate (including glyphosate

4    residues) must be accompanied by a false and misleading warning

5    when sold in stores and other facilities across California.

6         59.   Proposition 65's illegal warning requirement is highly

7    likely to cause Monsanto to lose long-time and valued customers.

8    California retailers of glyphosate have already experienced

9    reduced glyphosate sales as a result of the Proposition 65 listing.

10   While it is bad enough that California is disseminating a false

11   and misleading message by listing glyphosate as a product "known

12   to the State to cause cancer," compelling private parties to

13   disseminate that false and misleading State-mandated message more

14   broadly would result in further reductions in sales.

15        60.   It is obvious why customers will reduce or eliminate

16   their purchases and use of glyphosate in the event the warning

17   requirement comes into effect:  customers do not want to be exposed

18   to a product that bears a warning that a chemical in the product

19   they are using causes cancer; nor do consumers want to purchase or

20   consume food when that food bears a warning that a chemical residue

21   on that food causes cancer.  This is common sense.

22        61.   Indeed, Proposition 65's warning requirement has both

23   the purpose and the effect of causing reductions in purchases and

24   sales of products bearing the state-mandated Proposition 65

25   warning.  For example, the Attorney General touts how "successful"

26   Proposition 65 has been in "motivat[ing] businesses to eliminate

27   or reduce … [listed] chemicals in numerous consumer products" which

28   have been "reformulated" as a result of Proposition 65's

22

1   requirements.  *See* Xavier Becerra, Attorney General of California,

2   Proposition  65  Frequently  Asked  Questions,  *available  at*

3   https://oag.ca.gov/prop65/faqs-view-all.

4       62.  The listing of glyphosate under Proposition 65 and its

5   attendant  illegal  warning  requirement  is  already  causing  some

6   users of glyphosate to shift to other solutions for weed control.

7   Many government entities in California—including for example the

8   County of Marin and the City of Long Beach Parks and Recreation

9   Department—have a policy of not using products that appear on the

10  Proposition 65 list.  Following OEHHA's listing of glyphosate,

11  numerous  counties  and  municipalities  across  California  have

12  already decided to shift away from the use of glyphosate.  For

13  example, on July 11, 2017, the City Council of Burbank, California

14  voted to discontinue use of glyphosate in city parks for the next

15  year, while the City evaluated alternative products.  As part of

16  their deliberations, the City Council considered a presentation by

17  Public Works and Parks & Recreation staff explaining that the City

18  Council's consideration of this legislative item "that came before

19  [the Council] was spurred on by the fact that there was an action

20  taken by the state … as of July 7th … that [glyphosate] would be

21  put on … the Prop. 65 list as a potential hazard … [that could]

22  potentially cause cancer."  *See* City of Burbank, video of July 11,

23  2017  City  Council  meeting  at  3:01:05,  *available  at*

24  http://burbank.granicus.com/MediaPlayer.php?view_id=6&clip_id=79

25  43&meta_id=325562.

26      63.  Were Proposition 65's illegal warning requirement to

27  apply, there would  also be a serious risk that agricultural users

28  of  glyphosate-based  herbicides  would  switch  to  non-glyphosate

23

herbicide products or mechanical methods of vegetation management based on unfounded fears that glyphosate causes cancer. This would happen for a variety of reasons. For example, farmers may be misled by the warning language and not understand or appreciate the overwhelming contrary findings of EPA, OEHHA and the broader scientific community, including most applicably the findings of the 2017 AHS Health Study Update specifically analyzing glyphosate exposure and cancer in farmers/applicators and conclusively showing no association between the two. And food companies that purchase the commodities grown by farmers may be concerned about trace amounts of glyphosate and accordingly feel compelled to apply Proposition 65 warnings on food products to avoid litigation, which would almost certainly diminish sales of such food products.

64. Notably, a number of food manufacturers have already made inquiries of Monsanto concerning the Proposition 65 listing of glyphosate, and several leading food manufacturers have already been sued in putative consumer class actions for alleged failure to warn consumers of the presence of glyphosate residues in breakfast cereals. *See*, *e.g.*, *Stephenson v. Post Foods*, LLC, Case No. 1:16-cv-03396 (E.D.N.Y., filed June 22, 2016); *Cooper v. The Quaker Oats Co.*, Case No. 3:16-cv-02364 (N.D. Cal., filed April 29, 2016).

