UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHEAT GROWERS; NATIONAL CORN GROWERS ASSOCIATION; UNITED STATES DURUM GROWERS ASSOCIATION; WESTERN PLANT HEALTH ASSOCIATION; MISSOURI FARM BUREAU; IOWA SOYBEAN ASSOCIATION; SOUTH DAKOTA AGRI-BUSINESS ASSOCIATION; NORTH DAKOTA GRAIN GROWERS ASSOCIATION; MISSOURI CHAMBER OF COMMERCE AND INDUSTRY; MONSANTO COMPANY; ASSOCIATED INDUSTRIES OF MISSOURI; AND AGRIBUSINESS ASSOCIATION OF IOWA, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF DEFENDANTS OF CALIFORNIA, <br><br> Defendant. | Civil Action No. 2:17-cv-02401-WBS-EFB <br><br> **DECLARATION OF RENEE PINEL IN SUPPORT OF COMPLAINT FOR SUMMARY JUDGMENT** |

**DECLARATION OF RENEE PINEL**

I, Renee Pinel, do hereby declare under penalty of perjury that:

1.  I submit this Declaration in support of Plaintiffs' Motion for Summary Judgment. If called upon as a witness, I could competently testify to the matters set forth herein from my own personal knowledge, except to those matters set forth on

1

Case 2:17-cv-02401-WBS-EFB   Document 117-75   Filed 09/25/19   Page 2 of 10

information and belief, and as to those matters, I am informed and believe them to be true.

2. I am the President of the Western Plant Health Association ("WPHA"), a voluntary nonprofit trade association that represents the interests of fertilizer and crop protection manufacturers, biotechnology providers, distributors and agricultural retailers in California, Arizona and Hawaii. WPHA members manufacture and sell crop protection tools utilized by California farmers.

3. WPHA was founded in 1951. I have been working with WPHA since August 3, 1992.

4. WPHA members comprise more than 90% of all the companies marketing plant nutrients, soil amendments, agricultural minerals and crop protection products in California, Arizona and Hawaii, including glyphosate.

5. The purpose of the Western Plant Health Association is to promote the agronomically sound and environmentally safe use and handling of plant health products and services for the production of safe and high quality food, fiber and horticultural products. The focus of WPHA is to promote environmental stewardship and sound agronomic practices, to communicate industry issues, to participate in legislative and regulatory affairs and to facilitate member and industry relations. WPHA provides industry leadership in advancing the stewardship of fertilizer and crop protection products. WPHA's members support a variety of educational and research programs to ensure that all products are used in an environmentally sound manner.

Declaration of Renee Pinel
2

6. WPHA is actively engaged at the local, state and national levels to provide accurate, scientific-based information to legislators and regulators. Throughout each year, WPHA sponsors seminars, workshops and a number of conferences that help educate members and non-members on environmental, safety and other related issues.

7. Glyphosate was first commercialized as an herbicide in 1974 and has since become the world's most widely used herbicide because it is efficacious, economical and environmentally benign.

8. Glyphosate is a highly effective active ingredient controlling a wide range of weeds. It is important to both California agricultural economy and the efficient use of public agencies' budgets in California. It is registered for used in more than 160 countries, approved for use on more than 250 crops in California, and is in weed control applications in non-cultivated settings.

9. Glyphosate has extremely low volatility, meaning it is highly unlikely to move off-site as a vapor to damage off-site vegetation during application. After its application, glyphosate binds very tightly to most soils and sediments in the environment and becomes unavailable for uptake by roots of nearby plants. As a result, glyphosate poses negligible risk to non-target plants with unexposed roots in the application zone and exhibits limited movement through the soil, reducing risk of movement into groundwater.

10. Glyphosate's history of safe uses is supported by decades of data from more than 800 scientific studies, many of

which were conducted by independent researchers. The testing has shown that glyphosate does not produce acute or chronic toxicity to higher organisms including wild mammals, birds, fish, aquatic invertebrates, and terrestrial invertebrates such as earthworms and honeybees at environmentally realistic exposures level. It has also shown that glyphosate-based formulations, when used according to label directions, do not cause unacceptable adverse effects to wildlife and that glyphosate showed no effects on soil biomass or microbial respiration.

11. United State Environmental Protection Agency has placed the herbicide in its most favorable category for carcinogenicity.

12. The International Agency for Research on Cancer ("IARC") is the only agency in the world that considers glyphosate to be a carcinogen, and even IARC only has classified it as a *probable* carcinogen.

13. On July 7, 2017, the California Office of Environmental Health Hazard Assessment (OEHHA) formalized its listing of glyphosate under Proposition 65 as a chemical "known to the state to cause cancer."

14. I understand that, unless the associated statutory warning requirement remains enjoined, to avoid the prospect of a costly lawsuit any product containing glyphosate residues sold in California will be required to bear a false warning pursuant to CAL. CODE REGS. tit. 27, § 25603(a), (b), stating:

Declaration of Renee Pinel
4

⚠ **WARNING:** This product can expose you to chemicals including glyphosate, which is known to the State of California to cause cancer. For more information go to www.P65Warnings.ca.gov.

or, alternatively:

⚠ **WARNING:** Cancer - www.P65Warnings.ca.gov

or words to that effect.

