1  Philip J. Perry (CA Bar No. 148696)
   Richard P. Bress (admitted *pro hac vice*)
2  Andrew D. Prins (admitted *pro hac vice*)
   LATHAM & WATKINS LLP
3  555 Eleventh Street NW, Suite 1000
   Washington, DC 20004
4  Tel: (202) 637-2200
   philip.perry@lw.com
5  (*additional counsel on signature page*)

6

7

8

9                 UNITED STATES DISTRICT COURT

10               EASTERN DISTRICT OF CALIFORNIA

11

12 | NATIONAL ASSOCIATION OF WHEAT
   | GROWERS; NATIONAL CORN GROWERS
13 | ASSOCIATION; UNITED STATES
   | DURUM GROWERS ASSOCIATION;
14 | WESTERN PLANT HEALTH
   | ASSOCIATION; MISSOURI FARM          Civil Action No. 2:17-cv-02401-
15 | BUREAU; IOWA SOYBEAN                 WBS-EFB
   | ASSOCIATION; SOUTH DAKOTA
16 | AGRI-BUSINESS ASSOCIATION;
   | NORTH DAKOTA GRAIN GROWERS
17 | ASSOCIATION; MISSOURI CHAMBER       **PLAINTIFFS' COMBINED OPPOSITION**
   | OF COMMERCE AND INDUSTRY;           **TO DEFENDANT'S CROSS-MOTION FOR**
18 | MONSANTO COMPANY; ASSOCIATED        **SUMMARY JUDGMENT AND REPLY IN**
   | INDUSTRIES OF MISSOURI;             **SUPPORT OF PLAINTIFFS' MOTION**
19 | AGRIBUSINESS ASSOCIATION OF         **FOR SUMMARY JUDGMENT**
   | IOWA; CROPLIFE AMERICA; AND
20 | AGRICULTURAL RETAILERS              Date:       April 20, 2020
   | ASSOCIATION,                        Time:       1:30 p.m.
21 |                                     Courtroom:  5
   |                  Plaintiffs,        Trial Date: Not set.
22 |
   |                                     The Honorable William B. Shubb
23 |
   | XAVIER BECERRA, IN HIS              Case Filed: Nov. 15, 2017
24 | OFFICIAL CAPACITY AS ATTORNEY
   | GENERAL OF THE STATE OF
25 | CALIFORNIA,
   |
26 |
   |                  Defendant.
27 |

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT............................ 1

ARGUMENT......................................................... 9

I.  THE OVERWHELMING WEIGHT OF AUTHORITY IS THAT
    GLYPHOSATE DOES NOT CAUSE CANCER........................... 9

    A.  IARC's Probable Hazard Conclusion Remains
        An Outlier............................................. 9

    B.  No Recent Developments Undermine the International
        Consensus That Glyphosate Does Not Cause Cancer In
        Humans................................................ 14

    C.  The Attorney General's Attacks on EPA Lack Merit.... 19

II.  PLAINTIFFS' FIRST AMENDMENT CLAIM IS RIPE............... 25

    A.  Plaintiffs' Claims Are Constitutionally Ripe........ 26

    B.  Plaintiffs' Claims Are Prudentially Ripe............ 37

III. THE ATTORNEY GENERAL HAS FAILED TO ESTABLISH THAT
     PROPOSITION 65'S WARNING REQUIREMENT CAN BE
     APPLIED CONSTITUTIONALLY TO GLYPHOSATE.................. 38

    A.  The Third Proposed Warning Would Not Comply With
        Proposition 65........................................ 40

    B.  The Third Proposed Warning Violates The First
        Amendment............................................. 45

        1.  The Third Proposed Warning Is Not Eligible For
            Review Under *Zauderer*........................... 45

        2.  The Attorney General Still Fails To Carry the
            State's Burden Under *Central* Hudson............ 52

            a.  The Attorney General Fails To Show That the
                Warning Advances a Substantial Governmental
                Interest...................................... 53

            b.  The Attorney General Fails To Show that the
                Warning Requirement Is Narrowly Tailored...... 56

CONCLUSION.......................................................58

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) .....................................37, 38

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) .........................................28

*Am. Beverage Ass'n v. City of S.F.*,
  916 F.3d 749 (9th Cir. 2019) ...............................45

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) ...........................47, 51

*Amidon v. Student Ass'n of S.U.N.Y.*,
  508 F.3d 94 (2d Cir. 2007) .................................51

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) .........................................27

*Baxter Healthcare Corp. v. Denton*,
  120 Cal. App. 4th 333 (Cal. App. 2004) .....................28

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
  271 F.3d 1141 (9th Cir. 2001) ...........................6, 43

*Cellco P'Ship v. FCC*,
  357 F.3d 88 (D.C. Cir. 2004) ...............................29

*Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980) ......................................8, 52

*Consumer Def. Grp. v. Rental Hous. Indus. Members*,
  137 Cal. App. 4th 1185 (Cal. App. 2006) ................31, 33

*CTIA – The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) ...........................38, 48

*Czyzewski v. Jevic Holding Corp.*,
  137 S. Ct. 973 (2017) ....................................5, 30

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993) .........................................15

*Dowhal v. Smithkline Beecham Consumer Healthcare*,
  32 Cal. 4th 910 (2004) ...............................5, 40, 45

*Edenfield v. Fane*,
  507 U.S. 761 (1993) .........................................52

*Envtl. Law Found. v. Beech-Nut Nutrition Corp.,*
  235 Cal. App. 4th 307 (Cal. App. 2015) ......................33

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) .........................................44

*Homemakers N. Shore, Inc. v. Bowen,*
  832 F.2d 408 (7th Cir. 1987) ...............................19

*Int'l Dairy Foods Ass'n v. Amestoy,*
  92 F.3d 67 (2d Cir. 1996) ..................................54

*Italian Colors Restaurant v. Becerra,*
  878 F.3d 1165 (9th Cir. 2018) .......................4, 30, 53

*Johanns v. Livestock Mktg. Ass'n,*
  544 U.S. 550 (2005) .........................................52

*Legislature v. Deukmejian,*
  34 Cal. 3d 658 (1983) .......................................8

*Libertarian Party of L.A. Cty. v. Bowen,*
  709 F.3d 867 (9th Cir. 2013) ...............................27

*People ex rel. Lockyer v. Tri-Union Seafoods, LLC,*
  Nos. CGC-01-402975, CGC-04-432394, 2006 WL 1544384
  (Cal. Super. Ct. May 11, 2006) ............................42

*Mangual v. Rotger-Sabat,*
  317 F.3d 45 (1st Cir. 2003) ................................35

*Meese v. Keene,*
  481 U.S. 465 (1987) .........................................36

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
  559 U.S. 229 (2010) .........................................49

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ......................................5, 29

*Nat'l Ass'n of Mfrs. v. SEC,*
  800 F.3d 518 (D.C. Cir. 2015) .....................47, 51, 53

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
  272 F.3d 104 (2d Cir. 2001) ................................55

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
  138 S. Ct. 2361 (2018) .........................9, 45, 55, 57

*Office of Sen. Mark Dayton v. Hanson,*
  550 U.S. 511 (2007) .........................................44

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
  475 U.S. 1 (1986) ........................................7, 49

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN
SUPP. OF PLAINTIFFS' MOT. FOR S.J.

1   *People v. Canty*,
        32 Cal. 4th 1266 (2004) ....................................55
2
    *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*,
3       487 U.S. 781 (1988) ....................................44, 57

4   *In re Roundup Prod. Liab. Litig.*,
        385 F. Supp. 3d 1042 (N.D. Cal. 2019) ...............3, 23, 24
5
    *In re Roundup Prods. Liab. Litig.*,
6       390 F. Supp. 3d 1102 (N.D. Cal. 2018) ..................*passim*

7   *Rubin v. Coors Brewing Co.*,
        514 U.S. 476 (1995) .......................................52
8
    *Serono Labs., Inc. v. Shalala*,
9       158 F.3d 1313 (D.C. Cir. 1998) ............................19

10  *Suitum v. Tahoe Reg'l Planning Agency*,
        520 U.S. 725 (1997) .......................................37
11
    *Susan B. Anthony List v. Driehaus*,
12      573 U.S. 149 (2014) ...........................30, 31, 37, 38

13  *TrafficSchool.com, Inc. v. eDriver Inc.*,
        653 F.3d 820 (9th Cir. 2011) ..............................37
14
    *United States v. Students Challenging Regulatory
15      Agency Procedure*,
        412 U.S. 669 (1973) .......................................29
16
    *Video Software Dealers Ass'n v. Schwarzenegger*,
17      556 F.3d 950 (9th Cir. 2009) .....................46, 48, 53

18  *Wine & Spirits Retailers, Inc. v. Rhode Island*,
        418 F.3d 36 (1st Cir. 2005) ...............................36
19
    *Wolfson v. Brammer*,
20      616 F.3d 1045 (9th Cir. 2010) ...............26, 30, 31, 32

21  *Zauderer v. Office of Disciplinary Counsel of Supreme
        Court of Ohio*,
22      471 U.S. 626 (1985) ...................................*passim*

23                    **STATUTES & REGULATIONS**

24  29 C.F.R. § 1910.1200(g)(8)...................................34

25  40 C.F.R. § 152.43...........................................20

26  7 U.S.C. § 136a(e)-(f) ......................................20

27  Cal. Code Civ. Proc. § 128.5................................35

28  Cal. Code Regs. Tit. 11, § 3202(b).....................6, 40, 43

LATHAM&WATKINS
ATTORNEYS AT LAW

iv        PLAINTIFFS' COMBINED OPP. TO DEF.'S
          CROSS-MOT. FOR S.J. AND REPLY IN
          SUPP. OF PLAINTIFFS' MOT. FOR S.J.

Cal. Code Regs. Tit. 11, § 3203(b) ............................... 31

Cal. Code Regs. Tit. 27, § 25603(a), (b) ........................ 38

Cal. Code Regs. Tit. 27, § 25606(a) ............................. 34

Cal. Code Regs. Tit. 27, § 25701(b)(3)(A) ....................... 27

Cal. Code Regs. Tit. 27, § 25703 ................................ 11

Cal. Code Regs. Tit. 27, § 25705 ................................ 26

Cal. Code Regs. Tit. 27, § 25705(b)(1) .......................... 27

Cal. Code Regs. Tit. 27, § 25721(d)(4) .................. 30, 32, 33

Cal. Health & Safety Code §§ 25249.5-25249.13 ................... 56

Cal. Health & Safety Code § 25249.6 ................. 2, 27, 40, 42

Cal. Health & Safety Code § 25249.7 ............................. 27

Cal. Health & Safety Code § 25249.7(b) .......................... 31

Cal. Health & Safety Code § 25249.7(d) .......................... 31

Cal. Health & Safety Code § 25249.7(d)(1), (e)(1)(A) ........... 35

Cal. Health & Safety Code § 25249.7(h)(2) ................... 35, 36

Cal. Health & Safety Code § 25249.10 ............................ 26

Cal. Health & Safety Code § 25249.10(b) ......................... 40

Cal. Health & Safety Code § 25249.10(c) .................... 27, 31

**OTHER AUTHORITIES**

*Cause*, American Heritage Dictionary of the English
     Language (3d ed. 2000) ...................................... 46

Merriam-Webster's Collegiate Dictionary (10th ed.
     1993) ...................................................... 46

Merriam-Webster's Collegiate Dictionary (10th ed.
     1997) ...................................................... 46

Webster's II New College Dictionary (3d ed. 2005) ............. 46

Webster's Third New International Dictionary
     Unabridged (1993) .......................................... 46

LATHAM&WATKINS
ATTORNEYS AT LAW

v

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN
SUPP. OF PLAINTIFFS' MOT. FOR S.J.

1  **INTRODUCTION AND SUMMARY OF ARGUMENT**

2 Two years ago this Court recognized that "virtually

3 all . . . government agencies and health organizations that have

4 reviewed studies on [glyphosate] ha[ve] found there was no evidence

5 that it caused cancer." Mem. & Order re: Mot. for Prelim. Inj. 14

6 (Dkt. No. 75) ("PI Order"). Yet under Proposition 65, California

7 sought to compel Plaintiffs to tell consumers that glyphosate is

8 "known to the state to cause cancer" based on the view of one

9 nongovernmental health entity in Europe—the International Agency

10 for Research on Cancer ("IARC")—that glyphosate "probably" can

11 cause cancer. The Court concluded on that record that the warning

12 would be "misleading at best" and that it could not be

13 constitutionally compelled under the First Amendment. *Id.* And

14 the Court preliminarily enjoined the Attorney General (and those

15 in privity with him) from enforcing the Proposition 65 requirement

16 for glyphosate.

17 Nothing has changed that warrants a different conclusion

18 today. The Attorney General has identified no new material facts:

19 The Attorney General does not claim that a single regulator or

20 health agency now agrees with IARC. There have also been no

21 material changes in the law. This Court stayed proceedings to

22 await the Ninth Circuit's decisions in *American Beverage Ass'n v.*

23 *City of San Francisco* and *CTIA - The Wireless Ass'n v. City of*

24 *Berkeley*. The Ninth Circuit has issued opinions in both cases,

25 and nothing in them undermines this Court's conclusion that the

26 First Amendment forbids California from compelling Plaintiffs to

27 convey a controversial and misleading message on the State's

28 behalf. Finally, there have been no pertinent changes to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1   Proposition 65:  The statute still requires a "clear and reasonable

2   warning" before "expos[ing] any individual to a chemical known to

3   the state to cause cancer."  Cal. Health & Safety Code § 25249.6.

4   And private bounty hunters can still sue to enforce that

5   requirement, regardless of the views of California's Attorney

6   General.

7        The Attorney General nonetheless insists that this Court

8   should reach a different conclusion today.  The arguments he

9   advances have no merit.

10        1.  The Attorney General argues (at 14-20) that the facts

11  have changed because in a handful of personal injury cases juries

12  have concluded that glyphosate caused the plaintiffs' lymphomas.

13  But set against the overwhelming consensus of EPA and other

14  national regulators, a few personal injury verdicts are not a

15  material development for this case.  Furthermore, the plaintiffs

16  in each of those actions leaned heavily on IARC's outlier

17  conclusions, and Monsanto was prevented from fully informing the

18  juries of the worldwide consensus that glyphosate does not cause

19  cancer.  And, even then, the trial courts found that the science

20  just barely allowed plaintiffs' experts to get to a jury or their

21  claims to survive summary judgment.  Judge Chhabria in the Northern

22  District of California, for example, found that the evidence

23  "seem[ed] too equivocal to support any firm conclusion that

24  glyphosate causes" lymphoma.  *See In re Roundup Prods. Liab.*

25  *Litig.*, 390 F. Supp. 3d 1102, 1108-09 (N.D. Cal. 2018).  He also

26  recognized that the plaintiffs introduced "complete[] junk

27  science" at trial.  Supplemental Declaration of David C. Heering

28  (Heering Suppl. MSJ Decl.) Ex. B, Trial Tr. of Proceedings at

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

2   PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1875:4-14, *Hardeman v. Monsanto Co.*, No. C 16-00525 VC (N.D. Cal.
Mar. 11, 2019) ("*Hardeman* Trial Tr."). These personal injury
cases, all currently pending on appeal, change nothing here.