65. Because the warning requirement for glyphosate under Proposition 65 will cause at least some agricultural, commercial, and governmental users to deselect glyphosate in the event the warning requirement comes into effect, this will concomitantly reduce sales of glyphosate by Monsanto and other manufacturers of glyphosate-based herbicides.

1    66.  Furthermore, residential users of glyphosate-based

2  products might receive Proposition 65 warnings by other

3  manufacturers of glyphosate-based products or by retailers of

4  glyphosate-based products made by Monsanto or other manufacturers.

5  Their exposure to such warnings is likely to confuse residential

6  users who would have no way of discerning that "known to the State

7  of California to cause cancer" merely means "Despite the great

8  weight of scientific conclusions otherwise, an entity in France

9  believes glyphosate is probably carcinogenic" or that California's

10  own scientists believe glyphosate is not carcinogenic.  They will

11  therefore be less likely to purchase and use glyphosate-based

12  herbicides, including those made by Monsanto, around their homes

13  and gardens.

14    67.  The full extent of potential deselection of glyphosate-

15  based products may not yet be possible to quantify with absolute

16  precision, but it will not be limited to California.  Monsanto

17  operates in a global market, selling its glyphosate-based products

18  in over 160 countries.  Information is of course widely available

19  globally and people are highly mobile.  As a result, if California

20  consumers develop the false impression that glyphosate is known to

21  cause cancer, that incorrect impression will spread, impacting

22  consumer preferences well beyond California.  This effect will be

23  difficult to reverse; in other words, it is a bell that cannot

24  easily be "un-rung."

25    68.  Branding glyphosate-based products as carcinogenic will

26  also adversely affect Monsanto's reputation and goodwill.

27  Monsanto has invested significant resources and time researching,

28  developing, testing, and marketing its glyphosate-based products

over the last forty years.  A key factor in glyphosate's success—and at least one of the reasons that glyphosate is the most widely used herbicide in the world—is that it has a long history of safe use with uniform and longstanding approvals by multiple regulatory agencies around the world.  Branding glyphosate as carcinogenic is likely to result in unfounded consumer perception that glyphosate is harmful and can lead to cancer, thereby damaging Monsanto's reputation for manufacturing safe and reliable herbicides.  Having a state authority improperly brand glyphosate as carcinogenic, and then compel private parties to disseminate that message, is obviously even more likely to result in unfounded consumer perception that glyphosate is harmful and can lead to cancer, thereby further damaging Monsanto's reputation for manufacturing safe and reliable herbicides.  Consumers are already reacting negatively to the Proposition 65 listing; a label warning indicating that California knows that the product causes cancer will have even more profound impacts.

69.  In sum, California's false and misleading warning requirement will ultimately cause harm across the United States by improperly associating cancer risk with glyphosate, potentially impacting established safe glyphosate uses in virtually every U.S. state.  This has a direct and irreparable impact on Monsanto and its customer base.

70.  Moreover, the activist community closely monitors Proposition 65 determinations and is likely to attempt to use California's treatment of glyphosate under Proposition 65 to the detriment of Monsanto.  Thousands of individuals already have filed lawsuits against Monsanto alleging that Monsanto's products caused

1  their cancer, citing in support of their claims OEHHA's listing of

2  glyphosate under Proposition 65.  *See*, *e.g.*, *Giglio v. Monsanto*

3  *Co.*, No. 3:15-cv-2279, Rec. Doc. 17, at 9 n.5 (S.D. Cal. Nov. 27,

4  2015); *Rubio v. Monsanto Co.*, No. 2:15-cv-7426, Rec. Doc. 53, at

5  13 n.7 (C.D. Cal. Dec. 18, 2015).  On October 4, 2016, 21 such

6  lawsuits, filed in 10 different states, were consolidated in a

7  multi-district litigation in the U.S. District Court for the

8  Northern District of California.  *See In Re: Roundup Products Liab.*

9  *Litig.*, Case No. 3:16-md-2741 (N.D. Cal., Oct. 4, 2016).