15. These warnings all convey the same clear message: that glyphosate causes cancer. I and Western Plant Health Association members understand and believe that (i) these warnings convey the message that glyphosate causes cancer, and (ii) any warning that suggests that glyphosate causes cancer would be false and misleading.

16. I understand that the only reason that Proposition 65's warning requirement for glyphosate is not currently in effect is because a preliminary injunction has been entered in this case. I understand that the California Attorney General plans to seek to dissolve the preliminary injunction by requesting that the Court enter summary judgment in his favor. *See* Joint Status Report, ECF No. 100 at 2.

17. If the warning requirement comes into effect, it is highly likely that some number of food producers, reacting to California's listings and warnings, will tell farmers across the nation to stop using glyphosate on their products.

18. Loss of glyphosate would force the agricultural industry to resort back to tilling, which will inevitably lead to the following: soil erosion; decrease in water infiltration

rate of soil (results in more runoff and erosion); reduces organic matter in soil; destroys soil aggregates; and crop diseases can be harbored in surface residues.

19. An additional downstream impact of this loss would be an increase in food prices. As production costs rise, increased prices are ultimately passed on to consumers.

20. Regardless of how minute the actual levels of glyphosate residue in food products, it is highly likely that some food producers will require farmers to test agricultural products for glyphosate residue levels. This, too, would increase food production costs, which would be passed on to consumers.

21. WPHA members face an increasingly complex commercial environment where customers need assurances that food is produced free of Proposition 65 concerns. Despite the environmentally safe profile for Glyphosate, WPHA members will see reduced sales and use of Glyphosate if the Proposition 65 warning requirement for glyphosate comes into effect.

22. Retailers have previously indicated that without an injunction, they will not carry glyphosate-based products unless the products' labels are updated to carry a Proposition 65 warning with which sellers vehemently disagree.

23. Specifically, in the event that food products containing glyphosate residues are required to be labeled with a cancer warning, demand for those food products would fall, which in turn will reduce the demand for glyphosate. The reason is straightforward: Most consumers do not want to purchase or consume food when that food bears a warning conveying that a

chemical on that food causes cancer, which results in decreased demand for such foods (and, as a consequence, glyphosate itself). This is common sense; even I, a person who is significantly more knowledgeable about the food supply than an ordinary consumer, would be reluctant to purchase a food product bearing a cancer warning because I would naturally assume that the warning was accurate.

24. Because demand of food products bearing a glyphosate cancer warning would naturally be expected to fall, rather than accept reduced sales food producers are likely to simply cease purchasing glyphosate-treated products. Either way, glyphosate sales would decline, and our members would be harmed.

25. WPHA has an institutional interest in protecting the reputation of its members' glyphosate products. A false cancer warning regarding these products disparages them and the crops upon which they are utilized. WPHA members do not want to provide or have another entity provide a false statement about our products. While California's listing of glyphosate under Proposition 65 as a chemical "known to the state to cause cancer" has already harmed the reputation of our members' products, the additional warning requirement, mandating that glyphosate-treated foods found in stores, restaurants, and other public locations (as well as glyphosate products themselves) bear a false warning label, would greatly amplify that false and misleading message and make the damage to our members' products reputation far worse and more widespread, because it would be widely seen by consumers and other purchasers.

26. As discussed above, many of our members sell glyphosate in California and in other states, and will feel the impact of the Proposition 65 labeling requirements. If required to label their products our members would feel serious financial harm.

27. Any of our members that make the false warning will suffer additional injury in the form of being compelled by law to communicate and effectively endorse a disparaging falsehood about their products.

28. WPHA members were not aware of the IARC Working Group's evaluation of glyphosate and did not provide comments before, during or after its classification.

29. WPHA participated in the Office of Environmental Health Hazard Assessment's restricted notice-and-comment rulemaking by providing independent written comments and comments through a coalition letter.

30. I understand that OEHHA has recently issued a regulation that establishes a "No Significant Risk Level" (NSRL) of 1100 micrograms per day for glyphosate. But this safe harbor would do nothing to remedy the problems I have identified.

31. The NSRL would not remove the immediate prospect of costly lawsuits if the warning requirement comes into effect. To even attempt to take advantage of the NSRL, our members would be required to test to determine whether our products exceeded the NSRL. Even if some of the products were tested and found to contain concentrations of glyphosate below the NSRL, enforcement action could still be brought based on the presence of glyphosate, because the amount of glyphosate across ranges of

products will vary and because, in any event, the NSRL would merely provide an affirmative defense to liability. I know that private plaintiffs have previously brought long and costly enforcement actions based on various chemicals under Proposition 65, notwithstanding that defendants had a defense of compliance with the NSRL for those chemicals. Because the only way to prevent being sued if the glyphosate warning mandate goes into effect is to provide the false and misleading warnings, I expect the same economic pressures described above to remain notwithstanding the NSRL.

32. And of course, by its terms the NSRL does not apply to many of our members' glyphosate-based products which they sell into California, which include, among other things, containers of high concentration or pure glyphosate products.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on <u>9/19/2019</u>          /s/ Renee Pinel

At   <u>Sacramento, CA</u>           Renee Pinel

    City, State          (original signature retained by attorney Ann Grottveit)