The Attorney General also attempts to undermine EPA's
conclusion that glyphosate does not cause cancer. (He
conspicuously ignores almost every other international regulator.)
But EPA's conclusion is demonstrably better supported than IARC's.
EPA considered a much broader range of scientific data, followed
a much more rigorous and open process, and explicitly considered
and rejected IARC's contrary conclusions. And while the Attorney
General continues to argue (at 23-25) that Monsanto has "improperly
influenced EPA's scientific determination" over the decades, the
facts do not support this conspiracy theory. *See also In re
Roundup Prod. Liab. Litig.*, 385 F. Supp. 3d 1042, 1047 (N.D. Cal.
2019) (finding "[plaintiff] did not present evidence that Monsanto
hid evidence from the EPA or, alternatively, that it had managed
to capture the EPA"). Indeed, in the course of its glyphosate
risk assessment in 2018, EPA reviewed multiple public comments
leveling similar accusations of improper influence. *See* Heering
Suppl. MSJ Decl. Ex. D, Nat. Res. Defense Council, Comments on
Draft Human Health and Ecological Risk Assessment for Glyphosate,
EPA-HQ-OPP-2009-0361-0066, at 5 (Apr. 30, 2018) (asserting
"communication and collaboration between Monsanto" and EPA). But
EPA expressly noted that the comments submitted to it "did not
result in changes to the agency's risk assessment." Heering Suppl.
MSJ Decl. Ex. E, EPA, Response from the Pesticide Re-evaluation
Div. (PRD) to Comments on the Glyphosate Proposed Interim Decision
at 2 (Jan. 16, 2020).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
3   CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1        2.   Lacking any material factual developments that could

2   change the outcome of this case, the Attorney General once again

3   asks this Court to dismiss Plaintiffs' claims as unripe.   He

4   emphasizes OEHHA's finalization of a "no significant risk level"

5   (NSRL) for glyphosate, which may be used by Proposition 65

6   defendants to mount an affirmative defense to enforcement actions.

7   But this Court previously rejected the very same ripeness argument

8   premised on OEHHA's likely finalization of an NSRL, explaining

9   that even assuming Plaintiffs' "products were tested and found to

10  contain concentrations of glyphosate below the" NSRL, they would

11  "still have no reasonable assurance that they would not be subject

12  to enforcement action."   PI Order 7.

13       That holding is equally valid today.   Even if most glyphosate

14  exposures will be below the NSRL, that will not deter professional

15  bounty hunters from bringing suits to extract settlements—suits

16  that may need to be litigated to summary judgment or even trial to

17  fully establish an NSRL-based defense.   Given the history of

18  Proposition 65 litigation, and the incentives created by the

19  statutory scheme, such strike suits are inevitable.   And that

20  "credible threat of enforcement" by "private citizens [given] a

21  right of action to sue for damages" more than suffices to establish

22  that Plaintiffs' First Amendment claim is justiciable.   *Italian*

23  *Colors Restaurant v. Becerra*, 878 F.3d 1165, 1171-73 (9th Cir.

24  2018).

25       Moreover, Plaintiffs will in any event be forced to test their

26  products to determine whether they fall below the NSRL—testing

27  that even the Attorney General concedes (at 35) will cost, at

28  minimum, hundreds of dollars per product.   As this Court previously

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

4

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

recognized, that necessary expenditure of money and resources by itself confirms that this case is justiciable.  PI Order 9; *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154-55 (2010).  And this is to say nothing of the massive litigation costs involved in defending against bounty hunter suits, or the evidence Plaintiffs have produced that they will face lost sales from retailers who will fear to sell glyphosate products without a Proposition 65 warning.  In short, Plaintiffs stand to suffer multiple independent injuries from Proposition 65's warning requirement——injuries that militate for this Court's immediate review.

3.  On the merits, the Attorney General makes little effort to argue that either OEHHA's safe-harbor warnings or the two alternative warnings he previously proffered can constitutionally be applied to glyphosate.  Instead, the Attorney General now offers up a *third* proposed alternative warning.  But like the last two, this iteration complies neither with Proposition 65 nor the First Amendment.

As an initial matter, the third proposed warning would fail to comply with Proposition 65's warning requirement.  The California Supreme Court has held unequivocally that the statute requires a warning stating that the chemical at issue (here, glyphosate) is "'known to the state of California to cause [cancer],' or words to that effect." *Dowhal v. Smithkline Beecham Consumer Healthcare*, 32 Cal. 4th 910, 918 (2004).  This Court has recognized that the message conveyed by that compelled statement

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

5

1   is that "exposure to glyphosate *in fact causes cancer*." PI Order

2   14 (emphasis added).    The third proposal runs afoul of that

3   statutory requirement because "by discussing the EPA's contrary

4   finding that glyphosate does not cause cancer," it (like the

5   Attorney General's prior efforts) "appears to 'contradict or

6   obfuscate otherwise acceptable warning language' in violation of

7   [the Attorney General's own] regulation" interpreting Proposition

8   65.   Mem. & Order re: Mot. to Alter or Amend Prelim. Inj. Order 9

9   n.7 (Dkt. No. 97) ("Order Denying Mot. to Amend") (quoting Cal.

10  Code Regs. Tit. 11 § 3202(b)).   And this problem cannot be fixed

11  by tinkering further with the warning language: "[A] warning

12  properly    characterizing    the    debate    as    to    glyphosate's

13  carcinogenicity would not comply with Proposition 65 and the

14  applicable regulations," because any truthful description of the

15  science necessarily would contradict the core message required by

16  Proposition 65.   *Id.*

17       The procession of new alternative warnings proffered in this

18  litigation    itself    militates    against    the    Attorney    General's

19  interpretation    of    Proposition 65:    if    the    statute's    warning

20  requirement were really as formless and malleable as he suggests,

21  it would fail to provide the "degree of specificity and clarity"

22  necessary when "First Amendment freedoms are at stake." *Cal.*

23  *Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th

24  Cir. 2001).    To be clear, Plaintiffs do not contend that

25  Proposition 65 is, in fact, unconstitutionally vague; we believe

26  its requirements—as interpreted authoritatively by the California

27  Supreme Court and the Attorney General's own regulations—are

28  clear (and clearly unconstitutional as applied to glyphosate).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

6

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1   Rather, the serious constitutional doubts that would be raised by

2   a compelled-speech requirement as standardless as the Attorney

3   General's litigation-driven characterization of Proposition 65

4   provides an *additional* reason to reject his "flexible"

5   interpretation of the statute.

6       Even if the Attorney General's third proposed warning

7   complied with Proposition 65, however, it would not comply with

8   the First Amendment.  That problem is inescapable because the

9   message conveyed by Proposition 65's core statement——that

10  *glyphosate causes cancer*——is false or, at a minimum, profoundly

11  misleading.  PI Order 14.  And the First Amendment flatly forbids

12  the government from compelling false or misleading speech,

13  regardless of whether the government permits the speaker to add

14  further text (such as that in the third proposal) in an effort to

15  undo the damage caused by the compelled falsehood.  Indeed, forcing

16  private parties to engage in additional speech responding to IARC's

17  outlier views inflicts a further First Amendment harm.  *See Pac.*

18  *Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 4, 11-

19  12, 20-21 (1986) (holding that "the State is not free . . . to

20  force [a party] to respond to views that others may hold").

21      And even if allowing additional language could in theory cure

22  the First Amendment violation, the third proposed warning's text

23  would not suffice.  To the contrary, telling consumers that

24  glyphosate is "known" by California to "cause" cancer "because the

25  International Agency for Research on Cancer has classified it as

26  a carcinogen, concluding . . . that it is probably carcinogenic to

27  humans" *exacerbates* the problem, because it reinforces the message

28  that glyphosate in fact causes cancer.  Nor is that constitutional

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

7   PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1    problem remedied by the third proposal's brief acknowledgement

2    that "EPA has concluded that glyphosate is not likely to be

3    carcinogenic to humans."  As this Court has recognized, this text,

4    at most, "conveys the message that there is equal weight of

5    authority for and against the proposition that glyphosate causes

6    cancer," which is itself misleading "when the heavy weight of

7    evidence in the record is that glyphosate is not known to cause

8    cancer."  Order Denying Mot. to Amend 9.

9         Because the third proposed warning is inaccurate and

10   misleading, it is ineligible for review under *Zauderer v. Office*

11   *of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626

12   (1985), and it cannot survive scrutiny under *Central Hudson Gas &*

13   *Electric v. Public Service Commission*, 447 U.S. 557 (1980).  First,

14   the government has no legitimate interest, much less a substantial

15   interest, in misleading consumers.  Second, the governmental

16   interest the Attorney General now invokes——informing consumers

17   whenever one of a handful of entities (including IARC) determines

18   that a substance *may* cause cancer at a level that may be beyond

19   any relevant human exposure——is not in fact the interest underlying

20   the statute's notice requirement.  The voters who enacted

21   Proposition 65 were told that the purpose of the law would be to

22   require "businesses to warn people before knowingly and

23   intentionally exposing them to chemicals *that cause cancer*."

24   Zuckerman Cross-MSJ Decl. Ex. WW (Dkt. No. 138-23) (Ballot Summary

25   at 52 (emphasis added)).[1]  Third, even if it were in actuality the

26

27   [1] *See Legislature v. Deukmejian*, 34 Cal. 3d 658, 673 n.14 (1983)
     (noting that courts look to the "[b]allot summaries and arguments"
28   to determine voters' intent).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

                                        PLAINTIFFS' COMBINED OPP. TO DEF.'S
                                    8   CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                                        OF PLAINTIFFS' MOT. FOR S.J.

1  interest the statute was meant to advance, this new, nebulous

2  interest the Attorney General articulates is not a substantial

3  governmental interest that can justify compelled speech under

4  *Central Hudson*.   While consumers certainly have a substantial

5  interest in being told about products that actually cause cancer,

6  and perhaps about products that likely cause cancer, that cannot

7  justify the warning here, since even IARC did not conclude that

8  glyphosate can cause cancer in humans under realistic exposure

9  conditions——and the worldwide consensus is that glyphosate does

10 *not* present a cancer risk to humans.   Finally, to the extent the

11 State has any legitimate interest in informing consumers about

12 IARC's probable "hazard" finding, the Attorney General fails to

13 explain why the State could not advance that interest, without

14 burdening private speech, by providing consumers that information

15 itself.   *See Nat'l Inst. of Family & Life Advocates v. Becerra*,

16 138 S. Ct. 2361, 2376 (2018) ("*NIFLA*") (holding disclosure law

17 unconstitutional in part because California "could inform [its

18 citizens] itself with a public-information campaign").

19                                **ARGUMENT**

20 **I.   THE OVERWHELMING WEIGHT OF AUTHORITY IS THAT GLYPHOSATE DOES
       NOT CAUSE CANCER**

21

22         **A.   IARC's Probable Hazard Conclusion Remains An Outlier**

23         Throughout this litigation one thing has remained crystal

24 clear: the weight of global authority overwhelmingly reflects that

25 glyphosate does not cause cancer.   As this Court noted, aside from

26 IARC, "virtually all other government agencies and health

27 organizations that have reviewed studies on the chemical ha[ve]

28 found there was no evidence that it caused cancer."   PI Order 14.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

                                              PLAINTIFFS' COMBINED OPP. TO DEF.'S
                                         9  CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                                              OF PLAINTIFFS' MOT. FOR S.J.

1  That was true in 2018, and it is equally true today.  Most notably,

2  "EPA has reviewed studies regarding the carcinogenicity of

3  glyphosate multiple times and has determined each time that there

4  was no or insufficient evidence that glyphosate causes cancer."

5  *Id.* at 15-16.   EPA has explicitly rejected IARC's contrary

6  conclusion, found the claim that glyphosate is carcinogenic to be

7  "false and misleading," and cautioned that including a cancer

8  warning on the labeling of glyphosate products would render the

9  products unlawfully "misbranded."   *See* Heering MSJ Decl. Ex. E

10  (Dkt. No. 117-9).   Indeed, just last month, after spending years

11  "thoroughly evaluat[ing] potential human health risk associated

12  with exposure to glyphosate," EPA conclusively reaffirmed that

13  "there are no risks to human health from the current registered

14  uses of glyphosate and that glyphosate is not likely to be

15  carcinogenic to humans."   Heering Suppl. MSJ Decl. Ex. F, EPA,

16  Glyphosate: Interim Registration Review Decision Case No. 0178 at

17  10 (Jan. 2020).

18       And regulators worldwide continue to agree with EPA.  "Several

19  international agencies have likewise concluded that there is

20  insufficient evidence that glyphosate causes cancer, including the

21  European Commission's Health and Consumer Protection Directorate-

22  General, multiple divisions of the World Health Organization

23  besides the IARC, and Germany's lead consumer health and safety

24  regulator."  PI Order 16.  The Attorney General does not dispute

25  that expert regulators in Canada, Australia, New Zealand, Japan,

26  South Korea, and even California's OEHHA[2] have also concluded that

27  _____

28  [2] The Attorney General suggests (at 13) that during the NSRL process
OEHHA changed its earlier stance and now agrees with IARC's
carcinogenicity conclusions.  Not so.  OEHHA's Final Statement of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

                                    PLAINTIFFS' COMBINED OPP. TO DEF.'S
                              10   CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                                    OF PLAINTIFFS' MOT. FOR S.J.

1  glyphosate is not carcinogenic. *See* Pls.' MSJ at 37-38 (Dkt. No.