10     71.  For example, in a lawsuit filed in the U.S. District

11  Court for the District of Arizona, *Hayes v. Monsanto Co.*, 2:17-

12  cv-04374-SPL, (D. Ariz., filed Nov. 29, 2017) the plaintiff's

13  complaint alleges that California has listed glyphosate as a "known

14  carcinogen[,]" triggering attendant warning requirements, and that

15  OEHHA's action supports plaintiff's claims for *inter alia* strict

16  products liability based on "failure to warn" and negligence:

17           The list of known carcinogens, at a minimum, must

18           include substances identified by reference in Labor

19           Code § 6382(b)(1). That section of the Labor Code

20           identifies "[s]ubstances listed as human or animal

21           carcinogens by the International Agency for Research

22           on Cancer (IARC)." IARC's classification of glyphosate

23           as a Group 2A chemical ("probably carcinogenic to

24           humans") therefore triggered the listing. … A business

25           that deploys a listed chemical in its products must

26           provide "clear and reasonable warnings" to the public

27           prior to exposure to the chemical.  To be clear and

28           reasonable, a warning must "(1) clearly communicate

1             that the chemical is known to cause cancer, and/or

2             birth defects or other reproductive harm; and (2)

3             effectively reach the person before exposure."

4 A true and accurate copy of the Complaint with Jury Demand (ECF

5 No. 1) filed in the above-referenced case is attached hereto as

6 **Exhibit I.**

7      72. Similarly, plaintiffs' lawyers have cited OEHHA's

8 Proposition 65 regulatory actions with respect to glyphosate as

9 part of their litigation-driven public relations campaigns.  For

10 example, T. Matthew Phillips, an attorney in California who filed

11 a class action lawsuit against Monsanto in Los Angeles County,

12 posted the following update on the Facebook page "Monsanto Class

13 Action,":

14             PROP. 65 GLYPHOSATE UPDATE: Today, I met with Calif.

15             EPA regarding its intent to put the Prop. 65 warning

16             label on Roundup sold in Calif.  Under Prop. 65, "known

17             carcinogens" must be labeled. And note, because our

18             lawsuit is filed in Calif., we are thrilled with the

19             Prop. 65 requirement -- because it *proves* our case!

20             The Prop. 65 labeling decision *proves* Monsanto LIES

21             when they claim that Roundup affects plants only.

22             Thanks to the Prop. 65 labeling -- which publicly

23             declares that a given item is carcinogenic to humans -

24             - it becomes immediately apparent that Monsanto is

25             LYING about Roundup's effect on humans! And thus,

26             Calif. EPA effectively acts as the "knockout punch" --

27             resolving the litigation in our favor (with no need for

28             trial).

1  A true and accurate copy of the "Monsanto Class Action" update  is

2  attached hereto as **Exhibit J.**

3      73.   Likewise, the Miller Firm has brought multiple suits

4  against Monsanto based on glyphosate's alleged "carcinogenic

5  properties."  In a June 29, 2017 blog post soliciting new clients

6  who allegedly "developed non-Hodgkin's Lymphoma after exposure to

7  Roundup®," the Miller Firm indicated that California's Proposition

8  65 listing of glyphosate as a "cancer-causing" "carcinogenic

9  chemical[]" supported that firm's lawsuits against Monsanto:

10          The state of California has now added glyphosate, the

11          central ingredient in Monsanto's Roundup® herbicide,

12          to its list of carcinogenic chemicals. The CA Office

13          of Environmental Health Hazard Assessment (OEHHA) first

14          announced its intention to list glyphosate as cancer-

15          causing in September 2015.   … Glyphosate is being

16          listed by the state under the law known as Proposition

17          65, which "requires businesses to provide warnings to

18          Californians about significant exposures to chemicals

19          that cause cancer, birth defects or other reproductive

20          harm" (oehha.ca.gov/proposition-65/about-proposition-

21          65). … We are accepting clients who developed non-

22          Hodgkin's Lymphoma after exposure to Roundup®.  If this

23          has happened to you, please visit our Roundup Lawsuit

24          page to request a free consultation.  Or, please call

25          the Miller Firm at 1-800-882-2525.

26  A true and accurate copy of the "California Lists Glyphosate as a

27  Cancer-Causing Chemical Despite Monsanto Appeals" blog post,

28

1  https://millerfirmllc.com/california-lists-glyphosate-as-cancer-

2  causing/, is attached hereto as **Exhibit K.**

3      74.   The firm Baum, Hedlund, Aristei & Goldman, PC also uses

4  its website to solicit potential plaintiffs who allegedly may have

5  a claim against Monsanto arising from their exposure to glyphosate.