2  117-1); *see also* Def.'s Resp. to Pls.' Statement of Undisputed

3  Facts ¶¶ 16-17, 25-29 (Dkt. No. 125-2) (registering no substantive

4  dispute or objection to these entities' findings). Just as in

5  2018, the "heavy weight of evidence in the record [is] that

6  glyphosate is not in fact known to cause cancer." PI Order 17;

7  Order Denying Mot. to Amend 9 (same).[3]

8       The Attorney General mostly ignores this international

9  consensus, and instead claims (at 12-20) that "an accumulation of

10 evidence has bolstered IARC's classification of glyphosate's

11

12 Reasons *noted* IARC's "finding of sufficient evidence of
   carcinogenicity in experimental animals," *without* endorsing the
13 correctness of those findings. *See* Zuckerman Cross-MSJ Decl. Ex.
   O at 4 (Dkt. No. 135-2). Indeed, OEHHA steadfastly refused to
14 opine on the validity of "IARC's scientific conclusions," instead
   finding that comments addressed to those issues were "not directed
15 to the subject of this rulemaking." *Id.* at 2-3. OEHHA did "agree"
   with IARC that two mouse studies showed increased incidences of
16 tumors that were "treatment-related," but OEHHA did not weigh these
   studies against others to reach a broader conclusion on
17 carcinogenicity. *Id.* at 19-20. The only action OEHHA took—as
   required under Proposition 65—was to set the NSRL at a level
18 supposedly based on "evidence . . . of comparable scientific
   validity to the evidence . . . which form the scientific basis for
19 listing the chemical as known to the state to cause cancer" based
   on "the most sensitive study deemed to be of sufficient quality."
20 27 Cal. Code Regs. § 25703.

21 [3] In his Response to Plaintiffs' Statement of Undisputed Facts
   (Dkt. No. 125-2 ¶ 19), the Attorney General takes issue with
22 Plaintiffs' reliance on the World Health Organization Guidelines
   for Drinking-Water Quality for the view that "glyphosate presents
23 no evidence of carcinogenicity." But while those Guidelines did
   not reach an express conclusion on glyphosate's potential
24 carcinogenicity, the Guidelines did review multiple mouse studies
   concerning long-term exposure and carcinogenicity, found "no
25 effect on survival," and discounted one study reflecting a
   potential "carcinogenic effect in rats" "in light of the absence
26 of an effect at much higher dose levels in the more recent 2-year
   study in rats." Heering MSJ Decl. Ex. S (Dkt. No. 117-23) (WHO,
27 WHO/SDE/WSH/03.04/97, Glyphosate and AMPA in Drinking water:
   Background Document for Development of WHO Guidelines for
28 Drinking-Water Quality at 5-6 (rev. June 2005)).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

                                        PLAINTIFFS' COMBINED OPP. TO DEF.'S
                                    11  CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                                        OF PLAINTIFFS' MOT. FOR S.J.

1  carcinogenicity."    But  "additional  support  for  the  IARC

2  determination  does  not  change  the  fact  that  the  overwhelming

3  majority  of  agencies  that  .  .  .  have  examined  glyphosate  have

4  determined  it  is  not  a  cancer  risk."   Order  Denying  Mot.  to  Amend

5  5.   And,  in  fact,  the  recent  accumulation  of  evidence  shows  even

6  more  strongly  that  IARC  was  wrong.

7       Many  regulators,  including  EPA  and  the  national  regulators  in

8  Canada,  Australia,  and  New  Zealand,  have  directly  addressed  IARC's

9  glyphosate  findings  and  concluded  that  they  are  wrong,  or,  at  best,

10 unpersuasive.    EPA,  for  instance,  explained  just  last  year  why

11 IARC's  process  was  deficient  and  why  EPA  was  standing  by  its  non-

12 carcinogenicity  conclusion.   *See* Heering  MSJ  Decl.  Ex.  WW  at  7

13 (Dkt.  No.  117-54).   As  EPA  explained,  its  own  "cancer  evaluation

14 is  more  robust  than  IARC's  evaluation."   *Id*.   IARC  "only  considers

15 data  that  have  been  published  or  accepted  for  publication  in  the

16 openly  available  scientific  literature,"  but  EPA  considered  much

17 more  information  when  it  evaluated  glyphosate.   *Id*.; *see also id*.

18 ("IARC  only  considered  8  animal  carcinogenicity  studies  while

19 [EPA]  used  15  acceptable  carcinogenicity  studies  .  .  .  .").[4]   And

20 some  of  the  studies  IARC  *did*  consider  "were  not  appropriate  for

21 ─────────────────────

[4]  This  artificial,  self-imposed  limitation  severely  compromises
22 IARC's  conclusions.   For  example,  IARC  had  access  to  data  from  the
     2017  AHS  study——sponsored  by  the  U.S.  National  Institutes  of
23 Health,  National  Cancer  Institute,  and  the  National  Institute  of
     Environmental  Health  Science——that  analyzed  health  effects  in  over
24 54,000  pesticide  applicators  over  the  course  of  three  decades  and
     confirmed  there  is  "no  evidence  of  an  association  between
25 glyphosate  use  and  risk  of  any"  cancer.   *See* Heering  MSJ  Decl.  Ex.
     AA  (Dkt.  No.  117-32).    Yet  IARC's  artificial,  self-imposed
26 restrictions  prevented  it  from  considering  that  data,  because  the
     study  was  still  two  years  away  from  publication.   Of  course,  the
27 fact  that  the  data  underlying  this  gold-standard  study  was  not  yet
28 published  does  not  make  it  irrelevant.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

                                    PLAINTIFFS' COMBINED OPP. TO DEF.'S
                              12    CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                                    OF PLAINTIFFS' MOT. FOR S.J.

determining the human carcinogenic potential of glyphosate" because they were conducted in "non-mammalian species (*i.e.*, worms, fish, reptiles, and plants)" where results do not extrapolate to humans.  *Id.*

Not only was it more robust, EPA's glyphosate review was also "more transparent" than IARC's.  *Id.* at 8.  EPA's finding went through "external peer review" and was subject to public comments. *Id.*  And EPA "responded to [the external peer review] report, addressed [specific] recommendations, and made revisions to its cancer assessment that were transparent and provided to the public."  *Id.*  In contrast, IARC's process was completely closed-door: it was "not accessible to the public"; IARC's "deliberations are closed," "its process does not allow for public comments," and its "reports are final without an external peer review."  *Id.*

Canada's Pest Management Regulatory Agency also expressly rejected IARC's conclusion.  *See* Heering MSJ Decl. Ex. NN. app. I at 18-24 (Dkt. No. 117-45).  Just like EPA, Canada "assessed a much larger and more relevant body of scientific information than was considered by IARC," *id.* at 18, including significant and "detailed information" that IARC lacked, *id.* at 21.  And others in the broader global community have similarly rejected IARC's conclusion.  *See*  Heering MSJ Decl. Ex. PP at 8-9 (Dkt. No. 117-47) (Australia's Pesticides and Veterinary Medicines Authority "chose to consider glyphosate for reconsideration following the publication of the IARC Monograph," but retained its conclusion that "the scientific weight-of-evidence indicates that: exposure to glyphosate does not pose a carcinogenic or genotoxic risk to humans"); Heering MSJ Decl. Ex. QQ at 2, 16 (Dkt. No. 117-48) (New

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
13   CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

Zealand EPA "review[ed] the basis on which [IARC] classified [glyphosate] as a probable human carcinogen," and concluded that "based on a weight of evidence approach . . . glyphosate is unlikely to be genotoxic or carcinogenic to humans").

**B.   No Recent Developments Undermine the International Consensus That Glyphosate Does Not Cause Cancer In Humans**

Unable to identify a single national regulator that shares IARC's view that glyphosate is a probable carcinogen, the Attorney General instead claims that a handful of *personal injury* verdicts (all of which are currently on appeal), a letter written by an expert for tort plaintiffs, and a single new scientific article reinforce IARC's finding.  None of these developments provides the Attorney General material support.

1.   Jury verdicts in personal injury cases should have little weight in the face of the overwhelming contrary consensus by expert regulators who have intensively studied the issue.  But in any event, a closer look demonstrates that those personal injury verdicts, even taken on their own terms, fail to undermine the international consensus.

In the federal multidistrict litigation, *Hardeman v. Monsanto*, No. 16-cv-0525-VC (N.D. Cal.), plaintiffs are claiming that Monsanto's glyphosate-based herbicides caused Non-Hodgkin Lymphoma (NHL).  At the pre-trial phase the parties disputed both general causation (whether glyphosate is capable of causing NHL at all) and specific causation (whether exposure to Monsanto's glyphosate-based products caused plaintiffs' NHL).  *See In re Roundup*, 390 F. Supp. 3d at 1110.  Monsanto moved to exclude plaintiffs' proffered experts on both issues, arguing their

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
14   CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

testimony fell short of the minimum standards for admission of expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

Judge Chhabria explained that throughout the *Hardeman* litigation plaintiffs "heav[il]y reli[ed] on IARC's classification of glyphosate" and "put forward some expert opinions that largely parrot IARC's analysis and conclusions." *See In re Roundup*, 390 F. Supp. 3d at 1113; *see also* Heering Suppl. MSJ Decl. Exs. A & C, Trial Tr. of Proceedings at 358-59, 2015:15-20, *Hardeman v. Monsanto Co.*, No. 16-cv-00525 VC (2019). But, he warned, even IARC recognizes that its conclusion is a "first step" in an overall public health assessment, designed only to "identify cancer hazards even when *risks* are very low at current exposure levels." *See In re Roundup*, 390 F. Supp. 3d at 1114 (emphasis added). IARC's "hazard" determination does not involve the second necessary step——an actual "risk assessment," which gauges potential carcinogenic effects from realistic levels of human exposure——an assessment that IARC left to "other public health entities." *Id.* at 1108. At the general causation stage, Judge Chhabria concluded that "[t]he evidence, viewed in its totality, seem[ed] too equivocal to support any firm conclusion that glyphosate causes NHL" and that "evidence of a causal link between glyphosate exposure and NHL in the human population seems rather weak." *Id.* at 1108-09. Judge Chhabria nonetheless permitted the plaintiffs' experts to testify, but only because in his view the Ninth Circuit's *Daubert* precedent requires "more room for deference to experts in close cases than might be appropriate in some other Circuits." *Id.* at 1113.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

15
PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1    The ensuing jury verdict reflects only that very particular
2  presentation of the science at trial.   Although Judge Chhabria
3  properly excluded IARC's Monograph, he permitted the plaintiffs to
4  introduce the *fact* of IARC's glyphosate classification.   *See*
5  Heering Suppl. MSJ Decl. Ex. G, Pretrial Order No. 81 at 1, *In re*
6  *Roundup Prods. Liab. Litig.*, No. 16-md-02741-VC (N.D. Cal. Feb.
7  18, 2019).  And while he permitted Monsanto to advise the jury of
8  EPA's  contrary  conclusion,  he  excluded  as  "cumulative"  *all*
9  findings of foreign regulators that glyphosate is non-carcinogenic
10 (*id.*; Ex. H, Pretrial Order No. 159 at 1, *In re Roundup Prods.*
11 *Liab. Litig.*, No. 16-md-02741-VC (N.D. Cal. July 12, 2019)), thus
12 obscuring  from  the  jury  the  overwhelming  regulatory  consensus
13 supporting glyphosate's safety.   The trial was further impacted by
14 the  plaintiffs'  introduction  of   testimony  that  Judge  Chhabria
15 acknowledged was "complete[] junk science."   Heering Suppl. MSJ
16 Decl. Ex. B, *Hardeman* Trial Tr. 1875:4-14.  He later reprimanded
17 plaintiffs, and indicated that if he "understood the lack of basis
18 for that testimony, [he] would have excluded it."  *Id.*  Monsanto's
19 appeal is pending, but regardless of its outcome, the jury verdict
20 in that case provides the Attorney General no meaningful support.
21    The two state court verdicts the Attorney General identifies
22 (at 15-17, 19) are no more helpful.  In *Johnson v. Monsanto*, for
23 example,  only  *one*  expert—Dr.  Nabhan—claimed  that  glyphosate
24 caused  the  plaintiff's  NHL.   That  same  expert  was  excluded  on
25 *Daubert* grounds by Judge Chhabria at the *Hardeman* general causation
26 stage because the doctor "all but admitted that he reached his
27 conclusion regarding glyphosate upon reading the IARC report, and
28 that  contrary  new  evidence  was  unlikely  to  shake  his  faith  in

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
16  CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1  IARC's conclusion." *In re Roundup*, 390 F. Supp. 3d at 1148.  Dr.

2  Nabhan also appeared in the second state court case, *Pilliod v.*

3  *Monsanto*, but in that case he *expressly admitted* "that reasonable

4  people can disagree on whether glyphosate causes NHL."  Zuckerman

5  Cross-MSJ Ex. OO at 19 (Dkt. No. 138-15).

6      Again, to be clear, these few jury verdicts are entirely

7  irrelevant to the questions before this Court.  Despite the

8  Attorney General's suggestions to the contrary, a personal injury

9  verdict could not possibly render a Proposition 65 warning purely

10  factual and uncontroversial given the consensus of expert

11  regulators worldwide that glyphosate does not cause cancer.  But

12  even if the verdicts were somehow relevant, the particular and

13  limited presentation of evidence to which the juries in the

14  personal injury cases were exposed would fatally undermine any

15  reliance on them.

16      2.   The Attorney General next argues (at 11) that IARC's

17  conclusions are bolstered by a letter in which, he asserts, "94

18  scientists concluded that [the European Food Safety Authority's

19  (EFSA)] analysis of glyphosate [finding no evidence of

20  carcinogenicity] contained serious flaws."  In fact, this letter

21  was drafted by a *single* individual, Christopher Portier, who was

22  at the time a paid plaintiffs' consultant in the glyphosate

23  personal injury litigation.  Portier solicited the other letter

24  signatories without disclosing to them his financial stake in the

25  issue.[5]  And even putting aside this blatant conflict of interest,

---

[5] *See* Heering Suppl. MSJ Decl. Ex. I, Portier Dep. 69:11-15,
*Hardeman v. Monsanto*, No. 16-md-02741-VC (N.D. Cal. Sept. 5, 2017)
(Portier admitting he asked signatories to join his letter); *id.*
at 72:1-72:14 (Portier admitting he did not disclose to signatories
that he was a paid plaintiffs' consultant); *id.* at 84:1-8 (Portier

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
17  CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1   EFSA ultimately reviewed and rejected all of Portier's arguments.

2   Heering Suppl. MSJ Ex. J at 12, EFSA Letter to Prof. Christopher

3   J. Portier, Subject:  Open Letter;  Review of the Carcinogenicity

4   of Glyphosate by EFSA and BfR (Jan. 13, 2016) ("EFSA considers

5   that the arguments brought forward in the open letter do not have

6   an impact on the EFSA conclusion on glyphosate.  The arguments

7   expressed in the open letter reflect a misunderstanding of the

8   evidence used for the EFSA evaluation.")]

9      The only other evidence the Attorney General claims supports

10  IARC's conclusion (at 14) is a recently published meta-analysis

11  (Zhang et al.) finding a link "between exposures to [glyphosate-

12  based herbicides] and increased risk for NHL."[6]  EPA thoroughly

13  evaluated and rejected this meta-analysis as part of its recent

14  glyphosate registration review.  *See* Heering Suppl. MSJ Decl. Ex.