6  That firm's website also highlights the Proposition 65 warning:

7          California Code of Regulations Section 25904(b) states:

8          "[a] chemical or substance shall be included on the

9          [Prop 65] list of it is classified by [IARC] ... as:

10         ... (2) Probably carcinogenic to humans (Group 2A)."

11         ... Once listed as carcinogen by IARC, warnings were

12         required to prevent unwitting exposure to glyphosate.

13  A true and accurate copy of the "Prop 65 Listing and the Fight for

14  a    California    Glyphosate    Warning"    webpage,

15  https://www.baumhedlundlaw.com/toxic-tort-law/monsanto-roundup-

16  lawsuit/california-glyphosate-warning/, is attached hereto as

17  **Exhibit L.**

18   **Scientific and Regulatory Developments Relating to Glyphosate**

19      75.   As discussed in detail above, in connection with my

20  current and past roles at Monsanto, I have become personally

21  familiar with Monsanto's glyphosate products, the legal framework

22  for bringing those products to market, and the available scientific

23  literature about glyphosate.   I am also personally familiar with

24  many pertinent regulatory actions and decisions related to

25  glyphosate, both by U.S. and worldwide regulators.

26      76.   As noted above, any warning that conveyed that

27  glyphosate causes or likely causes cancer would be false, as there

28

1  is a near-unanimous worldwide consensus that glyphosate does not
2  cause cancer.

3      77.  Below are certain documents obtained from official
4  government publications, scientific journals, and other publicly
5  available sources, reflecting this near-unanimous worldwide
6  consensus, as well as related scientific and regulatory findings
7  relating to glyphosate and its regulatory treatment.

8      78.  Attached hereto as **Exhibit M** is a true and correct copy
9  of Michael Livingston et al., *Economic Returns to Herbicide*
10 *Resistance Management in the Short and Long Run: The Role of*
11 *Neighbor Effects*, Weed Sci., 2016 Special Issue.

12     79.  Attached hereto as **Exhibit N** is a true and correct copy
13 of U.S. EPA, EPA-738-F-93-011, Registration Eligibility Decision
14 (R.E.D.) Facts: Glyphosate (September 1993).

15     80.  Attached hereto as **Exhibit O** is a true and correct copy
16 of Eric Sfiligoj, *EPA Plans Response to IARC Glyphosate Finding…But*
17 *Not      Just      Yet,      CropLife*,      Apr.      6,      2015,
18 http://www.croplife.com/editorial/epa-plans-response-to-iarc-
19 glyphosate-finding-but-not-just-yet/.

20     81.  Attached hereto as **Exhibit P** is a true and correct copy
21 of OEHHA, Public Health Goal for Glyphosate in Drinking Water (Dec.
22 1997).

23     82.  Attached hereto as **Exhibit Q** is a true and correct copy
24 of OEHHA, Public Health Goal for Glyphosate (June 2007).

25     83.  Attached hereto as **Exhibit R** is a true and correct copy
26 of Health & Consumer Prot. Directorate-Gen., European Commission,
27 Review Report for the Active Substance Glyphosate, 6511/VI/99-
28 final (Jan. 21, 2002).

84.   Attached hereto as **Exhibit S** is a true and correct copy of WHO, WHO/SDE/WSH/03.04/97, Glyphosate and AMPA in Drinking-water: Background Document for Development of WHO Guidelines for Drinking-water Quality (rev. June 2005).

85.   Attached hereto as **Exhibit T** is a true and correct copy of Int'l Programme on Chemical Safety, Environmental Health Criteria 159: Glyphosate (1994).

86.   Attached hereto as **Exhibit U** is a true and correct copy of 1 Eur. Comm'n, Renewal Assessment Report: Glyphosate (rev. Mar. 31, 2015).

87.   Attached hereto as **Exhibit V** is a true and correct copy of Akshat Rathi & Gideon Lichfield, *Why it Sometimes Seems Like Everything Causes Cancer*, Quartz, June 23, 2016, https://qz.com/708925/why-it-sometimes-seems-like-everything-causes-cancer/.

88.   Attached hereto as **Exhibit W** is a true and correct copy of 112 Int'l Agency for Research on Cancer (IARC), WHO, Some Organophosphate Insecticides and Herbicides, IARC Monographs (2017).

89.   Attached hereto as **Exhibit X** is a true and correct copy of *Agriculture Biotechnology: A Look at Federal Regulation and Stakeholder Perspectives: Before the S. Comm. on Agric., Nutrition, & Forestry*, 114 Cong. 261 (2015).