15  K, EPA, Glyphosate: Epidemiology Review of Zhang et al. (2019) and

16  Leon et al. (2019) Publications for Response to Comments on the

17  Proposed Interim Decision (Jan. 6, 2020).  As EPA explained, the

18  meta-analysis unjustifiably *started* with a hypothesis that "the

19  highest exposures to glyphosate based herbicides . . . will lead

20  to increased risk of NHL in humans." *Id.* at 2; *id.* at 7 (concluding

21  that there was "little justification" for this hypothesis).  EPA

22  also found numerous "methodological and logical flaws" in the meta-

23

24  admitting that "[d]uring the entire period of time in which [he]
25  had conversations with U.S. and European regulators about
     glyphosate, [he was] a paid consultant for plaintiffs' counsel in"
26  personal injury litigation).

27  [6] *Citing* Zuckerman Cross-MSJ Decl. Ex. CC at 186 (purporting to
     attach Zhang, L. et al., *Exposure to glyphosate-based herbicides
28  and risk for non-Hodgkin lymphoma: A meta-analysis and supporting
     evidence*, 781 Mutation Research-Reviews 186 (Feb. 5, 2019)).

1    analysis.   *Id.* at 5.    And ultimately, Zhang et al. merely

2    "summarized  and  re-interpreted"  older  data  that  had  all

3    "previously been considered by EPA" as part of its conclusion that

4    glyphosate is not likely to be carcinogenic to humans.   *Id.* at 3.

5    **C.   The Attorney General's Attacks on EPA Lack Merit**

6       The Attorney General (at 20) next tries to cast doubt on EPA's

7    repeated non-carcinogenic conclusions about glyphosate.    That is

8    likely because he realizes that the conclusions of EPA, as an

9    "authoritative  body  under  Proposition  65"  (at  77),  are

10   particularly destructive to his case.   But the Attorney General's

11   efforts to discredit EPA are meritless.

12      The Attorney General first points (at 20-21) to deliberative

13   documents suggesting that some small minority of EPA staff believed

14   glyphosate was at least possibly carcinogenic.   But "the fact that

15   people in the chain of command have expressed divergent views does

16   not  diminish  the  effect  of  the  agency's  resolution  of  [a]

17   dispute[]."  *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408, 413

18   (7th Cir. 1987).   An expert agency's views are reflected in the

19   actions of "the decisionmaker authorized to speak on behalf of the

20   agency."  *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320-

21   21  (D.C.  Cir.  1998)  (rejecting  relevance  of  "memoranda

22   indicat[ing] there was some disagreement among FDA chemists as to"

23   technical question about "active ingredients" in a drug).   And far

24   from undermining the agency's final determination, debates among

25   staff  holding  differing  views  during  the  deliberative  process

26   reinforce  the  transparent  and  comprehensive  nature  of   EPA's

27   consideration of the issue.   Notably, moreover, EPA has reached

28   the  same ultimate conclusions about glyphosate going back five

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

                                    PLAINTIFFS' COMBINED OPP. TO DEF.'S
                              19  CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                                        OF PLAINTIFFS' MOT. FOR S.J.

1  presidential administrations. *See* Heering MSJ Decl. Ex. N (Dkt.

2  No. 117-18) (EPA R.E.D. Facts – Glyphosate (Sept. 1993)).

3      Next, the Attorney General contends (at 22) that EPA

4  considered different data points than IARC: specifically, that (1)

5  EPA relied "mostly on unpublished studies," while IARC "relied

6  mostly on published, peer-reviewed studies"; (2) "EPA focused on

7  studies of pure glyphosate, while IARC" considered glyphosate-

8  based products; and (3) "EPA focused on data for lower exposures

9  typical of dietary exposures . . . while IARC did not limit its

10  focus to those scenarios." These contentions do nothing to advance

11  the Attorney General's position.

12      The first allegation is misleading.  EPA had access to all of

13  IARC's data, and more.  *See supra* at 12-13 & n.4.  IARC's more

14  limited data-set should, if anything, undermine its conclusion.

15  *See* Heering MSJ Decl. Ex. WW at 7 (Dkt. No. 117-54) (EPA explaining

16  why this makes its evaluations "more robust" than IARC's).

17      Second, EPA's evaluations of pure glyphosate make EPA's

18  findings *more* relevant to this case than IARC's. As OEHHA itself

19  explains:  "The Proposition 65 warning requirement applies only to

20  chemicals listed for causing cancer or reproductive toxicity.  In

21  this case, the substance listed as causing cancer is glyphosate,

22  *not commercial formulations of glyphosate*." *See* Final Statement

23  of Reasons, No Significant Risk Level: Glyphosate, Zuckerman

24  Cross-MSJ Decl. Ex. O at 13 (Dkt. No. 135-2) (emphasis added).

25  (Moreover, EPA approves the formulated product when registering a

26  pesticide.  *See, e.g.*, 7 U.S.C. § 136a(e)-(f); 40 C.F.R. § 152.43.)

27      Third, it is true that IARC evaluated carcinogenicity under

28  heightened exposure scenarios—ones that humans will never

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

20

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1    actually face.[7]   But this again undermines rather than advances

2    the Attorney General's position.   A Proposition 65 warning must

3    state that "glyphosate is known to cause cancer."   Consumers will

4    interpret that to mean that glyphosate causes cancer in the real

5    world, *not* that glyphosate may only be carcinogenic under

6    unrealistically extreme exposure scenarios.   *See* PI Order 14

7    ("[T]he most obvious reading of the Proposition 65 cancer warning

8    is that exposure to glyphosate in fact causes cancer.").   And this

9    likely interpretation is directly contradicted by EPA's conclusion

10   that "there are no risks to human health" for real-world glyphosate

11   exposures.   Heering Suppl. MSJ Decl. Ex. F, EPA Interim

12   Registration Review Decision at 10; *see also id.* at 9 ("The

13   agency . . . concluded that there are no residential, non-

14   occupational bystander, aggregate, or occupational risks of

15   concern.").

16

17   ───────────────────────

18   [7] For example, IARC evaluated a mouse study in which mice were fed
     glyphosate of 98.6% purity, which (according to IARC) only resulted
     in statistically significant effects at a dose of 1,000

19   milligram/kg of body weight per day.   See Heering MSJ Decl. Ex. W
     at 353 (Dkt. No. 117-27) (112 Int'l Agency for Research on Cancer

20   (IARC), WHO, Some Organophosphate Insecticides and Herbicides,
     IARC Monographs (2017)).   That is many orders of magnitude above

21   California's NSRL.   *Compare id.*, *with* Zuckerman Cross-MSJ Decl.
     Ex. O at 1 (Dkt. No. 135-2) (Final Statement of Reasons, No

22   Significant Risk Level: Glyphosate).   And even the import of that
     mouse study is subject to serious doubt:   In 2006 the WHO and the

23   Food and Agriculture Organization of the UN reviewed that study
     and concluded that "[o]wing to the lack of a dose-response

24   relationship, the lack of statistical significance and the fact
     that the incidences recorded in this study fell within the

25   historical ranges for controls, these changes are not considered
     to be caused by administration of glyphosate," and that the

26   "administration of glyphosate to CD-1 mice for 104 weeks produced
     no signs of carcinogenic potential at any dose."   Heering MSJ Decl.

27   Ex. BBB (Dkt. No. 117-59) (Int'l Programme on Chem. Safety, WHO,
     Pesticide Residues in Food – 2004: Toxicology Evaluations at 122

28   (2006)); Pls.' SUF ¶ 57 (Dkt. No. 117-2).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

                                    PLAINTIFFS' COMBINED OPP. TO DEF.'S
                                 21 CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                                    OF PLAINTIFFS' MOT. FOR S.J.

1    The Attorney General also claims (at 23-24) that "EPA failed

2  to follow its own guidelines in determining that glyphosate is not

3  a carcinogen."   The Attorney General is copying these talking

4  points directly from Christopher Portier and Charles Benbrook,

5  both paid plaintiffs' experts in the glyphosate litigation.[8]  And

6  EPA expressly addressed each of these criticisms.  In one instance,

7  EPA addressed the issue as early as the 1980s.[9]  And as to the

8  Attorney General's additional assertion (at 24) that EPA's Science

9  _____

10  [8] *See* Def.'s Cross-MSJ 23-24 & nn.69-71, 73 (relying on Portier's
   trial testimony and an article authored by Benbrook).

11  [9] EPA has been aware of concerns with the laboratory that performed
   the Reyna and Gordon (1973) study since the 1980s, and in light of
12  that history, analyzed that study as only one among six mouse
   studies considered in its weight-of-evidence analysis.  *Compare*
13  Zuckerman Cross-MSJ Decl. Ex. RR at 1784:8-1787:18 (Dkt. No. 138-
   18) (Portier discussing EPA's knowledge dating back to the 1980s),
14  *with* Heering MSJ Decl. Ex. SS at 85 (Dkt. No. 117-50) (2017 EPA
   paper weighing this mouse study among others).  EPA also expressly
15  refuted the criticism (Def.'s Cross-MSJ 23) of the agency's
   "statistical determinations" by explaining why its statistical
16  approach was valid.  *Compare* Zuckerman Cross-MSJ Decl. Ex. RR at
   1788:4-1806:9 (Dkt. No. 138-18) (Portier discussing criticisms of
17  EPA's statistical determinations), *with* Heering Suppl. MSJ Decl.
   Ex. L, EPA, Response to the Final Report of the Federal
18  Insecticide, Fungicide, and Rodenticide Act Scientific Advisory
   Panel (FIFRA SAP) on the Evaluation of the Human Carcinogenic
19  Potential of Glyphosate 7-8 (Dec. 12, 2017) (addressing and
   rejecting criticisms of EPA's "statistical analyses and
20  interpretation of . . . results").  EPA similarly addressed
   Portier's criticism (Def.'s Cross-MSJ 23) that it should have
21  included a particular study that was contaminated by "a leukemia
   virus in the [mouse] colony."  *Compare* Zuckerman Cross-MSJ Decl.
22  Ex. RR at 1807:20-1814:11 (Dkt. No. 138-18)(Portier arguing that
   the contaminated data should have been included in EPA's analysis),
23  *with* Heering MSJ Decl. Ex. SS at 70 (Dkt. No. 117-50) (EPA
   explaining that the study was not included "due to the presence of
24  a viral infection within the colony, which confounded the
   interpretation of the study findings.").  Finally, Benbrook's
25  criticism (Def.'s Cross-MSJ 24) that "EPA relied on a large number
   of studies on bacteria," "all of which were negative," makes no
26  sense:  Neither Benbrook, nor the Attorney General, argues that
   those studies were in some way invalid, so their criticism simply
27  amounts to a demand to ignore available scientific data (which is
   the same thing the Attorney General repeatedly *criticizes* EPA for
28  (*e.g.*, at 23-24)).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

22

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1  Advisory Panel concluded that "the EPA evaluation does not appear
2  to follow the EPA 2005 cancer guidelines," EPA issued a detailed
3  response that squarely addressed that criticism.  *See* Heering
4  Suppl. MSJ Decl. Ex. L, EPA, Response to the Final Report of the
5  FIFRA Scientific Advisory Panel (FIFRA SAP) on the Evaluation of
6  the Human Carcinogenic Potential of Glyphosate (Dec. 12, 2017).

7      Unable to undermine EPA's conclusion on its scientific
8  merits, the Attorney General next insinuates that EPA's process
9  was somehow tainted.  He claims (at 25) that the judges in the
10 three personal injury cases found evidence "that Monsanto engaged
11 in conduct that skewed the scientific debate over the safety of
12 glyphosate."  But this is just false.  Judge Chhabria, for example,
13 noted that the multi-district bellwether plaintiff (Hardeman) "did
14 *not* present evidence that Monsanto hid evidence from the EPA or,
15 alternatively, that it had managed to capture the EPA."  *In re*
16 *Roundup Prods. Liab. Litig.*, 385 F. Supp. 3d 1042, 1047 (N.D. Cal.
17 2019) (emphasis added).  Nor, as Judge Chhabria noted, did Hardeman
18 adduce any "evidence that Monsanto was in fact aware that
19 glyphosate caused cancer but concealed it."  *Id.*  The *Johnson* court
20 made a similar finding.  *See* Zuckerman Cross-MSJ Decl. Ex. EE at
21 5 (Dkt. No. 138-5).  The *Pilliod* court did (erroneously) conclude
22 that Monsanto made "efforts to impede, discourage, or distort the
23 scientific inquiry about glyphosate," Zuckerman Cross-MSJ Decl.
24 Ex. OO at 19 (Dkt. No. 138-15), but even that court recognized
25 that "Monsanto did not hide evidence from the EPA," *id.* at 21.
26 And most of the reasons the *Pilliod* court offered for its outlier
27 finding merely reflect examples of Monsanto vigorously defending
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

23

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1  the safety of its product.  *See id.* at 17 (expressing that Monsanto

2  attempted to discredit IARC).[10]

3      The Attorney General also argues more generally (at 24-25)

4  that EPA may have been "influenced by Monsanto's efforts to skew

5  the scientific debate," but identifies no evidence that Monsanto

6  tainted the conclusions of EPA over the course of decades——much

7  less the conclusions of Canada, Germany, Japan, and the host of

8  expert regulators that agree with EPA.  To the contrary, Canada's

9  expert regulator recently addressed similar accusations of

10 improper influence by Monsanto and found them meritless.  *See*

11 Statement from Health Canada on Glyphosate (Jan. 11, 2019),

12 *https://www.canada.ca/en/health-canada/news/2019/01/statement-*

13 *from-health-canada-on-glyphosate.html.*  A group of twenty Health

14 Canada scientists who had not been involved in that agency's 2017

15 re-evaluation of glyphosate "assessed the validity of any studies

16 in question" and "whether any of the issues raised would influence

17 the results of the [2017] assessment."  *Id.*  That independent

18 review "concluded that the concerns raised by the objectors could

19 

10 The personal injury judges' explanations for why punitive
20 damages awards were nonetheless justified should not survive
   appeal, and in any event, they again afford the Attorney General
21 no support in this case.  Judge Chhabria's bottom line was that
   "Monsanto's behavior betrayed a lack of concern about the risk
22 that its product might be carcinogenic."  *In re Roundup*, 385 F.
   Supp. 3d at 1047.  And the *Johnson* court found that "[t]he jury
23 could find that the decision by Monsanto to continue marketing
24 [glyphosate products] notwithstanding a possible link with NHL
   constitutes corporate malice."  Zuckerman Cross-MSJ Decl. Ex. EE
25 at 5-6 (Dkt. No. 138-5).  In other words, these courts faulted
   Monsanto for unwaveringly standing behind glyphosate, a position
26 that is eminently warranted by the overwhelming consensus of
   national regulators that the pesticide does not cause cancer and
27 EPA's recent guidance that a cancer warning would be "false and
   misleading."
28

1    not be scientifically supported," and that the accusations "did

2    not create doubt or concern regarding the scientific basis for the

3    2017 re-evaluation decision for glyphosate." *Id.*

4          Contrary to the Attorney General's accusations of misconduct,

5    the evidence shows that Monsanto has vigorously defended its

6    product because it vigorously believes in its product.   For

7    instance, Judge Chhabria recognized that Monsanto's experts viewed

8    the AHS study—a study that found no evidence glyphosate causes

9    cancer—to be the "most powerful" evidence on the carcinogenicity

10   question.  *See In re Roundup*, 390 F. Supp. 3d at 1126.  It is easy

11   to see why:  the AHS study "considered by far the largest number

12   of NHL cases across a broad range of exposures and for the longest

13   period of time," it "appropriately controlled for confounding by

14   lifestyle factors and other pesticides" and it took efforts to

15   control for "selection bias" among study subjects.  *Id.*  And this

16   study was itself an update on a "2005 study" that also "reported

17   no statistically significant association between glyphosate use

18   and NHL."  *Id.* at 1124.  Monsanto's advocacy is informed by and

19   consistent with this science, and much more besides.