90.   Attached hereto as **Exhibit Y** is a true and correct copy of U.S. EPA, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016).

91.   Attached hereto as **Exhibit Z** is a true and correct copy of Fed. Inst. for Risk Assessment (BfR), BfR Communication No.

1  007/2015, Does Glyphosate Cause Cancer? (Mar. 23, 2015).

2      92.  Attached hereto as **Exhibit AA** is a true and correct copy

3  of Gabriella Andreotti et al., *Glyphosate Use and Cancer Incidence*

4  *in the Agricultural Health Study*, 110 J. Nat'l Cancer Inst., Nov.

5  9, 2017.

6      93.  Attached hereto as **Exhibit BB** is a true and correct copy

7  of Kate Kelland, *Cancer Agency Left in the Dark Over Glyphosate*

8  *Evidence*, Reuters, June 14, 2017.

9      94.  Attached hereto as **Exhibit CC** is a true and correct copy

10  of Ben Webster, *Weedkiller Scientist was Paid £120,000 by Cancer*

11  *Lawyers*,       The       Times,       Oct.       18,       2017,

12  https://www.thetimes.co.uk/article/weedkiller-scientist-was-

13  paid-120-000-by-cancer-lawyers-v0qggbrk6.

14      95.  Attached hereto as **Exhibit DD** is a true and correct copy

15  of Kiera Butler, *A Scientist Didn't Disclose Important Data – and*

16  *Let Everyone Believe a Popular Weedkiller Causes Cancer*, Mother

17  Jones,            June            15,            2017,

18  http://www.motherjones.com/environment/2017/06/monsanto-roundup-

19  glyphosate-cancer-who/.

20      96.  Attached hereto as **Exhibit EE** is a true and correct copy

21  of Letter from Joan E. Denton, Director, OEHHA, to Dr. Paul

22  Kleihues, Director, IARC (Feb. 7, 2002).

23      97.  Attached hereto as **Exhibit FF** is a true and correct copy

24  of Press Release, Governor Brown Proposes to Reform Proposition 65

25  (May 7, 2013).

26      98.  Attached hereto as **Exhibit GG** is a true and correct copy

27  of Anthony T. Caso, *Bounty Hunters and the Public Interest—A Study*

28  *of California Proposition 65*, Engage, Mar. 2012.

99. Attached hereto as **Exhibit HH** is a true and correct copy of Leeton Lee, *Nailed by a Bounty Hunter—A California Prop 65 Violation Can Cost Your Company*, PPB Magazine, Jan. 24, 2013, https://web.archive.org/web/20130616164651/http://pubs.ppai.org/2013/01/nailed-by-a-bounty-hunter-a-california-prop-65-violation-can-cost-your-company/.

100. Attached hereto as **Exhibit II** is a true and correct copy of OEHHA, Glyphosate Listed Effective July 7, 2017, as Known to the State of California to Cause Cancer (June 26, 2017), https://oehha.ca.gov/proposition-65/crnr/glyphosate-listed-effective-july-7-2017-known-state-california-cause-cancer.

101. Attached hereto as **Exhibit JJ** is a true and correct copy of OEHHA, Notice of Intent to List: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate.

102. Attached hereto as **Exhibit KK** is a true and correct copy of Joseph Perrone, Ph.D., *Advocacy Groups Have Ulterior Motive in Wanting Weedkiller Banned*, Modesto Bee, June 21, 2017.

103. Attached hereto as **Exhibit LL** is a true and correct copy of *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, EFSA J., Nov. 12, 2015.

104. Attached hereto as **Exhibit MM** is a true and correct copy of Food & Agric. Org. of the U.N. (FAO) and WHO, Joint FAO/WHO Meeting on Pesticide Residues: Summary Report (May 16, 2016).

105. Attached hereto as **Exhibit NN** is a true and correct copy of Pest Mgmt. Regulatory Agency, Health Canada, RVD2017-01, Re-evaluation Decision: Glyphosate (Apr. 28, 2017).

1    106. Attached hereto as **Exhibit OO** is a true and correct copy

2  of Eur. Chems. Agency (ECHA) Press Release ECHA/PR/17/06,

3  Glyphosate Not Classified as a Carcinogen by ECHA (Mar. 15, 2017).

4    107. Attached hereto as **Exhibit PP** is a true and correct copy

5  of Austl. Pesticides & Veterinary Meds. Auth., Final Regulatory

6  Position: Consideration Of The Evidence For A Formal

7  Reconsideration Of Glyphosate (March 2017), https://apvma.gov.au/

8  sites/default/files/publication/26561-glyphosate-final-

9  regulatory-position-report-final_0.pdf.