20         In sum, nothing the Attorney General has identified

21   undermines EPA's conclusion, much less the conclusion of the many

22   other international health regulators.  The record remains clear

23   that the heavy weight of authority reflects that glyphosate does

24   not cause cancer.

25   **II.   PLAINTIFFS' FIRST AMENDMENT CLAIM IS RIPE**

26         The Attorney General (at 41-50) reasserts that this case is

27   unripe for judicial review because Plaintiffs will likely be able

28   to establish, if sued, that glyphosate exposures from their

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

                                    PLAINTIFFS' COMBINED OPP. TO DEF.'S
                              25   CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                                    OF PLAINTIFFS' MOT. FOR S.J.

1   products fall within Proposition 65's affirmative defense for

2   goods that pose "no significant risk" of cancer at normal exposure

3   levels.   Cal. Health & Safety Code § 25249.10.   The Attorney

4   General points to the limited regulatory safe harbor created by

5   OEHHA in June 2018, which establishes a "no significant risk level"

6   (NSRL) for glyphosate, as well as evidence that glyphosate

7   exposures from common food products and from lawn and garden

8   pesticide applications fall below that threshold.   *See also* 27

9   Cal. Code Regs. § 25705.

10   Although Plaintiffs applaud the Attorney General's concession

11   that their products pose "no significant risk" of causing cancer,

12   this Court has already recognized that the NSRL does not render

13   Plaintiffs' First Amendment challenge unripe.   *See* PI Order 7-10.

14   The Court was aware of OEHHA's *proposed* glyphosate NSRL at the

15   time of its preliminary injunction ruling (*see id.* at 6-7), assumed

16   for purposes of its ripeness analysis that the proposed NSRL would

17   be adopted as the final NSRL (*id.* at 6-9), and concluded that

18   OEHHA's later adoption of that regulation was not a reason to

19   reconsider its preliminary injunction order (*see* Order Denying

20   Mot. to Amend 4-5).   Nothing has changed that would render

21   Plaintiffs' suit either constitutionally or prudentially unripe.

22   **A.   Plaintiffs' Claims Are Constitutionally Ripe.**

23   The constitutional component of ripeness "overlaps with the

24   'injury in fact' analysis for Article III standing," and ultimately

25   asks whether "the issues presented are 'definite and concrete, not

26   hypothetical or abstract.'"   *Wolfson v. Brammer*, 616 F.3d 1045,

27   1058 (9th Cir. 2010) (citations omitted).   Courts ask whether

28   plaintiffs face "a realistic danger of sustaining a direct injury

1  as a result of the statute's operation or enforcement," or whether

2  the alleged injury is instead "imaginary or speculative."  *Babbitt*

3  *v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

4  Where the First Amendment is implicated, this "inquiry tilts

5  dramatically toward a finding of standing."  *Libertarian Party of*

6  *L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013).  There is

7  nothing imaginary about Plaintiffs' injuries here.

8       There is no question that Proposition 65's warning mandate

9  applies to Plaintiffs.  The statute on its face requires Plaintiffs

10 to give a "clear and reasonable warning" before exposing "any

11 individual" to glyphosate.  Cal. Health & Safety Code § 25249.6.

12 If Plaintiffs violate this requirement, they are subject to civil

13 money penalties and an injunction against sale of the products at

14 issue.  *Id.* § 25249.7.  Only if Plaintiffs can prove at trial that

15 "the [challenged] exposure poses no significant risk assuming

16 lifetime exposure at the level in question" will they have an

17 affirmative defense to liability.  *Id.* § 25249.10(c).  OEHHA

18 regulations further provide that a level of exposure "shall be

19 deemed to pose no significant risk" if it falls below an

20 established NSRL.  27 Cal. Code. Regs. § 25701(b)(3)(A).  In July

21 2018, OEHHA finalized the NSRL for glyphosate at 1,100 micrograms

22 (or 1.1 milligrams) per day.  *Id.* § 25705(b)(1).  Thus, in an

23 enforcement action, proof that glyphosate exposure amounts to less

24 than 1,100 micrograms per day will establish an affirmative

25 defense.  Contrary to the Attorney General's arguments, that

26 potential affirmative defense does not mean that Plaintiffs are

27 not injured by Proposition 65, or that their claim is now unripe.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

27   PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1      At the preliminary injunction phase, the Attorney General

2  made the exact same argument he makes now, contending that

3  Plaintiffs would not have to "provide any warning if their

4  products' glyphosate levels are below" the NSRL that "will likely

5  be adopted." PI Order 6; *see also* Mot. for Reconsideration at 10

6  n.15. Citing the same articles on which he currently relies

7  regarding glyphosate exposure,[11] the Attorney General then asserted

8  that "it is doubtful that a single one of [Plaintiffs' food]

9  products would require a warning if the 1,100 [micrograms per day]

10  safe harbor level is adopted." Defs' Opp'n to PI Mot. 22-23. But

11  this Court correctly concluded that OEHHA's expected adoption of

12  a 1,100-microgram NSRL did not render Plaintiffs' claim unripe,

13  and it declined to reconsider that judgment when informed by the

14  Attorney General that the NSRL had been finalized. *See* PI Order

15  7-10; *see also* Reconsideration Order at 4. The Attorney General

16  provides no reason for the Court to alter its conclusion.

17      The concepts here are well established. As California courts

18  have recognized, Proposition 65 presents entities like Plaintiffs

19  with a "Hobson's choice": they must either attach false and

20  "stigmatizing" cancer warnings to their products or "risk having

21  to defend" against costly private enforcement actions. *Baxter*

22  *Healthcare Corp. v. Denton*, 120 Cal. App. 4th 333, 344 (Cal. App.

23  2004). If Plaintiffs acquiesce and adopt warnings, they will be

24  injured by being forced to defame their own products. *See Agency*

25  *for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205,

26

27  [11] *Compare* Def.'s Opp. to PI Mot. 22-23 (Dkt. No. 50) (relying on studies by Food Democracy Now and the Organic Consumers Association), *with* Lee Cross-MSJ Decl. ¶¶ 13-21 (Dkt. No. 129)

28  (relying on those same studies at summary judgment stage).

1    213 (2013) ("It is . . . a basic First Amendment principle that

2    'freedom of speech prohibits the government from telling people

3    what they must say.'" (citation omitted)); *see also* PI Order 17.

4    And they will bear the costs associated with relabeling their

5    products.  *See, e.g.*, Heering MSJ Decl. ¶ 49 (Dkt. No. 117-4).

6         Companies choosing not to issue a Proposition 65 warning, on

7    the other hand, will also suffer Article III injury because they

8    will need to expend money and resources testing their products to

9    determine "whether their products exceeded the safe harbor level,"

10   which is "itself is a cognizable injury."  PI Order 9; *see also*

11   *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154-55 (2010).

12   Courts routinely recognize that the costs of such regulatory

13   compliance confer standing.  *See, e.g.*, *Cellco P'Ship v. FCC*,

14   357 F.3d 88, 100 (D.C. Cir. 2004) (standing present where business

15   was "continuously burdened by the costs of complying . . . with

16   what it contends are 'unnecessary' regulations").  The Attorney

17   General has no meaningful response.  He asserts (at 35) that

18   "[m]any" foods have glyphosate levels "so low that significant

19   product testing is not likely to be necessary."  But the Attorney

20   General does not suggest that *no* testing will be necessary.  Nor

21   could he, given the need to conduct testing to establish the

22   affirmative no-significant-risk defense.  Instead, the Attorney

23   General claims (at 35) that testing will not be "overly costly"

24   because it will cost less than $300, and will not be "complex."

25   But the cost and complexity of testing is entirely irrelevant—

26   the need to expend *any* amount of time and money satisfies Article

27   III.  *See Monsanto*, 561 U.S. at 154-55; *United States v. Students*

28   *Challenging Regulatory Agency Procedure*, 412 U.S. 669, 689 n.14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1   (1973) (recognizing that plaintiffs need only "an identifiable

2   trifle" of harm); *Cyzewski*, 137 S. Ct. at 983.  And as discussed

3   below (at 32-33), the process for assessing compliance with the

4   NSRL for consumer products—which requires calculation of the

5   "average rate of . . . exposure for average users" of a "general

6   category or categories" of products, 27 Cal. Code Regs.

7   § 25721(d)(4)—is likely to be far more expensive and complex.

8   The need to expend resources on testing and compliance alone

9   defeats the Attorney General's ripeness arguments.

10          Refusing to issue Proposition 65 warnings would also expose

11  Plaintiffs to the near-certain threat of enforcement actions by

12  bounty hunters.  As this Court recognized, Plaintiffs "face a

13  credible threat of enforcement" if they decline to adopt a

14  glyphosate warning, "regardless of the possible enactment of a

15  safe harbor level for glyphosate."  PI Order 7-8.  And such a

16  "genuine threat of imminent prosecution" presents an Article III

17  injury, especially in the First Amendment context.  *Wolfson*, 616

18  F.3d at 1058 (citation omitted); *see also Susan B. Anthony List v.*

19  *Driehaus*, 573 U.S. 149, 161 (2014) (holding that "a credible threat

20  of enforcement" "amounts to an Article III injury in fact");

21  *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1173 (9th Cir.

22  2018) (finding standing because "even if the Attorney General would

23  not enforce the law, [the statute under review] gives private

24  citizens a right of action to sue for damages").

25          Proposition 65's statutory scheme and the long history of

26  bounty hunter suits establishes that such a suit is not just

27  credible, but highly likely.  The Attorney General asserts (at 49-

28  50) that the threat of enforcement suits cannot support standing

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

30

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1   here because "[i]t is always the case that plaintiffs can file

2   non-meritorious enforcement actions."  But the question is simply

3   whether there is "a well-founded fear" of prosecution.  *Wolfson*,

4   616 F.3d at 1062-63.  And the Supreme Court has recognized that

5   the "credibility of [a] threat [of prosecution] is bolstered" where

6   the challenged statute "allows 'any person' with knowledge of the

7   purported violation to file a complaint."  *Susan B. Anthony List*,

8   573 U.S. at 164 (citation omitted).  Under Proposition 65, *any*

9   person may bring an enforcement action on behalf of the public.

10  Cal. Health & Safety Code § 25249.7(d).  Bounty hunters need not

11  make a threshold showing that a product contains any particular

12  amount of glyphosate (so long as it contains some), or that a

13  product actually poses any risk of cancer.  Instead, the "no

14  significant risk" showing is an affirmative defense provable only

15  after litigation has commenced and the defendant has borne the

16  costs of testing to establish the level of exposure.  *See id.*

17  § 25249.10(c) ("[T]he burden of showing that an exposure meets the

18  criteria of this subdivision shall be on the defendant.").  In

19  short, as California's own courts have recognized, "the

20  instigation of Proposition 65 litigation [is] easy—and almost

21  absurdly easy at the pleading stage and pretrial stages."  *See*

22  *Consumer Def. Grp. v. Rental Hous. Indus. Members*, 137 Cal. App.

23  4th 1185, 1215 (Cal. App. 2006).

24      It is also lucrative.  Private plaintiffs stand to recover

25  twenty-five percent of any civil penalty assessed in a court-

26  approved settlement agreement—which can amount to $2,500 per

27  violation, per day.  *See* Cal. Health & Safety Code § 25249.7(b);

28  Cal. Code Regs. Tit. 11, § 3203(b).  Given this powerful economic

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

incentive, professional bounty hunters routinely file strike suits in which "businesses are forced by litigation costs and the risk of statutory damages to simply acquiesce and post a warning, even if those businesses know the warning is affirmatively false and misleading." Heering MSJ Decl. ¶ 51. Moreover, Plaintiffs have received "specific . . . threat[s] to initiate proceedings" from prior Proposition 65 litigants, *Wolfson*, 616 F.3d at 1058, who have made clear that they will sue over glyphosate should Proposition 65's warning requirement be allowed to take effect, Heering MSJ Decl. ¶ 52.

Moreover, the Attorney General is wrong to suggest (at 41) that the NSRL will prevent bounty hunter suits. Despite published reports that common food products will rarely, if ever, contain sufficient concentrations of glyphosate to expose consumers to levels exceeding the NSRL, and home and garden users of glyphosate-based products are unlikely to be exposed at levels that exceed the NSRL, bounty hunters are sure to argue otherwise. Determining exposure levels for home and garden use, in particular, requires a multitude of assumptions. Businesses must determine the "average rate of . . . exposure for average users of [a] consumer product," based on "data for use of a general category or categories" of products. 27 Cal. Code Regs. § 25721(d)(4). The declaration submitted by the Attorney General, for instance, simply assumes that exactly one drop of glyphosate product comes in contact with users' skin during each use, and that the product is used only twelve weeks per year. *See* Sandy Decl. ¶ 5. Paid plaintiffs' experts are likely to offer very different exposure assumptions. Indeed, they already have done so. In one tort suit, plaintiffs

produced an expert report claiming that they had been exposed to as much as 12,950 micrograms per day while using a glyphosate product for residential purposes. *See* Heering Suppl. MSJ Ex. M, Report of Toxicology Consultants and Assessment Specialists, LLC, at 18-19 (Jan. 14, 2019), *Pilliod v. Monsanto Co.*, No. RG-17-862702 (Cal. Super. Ct. filed June 2, 2017). And disputes regarding "average . . . exposure," the identity of "average users," and the relevant "category or categories of consumer products," 27 Cal. Code Regs. § 25721(d)(4), are unlikely to be resolved at summary judgment, leaving Plaintiffs to the uncertainties of trial. *See Envtl. Law Found. v. Beech-Nut Nutrition Corp.*, 235 Cal. App. 4th 307, 314 (Cal. App. 2015) (safe-harbor defense litigated at trial, even where OEHHA had set a regulatory safe-harbor level for that substance); *Consumer Def. Grp.*, 137 Cal. App. 4th at 1214 (explaining that "it [is] virtually impossible for a private defendant to defend a warning action on the theory that the amount of carcinogenic exposure is so low as to pose 'no significant risk' short of actual trial" (citation omitted)).