10    108. Attached hereto as **Exhibit QQ** is a true and correct copy

11  of Wayne Temple, Envtl. Prot. Auth., Gov't of N.Z., Review of the

12  Evidence Relating to Glyphosate and Carcinogenicity (August 2016).

13    109. Attached hereto as **Exhibit RR** is a true and correct copy

14  of Food Safety Commission of Japan, Risk Assessment Report:

15  Pesticides, Glyphosate Summary (September 2016).

16    110. Attached hereto as **Exhibit SS** is a true and correct copy

17  of U.S. EPA, Revised Glyphosate Issue Paper: Evaluation of

18  Carcinogenic Potential EPA's Office of Pesticide Programs (Dec.

19  12, 2017).

20    111. Attached hereto as **Exhibit TT** is a true and correct copy

21  of OEHHA, Notice to Interested Parties, Chemicals Listed Effective

22  May 20, 2016 As Known to the State of California to Cause cancer:

23  Tetrachlorvinphos, Parathion, and Malathion (May 20, 2016).

24    112. Attached hereto as **Exhibit UU** is a true and correct copy

25  of Khansari Law Corporation, Notice of Violations of California

26  Health & Safety Code Section 25249.6 et seq. re: Malathion (Dec.

27  8, 2017).

28    113. Attached hereto as **Exhibit VV** is a true and correct copy

1    of OEHHA, Revised Final Statement of Reasons, Section 12601, Clear

2    and Reasonable Warning (1988).

3       114. Attached hereto as **Exhibit WW** is a true and correct copy

4    of U.S. EPA, *Glyphosate: Proposed Interim Registration Review*

5    *Decision,      Case      No.      0178*      (Apr.      23,      2019),

6    https://www.regulations.gov/document?D=EPA-HQ-OPP-2009-0361-

7    2344.

8       115. Attached hereto as **Exhibit XX** is a true and correct copy

9    of U.S. EPA, *Glyphosate: Response to Comments on the Human Health*

10    *Draft      Risk      Assessment*      (Apr.      23,      2019),

11    https://www.regulations.gov/document?D=EPA-HQ-OPP-2009-0361-

12    2343.

13       116. Attached hereto as **Exhibit YY** is a true and correct copy

14    of OEHHA, Notice of Amendment to Section 25705, No Significant

15    Risk Level – Glyphosate (2018).

16       117. Attached hereto as **Exhibit ZZ** is a true and correct copy

17    of OEHHA, Final Regulatory Amendment Section 25705, Glyphosate

18    (2018).

19       118. Attached hereto as **Exhibit AAA** is a true and correct

20    copy of OEHHA, Final Statement of Reasons, Section 25705(B)

21    Specific  Regulatory  Levels  Posing  No  Significant  Risk  No

22    Significant Risk Level: Glyphosate (2018).

23       119. Attached hereto as **Exhibit BBB** is a true and correct

24    copy of Glyphosate.  In: Joint FAO/WHO Meeting on Pesticide

25    Residues.  Pesticide  residues  in  food – 2004: toxicological

26    evaluations.  Report No. WHO/PCS/06.1  Geneva: World Health

27    Organization (2006).

28       120. Attached hereto as **Exhibit CCC** is a true and correct

1   copy of an English language translation of Rural Development

2   Administration (Korea), Safety of Pesticides Containing Glyphosate

3   and Diazinon Confirmed (Mar. 10, 2017).

4       121. Attached hereto as **Exhibit DDD** is a true and correct

5   copy of Statement from Health Canada on Glyphosate, Health Canada

6   (Jan. 11, 2019), https://www.canada.ca/en/health-canada/news/

7   2019/01/statement-from-health-canada-on-glyphosate.html

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DAVID C. HEERING

1   I declare under penalty of perjury under the laws of the United

2   States of America that the foregoing is true and correct.

3

4   Executed on 9/25/2019              /s/David C. Heering, Ph.D.

5   At St. Louis, Missouri            David C. Heering, Ph.D.

6

7                                     (original signature retained
                                      by Attorney Andrew D. Prins)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28