Furthermore, the Attorney General acknowledges (at 47 n.103) that his exposure estimates do "not apply to workers who may apply glyphosate more frequently and in greater quantities as part of their job requirements." *See also* Ex. N, Report of Dr. William Sawyer at 152, 156 (Dec. 21, 2017), *Johnson v. Monsanto Co.*, No. CGC-16-550128 (Cal. Super. Ct. filed Jan. 28, 2016) (full-time landscaping worker claimed that he was exposed to 50 milligrams (5,000 micrograms) of glyphosate per day). The Attorney General instead argues (at 48-49) that at least *one subset* of these users

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1   ──occupational workers──will receive safety data sheets (SDS) that

2   the Occupational Safety and Health Administration (OSHA) requires

3   employers to give their employees, and which serve as a substitute

4   for Proposition 65 warnings.  *See* 27 Cal. Code Regs. § 25606(a).[12]

5   But not all occupational users of glyphosate products will receive

6   SDSs, because not all occupational users are "employees" to whom

7   an SDS must be provided.  29 C.F.R. § 1910.1200(g)(8).[13]  Self-

8   employed  farmers  or  landscapers,  for  instance,  are  not

9   "employees."  Bounty hunters will almost certainly file strike

10  suits asserting that glyphosate manufacturers and retailers must

11  provide Proposition 65 warnings to such independent farmers or

12  landscapers when selling them glyphosate products.

13      Defendants point to various procedural protections afforded

14  by Proposition 65, but these provide cold comfort to businesses

15  besieged by private enforcement litigation.  For example, the

16  statute requires private plaintiffs to provide notice to the

17  Attorney General 60 days before initiating any litigation, and

18  requires the Attorney General to inform the potential plaintiff in

19  a public letter if he determines the complaint lacks merit.  *See*

20  [12] Notably, the language of Monsanto's SDS for Roundup would not

21  be compliant with Proposition 65, even under the Attorney General's
    this-case-only flexible reading of the statute's requirements.  It

22  states that although glyphosate is "[l]isted as Category 2A by
    [IARC]," "our expert opinion is that classification as a carcinogen

23  is not warranted."  Zuckerman Cross-MSJ Decl. Ex. K (Dkt. No. 133-
    10).

24  [13] Indeed, OEHHA acknowledged as much.  Heering Suppl. MSJ Decl.

25  Ex. O, Final Statement of Reasons, Title 27, California Code of
    Regulations, Proposed Repeal of Article 6 and Adoption of New

26  Article 6 Regulations for Clear and Reasonable Warnings at 29
    (Response to Comment 35) ("[I]n an occupational setting where a

27  warning is not required for a given chemical exposure under federal
    or California OSHA regulations, a person may still be required to

28  provide a warning under Proposition 65.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

34                    PLAINTIFFS' COMBINED OPP. TO DEF.'S
              CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
                       OF PLAINTIFFS' MOT. FOR S.J.

Cal. Health & Safety Code § 25249.7(d)(1), (e)(1)(A). The Attorney General asserts (at 38) that it will be his "practice" to assess whether a plaintiff suing over glyphosate residue in food products has submitted evidence suggesting that exposure will be above the NSRL. But while this commitment to a fulsome analysis of a likely affirmative defense (the NSRL) is quite welcome, it does not appear to be required by statute or regulation——and thus is not a commitment that Plaintiffs can rely on under future attorneys general. *See id.* More fundamentally, nothing gives the Attorney General the power to *prevent* a bounty hunter from filing a complaint even if the Attorney General determines that complaint to be meritless. *Cf. Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003) (finding standing because "[e]ven if the [Puerto Rico] Department of Justice did disavow any intention to" enforce a law, it "exercises no control over whom the local police choose to prosecute"). The Attorney General hypothesizes that bounty hunters would likely be discouraged from filing suit after receiving such a letter, but Plaintiffs have presented evidence to the contrary. *See* Norris Decl. ¶¶ 8-10 (describing Proposition 65 litigation that lasted for six years despite no-merit letter from the Attorney General).

The Attorney General also points to Proposition 65's provision for the assessment of costs and attorney's fees for "frivolous" private enforcement actions. *See* Cal. Health & Safety Code § 25249.7(h)(2); *see also* Cal. Code Civ. Proc. § 128.5. But this sanction is available only if a trial court "determines that there was no actual or threatened exposure to a listed chemical" at any level and makes a further finding that "there was no

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
35  CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

credible factual basis for the certifier's belief that an exposure to a listed chemical had occurred or was threatened." Cal. Health & Safety Code § 25249.7(h)(2). Thus, bounty hunters have no fear of sanction in cases where *some* exposure to glyphosate indisputably occurred, even where it is far below the NSRL. Private bounty hunters know to target businesses (like Plaintiffs) who sell products that result in at least some glyphosate exposure.

Finally, Plaintiffs stand to incur harm from lost sales if they roll the dice and decline to issue glyphosate warnings. *See* PI Order 8 n.8 (recognizing that Plaintiffs have presented evidence of likely lost sales). Given the litigation risks created by Proposition 65, retailers of Plaintiffs' glyphosate products—who could themselves be subject to private enforcement actions should the warning requirement be allowed to take effect—have informed Monsanto that they will not sell glyphosate-based products without Proposition 65 warnings. Heering MSJ Decl. ¶ 45. This represents an independent Article III injury. *See Meese v. Keene*, 481 U.S. 465, 473-74 (1987) (finding that plaintiff had standing to challenge compelled disclaimer that would likely cause third parties not to vote for him); *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 45-46 (1st Cir. 2005) (finding standing for First Amendment challenge to a statute that had an "obviously coercive effect" on a plaintiff's business franchisees which would ultimately cause the plaintiff economic harm). Just as the plaintiff in an unfair-competition suit undoubtedly has standing to challenge the business practices of a competitor on the basis that third-party consumers will refrain from buying the plaintiff's products, Plaintiffs here have standing based on the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
36 CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1   lost sales that will result from retailers' justifiable fear of

2   the consequences of selling glyphosate products without a

3   Proposition 65 warning.  *Cf. TrafficSchool.com, Inc. v. eDriver*

4   *Inc.*, 653 F.3d 820, 825-26 (9th Cir. 2011) (recognizing standing

5   for Lanham Act claim based on theory that customers were likely to

6   be deceived into buying defendant's products rather than

7   plaintiff's).

8       **B.   Plaintiffs' Claims Are Prudentially Ripe.**

9       The Attorney General similarly offers no reason for this Court

10  to reconsider its conclusion that Plaintiffs' claims are

11  prudentially ripe.  *See* PI Order 6.  Prudential ripeness consists

12  of two considerations: "the fitness of the issues for judicial

13  decision and the hardship to the parties of withholding court

14  consideration."  *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S.

15  136, 149 (1967)).  As Plaintiffs previously argued (*see* Pls.'

16  Prelim. Inj. Reply at 15 (Dkt. No. 66)), this case is on all fours

17  with *Susan B. Anthony List*.  In that case, as here, the plaintiffs

18  suffered a hardship for ripeness purposes because they were put to

19  an untenable choice: comply with a statutory mandate that infringed

20  on First Amendment rights or risk statutory penalties.  *Susan B.*

21  *Anthony List*, 573 U.S. 167-68.  Indeed, the hardship caused by

22  delaying review is particularly acute here, as absent the Court's

23  preliminary injunction, Proposition 65's warning requirement would

24  take effect immediately and Plaintiffs would have to begin

25  immediately to test or relabel their products.  *See Suitum v. Tahoe*

26  *Reg'l Planning Agency*, 520 U.S. 725, 743-44 (1997) (finding

27  ripeness "where a regulation requires an immediate and significant

28  change in the plaintiffs' conduct of their affairs with serious

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

37   PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1  penalties attached to noncompliance"). Moreover, Plaintiffs' case

2  is fit for judicial review, because the issues would "not be

3  clarified by further factual development." *Susan B. Anthony List*,

4  573 U.S. 167; *see also Abbott Labs*., 387 U.S. at 149 (case

5  prudentially ripe where "issue[s] tendered" are "purely legal").

6  At this late stage, no factual issues remain, and the case is fit

7  for judicial review.

8  **III.  THE ATTORNEY GENERAL HAS FAILED TO ESTABLISH THAT PROPOSITION**
    **65'S WARNING REQUIREMENT CAN BE APPLIED CONSTITUTIONALLY TO**

9  **GLYPHOSATE**

10      On the merits of Plaintiffs' First Amendment challenge,

11  Plaintiffs and the Attorney General agree on several key points.

12  First, the Attorney General recognizes (at 57) that *Zauderer*'s

13  narrow exception to intermediate scrutiny applies only to

14  compelled disclosures that are "purely factual and

15  uncontroversial." (quoting *CTIA – The Wireless Ass'n v. City of*

16  *Berkeley*, 928 F.3d 832, 844-45 (9th Cir. 2019) ("*CTIA II*")).

17  Second, the Attorney General acknowledges (at 77) that the "core

18  information" that must be communicated by any warning is that "the

19  state of California has determined that glyphosate is known to

20  cause cancer under Proposition 65." And finally, the Attorney

21  General does not seriously dispute that the two safe harbor

22  warnings provided by OEHHA's regulations would be inaccurate and

23  misleading, and therefore unconstitutional, as applied to

24  glyphosate. *See* Cal. Code Regs. Tit. 27, § 25603(a), (b).

25      Those points of agreement dictate this case's outcome. It is

26  neither "purely factual" nor "uncontroversial" to say that

27  glyphosate is "known" by California to cause cancer, which is the

28  core message that a compliant Proposition 65 warning must convey.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

38

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

As this Court previously held, "the most obvious reading of the Proposition 65 cancer warning is that exposure to glyphosate in fact causes cancer," PI Order 14. And that message "is inherently misleading" when "all other regulatory and governmental bodies . . ., including the EPA," and regulators for the European Union, Germany, Canada, Japan, South Korea, and New Zealand,[14] "have found the opposite." *Id.* at 16.

The Attorney General (at 59) now offers up a third alternative warning that only slightly rephrases the second proposed warning that this Court already rejected:[15]

> WARNING: This product can expose you to glyphosate. The State of California has determined that glyphosate is known to cause cancer under Proposition 65 because the International Agency for Research on Cancer has classified it as a carcinogen, concluding that there is sufficient evidence of carcinogenicity from studies in experimental animals and limited evidence in humans, and that it is probably carcinogenic to humans. The EPA has concluded that glyphosate is not likely to be carcinogenic to humans. For more information about glyphosate and Proposition 65, see www.P65warnings.ca.gov.

---

[14] *See supra* 10-14.

[15] The second proposed warning read:

> WARNING: This product can expose you to glyphosate, a chemical listed as causing cancer pursuant to the requirements of California law. The listing is based on a determination by the United Nations International Agency for Research on Cancer that glyphosate presents a cancer hazard. The U.S. Environmental Protection Agency has tentatively concluded in a draft document that glyphosate does not present a cancer hazard. For more information go to www.P65warnings.ca.gov.

Order Denying Mot. to Amend 7.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

39

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1    This third attempt fails like its predecessors because the

2    warning does not meet the requirements of Proposition 65, and even

3    if it did, it would still emphatically violate the First Amendment.

4    **A.   The Third Proposed Warning Would Not Comply With**
     **Proposition 65**

5

6    The Attorney General acknowledges (at 32) that Proposition 65

7    requires a "clear and reasonable warning."  And he does not dispute

8    the California Supreme Court's controlling holding that a clear

9    and reasonable Proposition 65 warning must state that a "'product

10   contains [chemical], a chemical known to the state of California

11   to cause reproductive harm [or cancer],' or words to that effect."

12   *Dowhal*, 32 Cal. 4th at 918; *see* Cal. Health & Safety Code

13   §§ 25249.6, 25249.10(b); *see also* PI Order 14-15 ("[I]n order for

14   a warning to be per se clear and reasonable, the warning must state

15   that the chemical is *known* to cause cancer.").   Further, the

16   Attorney General's own regulations specify that a warning is

17   necessarily not clear and reasonable if it "use[s] . . . the adverb

18   'may' to modify whether the chemical causes cancer" or contains

19   "additional words or phrases that contradict or obfuscate

20   otherwise acceptable warning language."  Cal. Code Regs. Tit. 11,

21   § 3202(b).

22   Just like his second proposed warning, the Attorney General's

23   newest warning, "by discussing the EPA's contrary finding that

24   glyphosate does not cause cancer, appears to 'contradict or

25   obfuscate otherwise acceptable warning language' in violation of

26   [the Attorney General's] regulation."  Order Denying Mot. to Amend

27   9 n.7.  After all, if parties cannot use the word "may" to qualify

28   whether glyphosate causes cancer, they obviously cannot call into

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

40

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1  even greater doubt whether glyphosate causes cancer by citing the

2  contrary conclusion of EPA.   Tellingly, the Attorney General

3  himself "essentially took the position that the warning he now

4  advocates was insufficient," when his counsel rejected at the

5  preliminary injunction hearing a warning "that would state that

6  glyphosate was a carcinogen as 'determined by one of the agencies

7  but not by the others' because such language would 'dilute' the

8  warning."  *Id.* at 7-8.  Because the third proposed warning does

9  not comply with Proposition 65, it affords no defense to

10  Plaintiff's claim that the warning required by the statute violates

11  the First Amendment.

12      The failure of this latest proposed alternative warning is

13  unsurprising.  This Court was rightly skeptical that any "warning

14  properly characterizing the debate as to glyphosate's

15  carcinogenicity would . . . comply with Proposition 65 and the

16  applicable regulations."  *Id.* at 9 n.7.  It is impossible to

17  envision a warning that could both accurately account for the great

18  weight of authority concluding that glyphosate is unlikely to cause

19  cancer while complying with the statute's prohibition against

20  "words or phrases that contradict or obfuscate" the core

21  Proposition 65 message, as interpreted by the Attorney General's

22  regulations.

23      Recognizing this difficulty, the Attorney General now argues

24  (at 78) that this Court should ignore his regulations.  That is a

25  remarkable argument: even granting that those regulations "simply

26  provide[] guidelines that the Attorney General will consider in

27  his review of Proposition 65 settlements," *id.*, they undoubtedly

28  reflect the Attorney General's considered interpretation of what

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

the statute itself requires. *See People ex rel. Lockyer v. Tri-Union Seafoods, LLC*, Nos. CGC-01-402975, CGC-04-432394, 2006 WL 1544384, at *61 (Cal. Super. Ct. May 11, 2006) (concluding that language that "dilutes the actual warning" is non-compliant, citing Attorney General's regulation). In other words, the Attorney General's regulations prohibit the approval in settlements of text that dilutes or qualifies the core Proposition 65 message that a chemical is known to cause cancer because he (correctly) interprets Proposition 65 to require that this core warning be conveyed "clear[ly]." *See* Cal. Health & Safety Code § 25249.6. His attempt now to argue that this interpretation is not germane because it addresses only terms permissible in settlements is nonsensical. And it is wildly inconsistent with the fact that the only examples the Attorney General provides this Court of non-standard warnings that assertedly satisfy Proposition 65 (at 76-77) *come from settlements with the Attorney General*. The Attorney General cannot ground his case on a series of consent decrees while arguing that his regulations governing consent decrees are irrelevant.

Moreover, those consent decrees do not support his argument that speakers may add text that dilutes the core Proposition 65 warning. In each cited instance (at 76-77), the substance at issue—mercury and acrylamide—was not disputed at the time to cause cancer or birth defects, the warnings said as much, and additional text approved in the decrees merely added information that did not qualify or undermine that core statement. In the case of mercury in fish, the modified warning added that "[f]ish and shellfish are an important part of a healthy diet and a source

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

42

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

of essential nutrients," Zuckerman Cross-MSJ Decl. Ex. AAA (Dkt. No. 141-1 at 17), while in the case of acrylamide the modification noted that the carcinogenic substance was not "added to . . . foods," that other foods sold by the restaurant did not contain the substance, that cancer risk "is affected by a wide variety of factors," and that the "FDA has not advised people to stop eating baked or fried potatoes," Zuckerman Cross-MSJ Decl. Ex. BBB at 4-5 (Dkt. No. 141-2).  None of those modifications "contradict[s] or obfuscate[s]" the central message: that the substance at issue causes cancer or birth defects.  *See* Cal. Code Reg. Tit. 11, § 3202(b).  By contrast, the third proposed warning contradicts the proposition that glyphosate causes cancer by noting EPA's contrary determination.

The Attorney General's third successive attempt at a permissible warning also highlights an additional and fundamental flaw in his underlying statutory interpretation.  Although Plaintiffs believe that Proposition 65 is perfectly clear—and clearly requires them to utter misleading and controversial speech in contravention of the First Amendment—if, as the Attorney General seems to argue, the requirements of Proposition 65 are infinitely malleable, they would also necessarily be unconstitutionally vague.  The Attorney General touts the benefits of a warning requirement that can be tailored to "unique circumstances" (at 77) and permit "nuance[]" (at 76).  But imposing serious penalties based on a disclosure law that fails to "specify precisely what disclosures [are] required" would, as the Supreme Court has explained, "raise significant due process concerns." *Zauderer*, 471 U.S. at 653 n.15; *see also Cal. Teachers Ass'n*, 271

1  F.3d at 1150 ("When First Amendment freedoms are at stake, courts

2  apply the vagueness analysis more strictly, requiring statutes to

3  provide a greater degree of specificity and clarity than would be

4  necessary under ordinary due process principles.").

5      The succession of warnings the Attorney General has proposed

6  in this litigation demonstrates at the very least that (if those

7  warnings were compliant with Proposition 65) Plaintiffs would lack

8  "fair notice" as to what conduct is required of them. *FCC v. Fox*

9  *Television Stations, Inc.*, 567 U.S. 239, 253 (2012). It cannot be

10 the case that in order to know what speech the statute requires,

11 businesses must make their best guess and face potentially crushing

12 liability in a future suit by a bounty hunter or prosecutor who

13 takes a less "flexible" view than this Attorney General, should a

14 court decide that a modified warning was insufficiently justified

15 by the "unique circumstances" (at 77) to pass statutory muster.

16 *See Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 793

17 (1988) ("[W]e could not agree to a measure that requires the

18 speaker to prove 'reasonableness' case by case . . . ."). In

19 addition to its fundamental inconsistency with the authoritative

20 holding of the California Supreme Court and the Attorney General's

21 own regulations, the Attorney General's continually evolving

22 interpretation of Proposition 65 should be rejected because it

23 poses serious constitutional difficulties. *See, e.g.*, *Office of*

24 *Sen. Mark Dayton v. Hanson*, 550 U.S. 511, 514 (2007).[16]

25

26 ─────────────
   [16] To be clear, Plaintiffs are not asserting a freestanding
   vagueness or due process claim, so the Attorney General's argument
27 (at 80) that these claims were not pleaded by Plaintiffs misses
   the mark entirely——as does his digression into the distinction
28 between as-applied and facial claims (at 80-82). Instead,
   Plaintiffs merely argue, as a matter of statutory construction,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
44 CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

**B.   The Third Proposed Warning Violates The First Amendment**

This Court previously recognized that any warning for glyphosate that complies with Proposition 65 would violate the First Amendment.  Nothing has changed.  The Attorney General's third proposed warning—like his prior two—violates the First Amendment.  The warning requirement he envisions is ineligible for review under *Zauderer*, and the Attorney General has failed to carry his burden under *Central Hudson*.

1.   The Third Proposed Warning Is Not Eligible For Review Under *Zauderer*

In order for a compelled speech mandate to be eligible for review under *Zauderer*, the speech compelled must be "purely factual and uncontroversial." *See NIFLA*, 138 S. Ct. at 2372; *Am. Beverage Ass'n v. City of S.F.*, 916 F.3d 749, 756 (9th Cir. 2019) (reaffirming that *Zauderer* applies to speech that is purely factual, noncontroversial, and not unjustified or unduly burdensome).  The Attorney General's third proposed warning fails that test because it is as misleading as his first two attempts.  Indeed, this will be the case with any conceivable warning that the Attorney General invents that would even arguably comply with Proposition 65, because regardless of any "flexibility" or "nuance[]" that Proposition 65 might allow (at 74-76), the fundamental requirement of its speech mandate is that a party communicate that its products contain a chemical "known to the state of California to cause [cancer], or words to that effect." *Dowhal*, 32 Cal. 4th at 918.  Thus, as required by Proposition 65,

that the Court should reject an interpretation that would raise serious doubts about the constitutionality of Proposition 65.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
45   CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

the third proposed warning states (at 59) that "California has determined that glyphosate is known to cause cancer."  And because the great weight of authority is that glyphosate does *not* cause cancer, *supra* Section I, this core message is neither "purely factual" nor "uncontroversial."

There is simply no way to simultaneously state that California "knows" that glyphosate "causes" cancer and convey a purely factual warning.  Knowledge means a perception of truth.  *See Know*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "know" as to "perceive directly" to "recognize the nature of" or "to be aware of the truth or factuality of"); *Know*, Webster's II New College Dictionary (3d ed. 2005) (defining "know" as "[t]o perceive directly with the senses or mind" or to "believe to be true with absolute certainty," and defining "known" as "[p]roved"); *Known*, Webster's Third New International Dictionary Unabridged (1993) (defining "known" to include "a known truth that no one denies").  And "cause" is defined as a "reason for an action or condition."  *Cause*, Merriam-Webster's Collegiate Dictionary (10th ed. 1997); *see also Cause*, American Heritage Dictionary of the English Language (3d ed. 2000) (defining verb "cause" to mean "[t]o be the cause of or reason for").  To state that glyphosate is "known" by California to "cause" cancer thus conveys a certainty that glyphosate in fact causes cancer, and in light of the overwhelming consensus to the contrary, that message is inaccurate and inherently misleading.  This precludes review under *Zauderer* because a message that is inaccurate and/or misleading is, by definition, not "purely factual and uncontroversial."  *See Video*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

46

1    *Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 966-67

2    (9th Cir. 2009).

3        That is so even though "known to the state of California to

4    cause cancer" is a statutory term of art.  As this Court has

5    recognized, "[o]rdinary consumers do not interpret warnings in

6    accordance with a complex web of statutes, regulations, and court

7    decisions."  PI Order 14; *see also Nat'l Ass'n of Mfrs. v. SEC*,

8    800 F.3d 518, 529-30 (D.C. Cir. 2015) (rejecting government's

9    attempt to apply *Zauderer* to a warning that a product was not

10   "conflict free" because that term had a statutory definition, as

11   "there would be no end to the government's ability to skew public

12   debate by forcing companies to use the government's preferred

13   language"); *id.* at 540 (Srinivasan, J., dissenting) (acknowledging

14   that government does not have "carte blanche to compel commercial

15   speakers to voice any prescribed set of words as long as the words

16   are defined by statute or regulation").  And a reasonable consumer

17   will understand this language in a commonsense way to mean that

18   "exposure to glyphosate in fact causes cancer."  Order Denying

19   Mot. to Amend 6.

20       The Attorney General's third proposed warning also is

21   "controversial" in the sense that it is subject to "disagree[ment]"

22   regarding "the truth of the facts required to be disclosed."  *Am.*

23   *Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir.

24   2014).  His brief attacks a straw man by arguing (at 63) that the

25   First Amendment "does not prohibit compelled disclosures relating

26   to every topic over which there exists some scientific

27   disagreement."  This is not a circumstance in which the compelled

28   statement is the consensus view, with only fringe "scientific

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

47   PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1   disagreement" on the other side of the debate.   It is the opposite

2   circumstance:   The vast weight of authority *disagrees* with the

3   proposition that glyphosate causes cancer.   *See supra* at 9-14.

4   Proposition 65's compelled statement to the contrary is *highly*

5   controversial.[17]

6        These problems, which render the core Proposition 65

7   statement for glyphosate ineligible for review under *Zauderer*, are

8   not remedied by the additional text of the third proposed warning.

9   For two reasons.   First, the only warning that Proposition 65

10  *compels* is that glyphosate is "known to the State to cause cancer."

11  The supplemental text proffered by the Attorney General is not

12  required by the statute; it is, at best, clarifying language that

13  Proposition 65 permits a speaker to append.   As such, it does not

14  affect the appropriate level of scrutiny.   The scrutiny afforded

15  a compelled warning depends on the message conveyed by the

16  compelled speech, not on whatever additional language the

17  government allows the speaker to add to prevent listeners from

18  being deceived by that compelled speech.   Ample precedent makes

19  clear that a misleading compelled warning is not eligible for

20  *Zauderer* review, *see CTIA II*, 928 F.3d at 845, and is in fact

21  flatly forbidden, *see Video Software Dealers*, 556 F.3d at 967.

22

---

23  [17] The Attorney General's reliance (at 63-64) on *CTIA II* is entirely
    misplaced.   The Ninth Circuit expressly found that the compelled
24  disclosure at issue in that case was uncontroversial only because
    it "was factual and not misleading," and to support that conclusion
25  the court relied heavily on the fact that the disclosure was "a
    short-hand description of the warning the FCC already requires
26  cell phone manufacturers to include in their user manuals."   *CTIA
    II*, 928 F.3d at 848.   This case presents the polar opposite
27  situation, given EPA's express conclusion that a Proposition 65
    cancer warning for glyphosate would be false and misleading.
28  Heering MSJ Decl., Exh. E.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
48   CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1   And the Attorney General offers no support for the remarkable

2   proposition that the government may nonetheless compel a false and

3   misleading statement so long as it permits the speaker to

4   simultaneously rebut that statement.[18]   To the contrary, when

5   courts have taken account of a speaker's ability to add additional

6   information to a compelled statement, they have done so only *after*

7   first determining that the compelled statement is purely factual

8   and uncontroversial on its own terms.   *See, e.g.*, *Milavetz, Gallop*

9   *& Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010) (noting

10  that speaker was legally permitted to "convey[] any additional

11  information" only after the Court determined that compelled

12  "disclosures entail only an accurate statement").

13      Second, even if the supplemental text of the third proposed

14  warning were properly considered, it does not render the statement

15  as a whole purely factual and uncontroversial.   Consider first its

16  statement (at 59) that California "has determined that glyphosate

17  is known to cause cancer under Proposition 65 *because the*

18  *International Agency for Research on Cancer has classified it as*

19  *a carcinogen*" (emphasis added).   The clear import of that sentence

20  remains that California "knows" that glyphosate "causes" cancer

21  *because it causes cancer*.   Specifying that California knows this

22

---

23  [18] If a speaker were compelled to state that "the sky is green,"
    that would be neither purely factual nor uncontroversial.   And

24  that statement would remain false and misleading even if the
    speaker were legally permitted to append additional text noting

25  that some individuals believe the sky is actually blue.   The First
    Amendment harm arises from being forced to utter a false and

26  misleading statement, and that harm is not cured merely because a
    speaker is permitted in the next breath to disavow the statement.

27  *See Pac. Gas & Elec. Co.*, 475 U.S. at 11-12 ("[T]he State is not
    free . . . to force [a party] to respond to views that others may

28  hold.").

because an entity called "the International Agency for Research on Cancer" "classified glyphosate as a carcinogen" does nothing to undermine that central truth; if anything, it reinforces the gravity of the misleading message by referencing an entity whose name suggests authoritative scientific knowledge. True, the statement goes on to explain the basis for IARC's classification, and to note that its actual finding was that glyphosate is "probably carcinogenic to humans." But even then, it misleads because it fails to acknowledge that IARC made no finding that glyphosate entails any risk of cancer to humans at real-world exposure levels.

These problems are not cured by the remaining supplementary text. After stating that glyphosate is "known" by California "to cause cancer," and discussing at length IARC's classification of glyphosate as a carcinogen, the third proposed warning briefly notes that EPA "has concluded that glyphosate is not likely to be carcinogenic to humans." But it does not mention that EPA considered and rejected IARC's conclusion after reviewing a far broader scope of scientific studies, and conspicuously fails to note the host of international regulators that have unanimously found that glyphosate poses no cancer risk.[19] By mentioning only

---

[19] The Attorney General seemingly justifies excluding the consensus among international regulators by observing (at 60) that the disclosure includes the views only of "two authoritative agencies" under Proposition 65. But California cannot by statute limit what evidence is relevant under the First Amendment. Regardless of California voters' purported desire to be informed when any of a small subset of agencies classifies a chemical as a carcinogen, the resulting statement that the chemical is "known to cause cancer" will be misleading and controversial where, as here, the singular agency's classification runs counter to a worldwide consensus that the chemical does not cause cancer.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1    IARC and EPA's opposing findings, the warning adds yet another

2    layer of deception because it "conveys the message that there is

3    equal weight of authority for and against the proposition that

4    glyphosate causes cancer . . . when the heavy weight of evidence

5    in the record is that glyphosate is not known to cause cancer."

6    Order Denying Mot. to Amend 9; *Amidon v. Student Ass'n of S.U.N.Y.*,

7    508 F.3d 94, 101 (2d Cir. 2007) (holding that the amount of space

8    "allocated to a [controversial view], whether a lot or a little,

9    can skew [the] debate on issues" unconstitutionally); *AMI*, 760

10   F.3d at 27 (compelled disclosure is controversial if it is "one-

11   sided [and] incomplete"); *Nat'l Ass'n of Mfrs.*, 800 F.3d at 537

12   (Srinivisan, J., dissenting) (acknowledging that a one-sided or

13   incomplete warning would "fall outside *Zauderer*'s zone").[20]

14         Finally, the Attorney General's contention (at 65) that his

15   third proposed warning is nonetheless factual and uncontroversial

16   because it "conveys information similar to that provided by"

17   several federal agencies is fundamentally misleading.  *None* of

18   those agencies has concluded that glyphosate causes or is known to

19   cause cancer.  *See* Zuckerman Cross-MSJ Decl. Exs. GGG-JJJ (Dkt.

20   Nos. 141-7 to 141-10).  And several of the agency factsheets cited

21   by the Attorney General indicate precisely the opposite.  *See*

22   Zuckerman Cross-MSJ Decl. Ex. HHH at 2 (Dkt. No. 141-8) (FDA

23   factsheet noting that "[o]ne international organization (the

24   International Agency for Research on Cancer) concluded that

25

26   [20] The Attorney General asserts (at 60) that, as between the views
     of IARC and EPA, the third proposed warning does not "purport[] to
27   tell the consumer which position is correct."  That is absurd.  By
     stating that glyphosate is known to California to cause cancer,
28   the proposed warning definitively takes a side.

glyphosate may be a carcinogen," but explaining that EPA has repeatedly reaffirmed that glyphosate does not cause cancer, and noting that several other organizations, "including the European Food Safety Authority" and another component of the World Health Organization "have determined that it is unlikely to be a carcinogen").

More fundamentally, the fact that some agencies, *in their own factsheets*, include IARC's conclusion regarding glyphosate (along with the contrary findings from regulators around the world) has no bearing on the First Amendment analysis. When speaking for itself, an agency's message need not be "purely factual" nor "uncontroversial." *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny."). Governments are generally free to disseminate their own opinions, however controversial——but that does not mean that they can compel private parties to do so.

> 2.   The Attorney General Still Fails To Carry the State's Burden Under *Central* Hudson

*Central Hudson* requires that the government show a "substantial" government interest that its regulation "directly" advances through burdens on speech no more "extensive than . . . necessary to serve that interest." *Cent. Hudson Gas*, 447 U.S. at 566. To show that a regulation will "directly advance the state interest," the government must demonstrate that it "will in fact alleviate [the asserted harms] to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (same). The government's "burden under this test is 'heavy,'" and it "cannot satisfy it 'by mere

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

52

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1 speculation or conjecture.'" *Italian Colors*, 878 F.3d at 1176

2 (citations omitted).

3     The glyphosate warning requirement flunks each step of the

4 *Central Hudson* test.  The Attorney General has neither established

5 that the warning directly and materially advances a substantial

6 governmental interest, nor shown that the warning requirement is

7 sufficiently tailored to such an interest.

8         a.    The Attorney General Fails To Show That the
                Warning Advances a Substantial Governmental

9                 Interest

10     The Attorney General has no answer to the fundamental truth

11 that California has no legitimate interest, much less a substantial

12 one, in requiring Plaintiffs to convey an inaccurate and misleading

13 message.  As this Court previously concluded, any message about

14 glyphosate that complied with Proposition 65's requirements would

15 necessarily be inaccurate and misleading because a "reasonable

16 consumer would not understand that a substance is 'known to cause

17 cancer' where only one health organization had found that the

18 substance in question causes cancer and virtually all other

19 government agencies and health organizations . . . had found there

20 was no evidence that it caused cancer." PI Order 14.  That finding

21 is sufficient to resolve this case under any level of First

22 Amendment scrutiny.  *See Video Software Dealers*, 556 F.3d at 967

23 (state "has no legitimate reason to force retailers to affix false

24 information on their products"); *see also Nat'l Ass'n of Mfrs.*,

25 800 F.3d at 539 (Srinivisan, J., dissenting) (recognizing that not

26 only would a misleading disclosure "not qualify for *Zauderer's*

27 relaxed standard," but would "run into a more basic First Amendment

28 problem still").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
53  CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1    Even apart from its misleading nature, the glyphosate message

2    advances no substantial governmental interest. The Attorney

3    General argues (at 66 and 73) that the governmental interests

4    underlying the Proposition 65 warning requirement are satisfying

5    the desire of voters "to know if they would be exposed to chemicals

6    that IARC . . . had determined are likely carcinogenic," and

7    "providing Californians with information they wanted to receive

8    about the products they purchase." To the extent those interests

9    animate the statute, they are not substantial: mere consumer

10   curiosity does not justify encroaching on the First Amendment

11   rights of private parties. *See Int'l Dairy Foods Ass'n v. Amestoy*,

12   92 F.3d 67, 74 (2d Cir. 1996) (holding that "consumer curiosity

13   alone is not a strong enough state interest to sustain the

14   compulsion of even an accurate, factual statement . . . in a

15   commercial context").

16   To illustrate, if California voters passed an initiative

17   compelling vaccine manufacturers to state that a "vaccine is known

18   by the State of California to cause autism" whenever an

19   organization of anti-vaccination activists listed that vaccine as

20   harmful—even if the organization's listing was contradicted by

21   the vast weight of scientific evidence—that requirement would not

22   advance a substantial interest in conveying accurate health

23   information. It might serve an interest in conveying to California

24   voters scientifically inaccurate information that they nonetheless

25   wish to receive. But such a mere curiosity interest is not

26   substantial—and certainly cannot justify compelling private

27   parties to utter false or misleading speech.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
54 CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1   California does of course have a substantial interest in

2 informing consumers about *actual* cancer risks.  *See NIFLA*, 138 S.

3 Ct. at 2376 (recognizing interest in speech that actually advances

4 health and safety).[21]  And that is the interest voters in fact

5 intended to advance through Proposition 65.  In enacting the law,

6 California voters relied on the ballot summary, which explained

7 that Proposition 65 would require "businesses to warn people before

8 knowingly and intentionally exposing them to chemicals *that cause*

9 *cancer*."  Zuckerman Cross-MSJ Decl. Ex. WW (Dkt. No. 138-23)

10 (Ballot Summary at 52 (emphasis added)); *see also People v. Canty*,

11 32 Cal. 4th 1266, 1281 (2004) (recognizing that "analyses and

12 arguments contained in the official ballot pamphlet" are

13 particularly probative of voters' intent).  Notably, the ballot

14 summary disclaimed any suggestion that the law served an interest

15 merely in warning of substances that *might* cause cancer, instead

16 assuring voters that there "are certain chemicals that are

17 scientifically known[,] not merely suspected, but known[] to cause

18 cancer," and that Proposition 65 would "[w]arn *us* before we're

19 exposed to any of these dangerous chemicals."  Zuckerman Cross-

20 MSJ Decl. Ex. WW at 54 (Dkt. No. 138-23).  Similarly, the statutory

21 text of Proposition 65 declared the right to "be informed about

22 exposures to chemicals *that cause* cancer, birth defects, or other

23 reproductive harm"——not the right to be informed each time a

24 foreign agency believes that such harms may be present at some

25 unrealistically high level, even if that belief contradicts the

26 ―――――――――――――――

27 [21] This case is thus fundamentally unlike *National Electrical*
*Manufacturers Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), where

28 no one disputed that the substance at issue——mercury——would in
fact pose a health and safety threat.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

weight of scientific evidence. Safe Drinking Water and Toxic Enforcement Act of 1986 § 1, Cal. Health & Safety Code §§ 25249.5-25249.13 (emphasis added).

The question is thus whether "California has shown that requiring a Proposition 65 warning" sufficiently serves "the law's stated interest in informing Californians about exposures to chemicals that cause cancer." Order Denying Mot. to Amend 8. And the Attorney General cannot and does not contend that a glyphosate warning advances *that* interest. The Attorney General may be correct (at 68) that California's interest is not limited to situations where "there is 100% certainty and universal agreement that [a substance] causes cancer." But, again, that is irrelevant to this case. There is a worldwide consensus that glyphosate does *not* cause cancer, despite the dissenting views of IARC. *See supra* 9-14. Regardless of what the answer might be if there "[were] stronger evidence in support of the chemical's carcinogenicity," *cf.* Order Denying Mot. to Amend at 9 n.8, the Attorney General has failed to show that, under the facts as they actually exist, enforcing a Proposition 65 warning for glyphosate would directly and materially advance California's interest in informing consumers about substances that cause cancer.

> b.  The Attorney General Fails To Show that the Warning Requirement Is Narrowly Tailored

The Attorney General maintains (at 74) that the warning requirement is narrowly tailored because it "allows for flexibility such that a variety of warnings are available to businesses." This argument fails for the reasons explained above. Even taking into account the limited flexibility allowed by the

1  statute and regulations, a Proposition 65-compliant glyphosate

2  warning would necessarily be inaccurate and misleading.

3      To the extent that California wishes to inform residents about

4  the outlier views of individual agencies, the Attorney General has

5  failed to show that the State could not accomplish that goal by

6  informing residents itself. *See NIFLA*, 138 S. Ct. at 2376 (holding

7  that disclosure law was not narrowly tailored where California

8  "identified no evidence" that it could not accomplish its stated

9  interest "itself with a public-information campaign").  Indeed,

10  "California could inform" its citizens about IARC's conclusions

11  "without burdening a speaker with unwanted speech," and the

12  Attorney General has provided no meaningful evidence "that an

13  advertising campaign is not a sufficient alternative" to compelled

14  speech.  *Id.* (quoting *Riley*, 487 U.S. at 800).  The Attorney

15  General notes (at 74) that OEHHA already "provides information

16  about glyphosate" on its own website and on the Proposition 65

17  website.  But in *NIFLA*, too, California "argue[d] that it ha[d]

18  already tried an advertising campaign"——yet the Supreme Court held

19  that even a "tepid response" to that campaign "d[id] not prove

20  that an advertising campaign is not a sufficient alternative."

21  *Id.*  Here, the Attorney General points to no evidence *at all* that

22  its own speech is so inadequate that it is entitled to "co-opt

23  [Plaintiffs] to deliver its message for it."  *Id.*

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

PLAINTIFFS' COMBINED OPP. TO DEF.'S
57  CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.

1

**CONCLUSION**

2          For the foregoing reasons, this Court should enter summary

3    judgment for Plaintiffs on Claim I (First Amendment) of their First

4    Amended Complaint and permanently enjoin the Attorney General and

5    those in privity with him from enforcing the Proposition 65 warning

6    requirement as to glyphosate.[22]   And the Court should deny the

7    Attorney General's cross-motion for summary judgment.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    [22] The Attorney General does not dispute that if Plaintiffs are
      correct on the merits, they have satisfied the remaining elements
28    necessary for permanent equitable relief.  *See* Pls.' MSJ 54-61.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

58    PLAINTIFFS' COMBINED OPP. TO DEF.'S
      CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
      OF PLAINTIFFS' MOT. FOR S.J.

```
 1  Dated:  February 12, 2020          Respectfully submitted,

 2                                      /s/  Philip J. Perry

 3
    Catherine L. Hanaway (admitted     Philip J. Perry (CA Bar No.
 4  pro hac vice)                       148696)
    Matthew T. Schelp (admitted pro    Richard P. Bress (admitted pro
 5  hac vice)                           hac vice)
    Matthew P. Diehr (admitted pro     Andrew D. Prins (admitted pro
 6  hac vice)                           hac vice)
    Christopher C. Miles (CA Bar       Ryan S. Baasch (admitted pro
 7  No. 268774)                         hac vice)
    Natalie R. Holden (admitted pro    Nicholas L. Schlossman
 8  hac vice)                           (admitted pro hac vice)

 9  HUSCH BLACKWELL                     LATHAM & WATKINS LLP
    The Plaza in Clayton               555 Eleventh Street NW
10  190 Carondelet Plaza Suite 600     Suite 1000
    St Louis, Missouri 63105           Washington, DC 20004
11  Tel. (314) 480-1903                Tel: (202) 637-2200
    catherine.hanaway@huschblackwel    philip.perry@lw.com
12  l.com
                                       Attorneys for Plaintiffs
13  Attorneys for Plaintiffs           Monsanto Company and CropLife
    National Association of Wheat      America
14  Growers, National Corn Growers
    Association, United States         Trenton H. Norris (CA Bar No.
15  Durum Growers Association,          164781)
    Monsanto Company, Missouri Farm    ARNOLD & PORTER KAYE SCHOLER
16  Bureau, Iowa Soybean               LLP
    Association, South Dakota Agri-    Three Embarcadero Center
17  Business Association, North        10th Floor
    Dakota Grain Growers               San Francisco, CA 94111
18  Association, Missouri Chamber      Tel:  (415) 471-3303
    of Commerce and Industry,
19  Agribusiness Association of        Attorney for Plaintiff
    Iowa, and Associated Industries   Monsanto Company
20  of Missouri
                                       Eliot Belilos (admitted pro
21  Ann M. Grottveit (CA Bar No.       hac vice)
    256349)                            Gary Baise (admitted pro hac
22  KAHN, SOARES & CONWAY, LLP         vice)
    1415 L Street, Suite 400           OLSSON FRANK WEEDA TERMAN MATZ
23  Sacramento, CA  95814              PC
    Tel: (916) 448-3826                600 New Hampshire Ave NW # 500
24  agrottveit@kscsacramento.com       Washington, DC 20037
                                       Tel: (202) 789-1212
25  Attorney for Plaintiff Western     ebelilos@ofwlaw.com
    Plant Health Association
26                                     Attorneys for Plaintiff
                                       Agricultural Retailers
27                                     Association

28
```

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

59

PLAINTIFFS' COMBINED OPP. TO DEF.'S
CROSS-MOT. FOR S.J. AND REPLY IN SUPP.
OF PLAINTIFFS' MOT. FOR S.J.