1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10                             ----oo0oo----

11

12    NATIONAL ASSOCIATION OF WHEAT        No. 2:17-cv-2401 WBS EFB
      GROWERS; NATIONAL CORN GROWERS
13    ASSOCIATION; UNITED STATES DURUM
      GROWERS ASSOCIATION; WESTERN
14    PLANT HEALTH ASSOCIATION; IOWA       MEMORANDUM AND ORDER RE:
      SOYBEAN ASSOCIATION; SOUTH           CROSS MOTIONS FOR SUMMARY
15    DAKOTA AGRI-BUSINESS                 JUDGMENT
      ASSOCIATION; NORTH DAKOTA GRAIN
16    GROWERS ASSOCIATION; MISSOURI
      CHAMBER OF COMMERCE AND
17    INDUSTRY; MONSANTO COMPANY;
      ASSOCIATED INDUSTRIES OF
18    MISSOURI; AGRIBUSINESS
      ASSOCIATION OF IOWA; CROPLIFE
19    AMERICA; and AGRICULTURAL
      RETAILERS ASSOCIATION,
20
                  Plaintiffs,
21
            v.
22
      XAVIER BECERRA, in his official
23    capacity as Attorney General of
      the State of California,
24
                  Defendant.
25

26                             ----oo0oo----

27          This case concerns California's Proposition 65, which,

28

                                    1

among other things, requires warning labels for products

containing chemicals known to the state of California to cause

cancer, as determined by certain outside entities.  The parties

have filed cross motions for summary judgment on plaintiffs'

claim that the warning requirement, as applied to the chemical

glyphosate,[1] violates the First Amendment of the United States

Constitution.[2]  (Docket Nos. 117, 124.)

I.   Background

Under Proposition 65, the Safe Drinking Water and Toxic

Enforcement Act of 1986, Cal. Health & Safety Code §§ 25249.5-

25249.14 ("Proposition 65"), the Governor of California is

required to publish a list of chemicals (the "Proposition 65

list") known to the State to cause cancer, as determined by,

inter alia, certain outside entities, including the United States

Environmental Protection Agency ("EPA"), the United States Food

and Drug Administration ("FDA"), and the International Agency for

Research on Cancer ("IARC").[3]  AFL-CIO v. Deukmejian, 212 Cal.

---

[1]     Glyphosate is an herbicide widely used to control
weeds in various settings and is an active ingredient in
defendant Monsanto Company's ("Monsanto") product Roundup.
Plaintiffs or their members sell glyphosate-based herbicides, use
glyphosate in their cultivation of crops that are incorporated
into food products sold in California, or process such crops into
food products sold in California.  (Am. Compl. ¶¶ 9-22 (Docket
No. 23).)

[2]     Lauren Zeise, director of the Office of Environmental
Health Hazard Assessment, was initially named in the complaint
and included in the court's preliminary injunction, though per
the parties' stipulation, she was dismissed from the case and the
injunction was amended to refer specifically to the Attorney
General.  (Docket No. 93.)

[3]     The IARC was founded in 1965 as the cancer
research arm of the United Nations' World Health Organization and

2

1    App. 3d 425, 431-34 (3d Dist. 1989) (citing, inter alia, Cal.

2    Labor Code 6382(b)(1)); see also Cal. Code Regs. tit. 27 §§

3    25306(m), 25904(b)[4] ("A chemical or substance shall be included

4    on the list [of chemicals known to the state to cause cancer] if

5    it is classified by the International Agency for Research on

6    Cancer" as "carcinogenic to humans" or "[p]robably carcinogenic

7    to humans" and there is "sufficient evidence of carcinogenicity

8    in experimental animals.").[5]

9         Proposition 65 also prohibits any person in the course

10   of doing business from knowingly and intentionally exposing

11   anyone to the listed chemicals without a prior "clear and

12   reasonable" warning, with this prohibition taking effect 12

13   months after the chemical has been listed.  Cal. Health & Safety

14   Code §§ 25249.6, 25249.10(b); Deukmejian, 212 Cal. App. 3d at

---

exists to "promote international collaboration in cancer
research."  (Zuckerman Decl. (Docket No. 130), Ex. C at 5-6
(Docket No. 133-2).)  The United States was a founding member of
the IARC and remains a member.  (Zuckerman Decl., Ex. C at 27.)
The IARC publishes, in the form of "Monographs," "critical
reviews and evaluations of evidence on the carcinogenicity of a
wide range of human exposures." (Zuckerman Decl., Ex. A at 10
(Docket No. 134-1).)

      The other two outside entities named under the
Proposition 65 regulations are the National Institute for
Occupational Safety and Health, which is part of the Centers for
Disease Control, and the National Toxicology Program, which is
part of the National Institutes of Health.  Cal. Code Regs. tit.
27 § 25306(m).

      [4]   Several new versions of the Proposition 65
implementing regulations took effect on August 30, 2018, after
this case was filed.  This opinion refers to the current versions
of the regulations unless otherwise noted.

      [5]   California's Office of Environmental Health Hazard
Assessment ("OEHHA") is the agency responsible for implementing
Proposition 65.  Cal. Code Regs. tit. 27 div. 4 ch. 1 Preamble.

3

1   431-34.  While the statute does not explain what constitutes a

2   clear and reasonable warning, OEHHA regulations provide two "safe

3   harbor" warnings which are per se clear and reasonable.  The

4   first safe harbor warning contains a black exclamation point in a

5   yellow triangle with the words "WARNING: This product can expose

6   you to chemicals including [name of one or more chemicals], which

7   is [are] known to the State of California to cause cancer.  For

8   more information go to www.P65Warnings.ca.gov."  Cal. Code Regs.

9   tit. 27, § 25603(a).  The second safe harbor warning, the "short

10  form" warning, includes a black exclamation point in a yellow

11  triangle and the words "WARNING: Cancer –

12  www.P65Warnings.ca.gov."  Cal. Code Regs. tit. 27, § 25603(b).

13          Failure to comply with Proposition 65 may result in

14  penalties up to $2,500 per day for each failure to provide an

15  adequate warning, and enforcement actions may be brought by the

16  California Attorney General, district attorneys, certain city

17  attorneys and city prosecutors, or private citizens, who may

18  recover attorney's fees.  Cal. Health & Safety Code § 25249.7;

19  Cal. Code Regs. tit. 11 § 3201.

20          In 2015, the IARC classified glyphosate as "probably

21  carcinogenic" to humans based on "sufficient evidence" that it

22  caused cancer in experimental animals and "limited evidence" that

23  it could cause cancer in humans.  (Zuckerman Decl., Ex. A, at

24  361-99 (Docket No. 134-4, 134-5).)  However, several other

25  organizations, including the EPA, other agencies within the World

26  Health Organization, and government regulators from multiple

27  countries, have concluded that there is insufficient or no

28

4

evidence that glyphosate causes cancer.[6] (Heering Decl. (Docket No. 117-4), Exs. N, R, S, T, U, Z, AA, MM, NN, OO, PP, QQ, RR, SS, WW, XX, CCC (Docket Nos. 117-18, 117-22 to 117-25, 117-31, 117-32, 117-44 to 117-50, 117-54, 117-55, 117-60) (reports or findings from, inter alia, the EPA, European Commission Health & Consumer Protection Directorate-General, WHO Int'l Programme on Chem. Safety, Germany, U.N. Food & Agric. Org., Canada, European Chems. Agency, Australia, New Zealand, Japan, and South Korea). The EPA reaffirmed its determination in April 2019, and then in August 2019, stated that it would not approve herbicide labels with a Proposition 65 warning, as such labels would be false and misleading and "misbranded" under the federal herbicide labeling law, 7 U.S.C. § 136a. (Heering Decl. Exs. E, WW (Docket Nos. 117-9, 1117-54).)

As a result of the IARC's classification of glyphosate as probably carcinogenic, the OEHHA listed glyphosate as a chemical known to the state of California to cause cancer on July 7, 2017, and thus the attendant warning requirement was to take effect on July 7, 2018. (See Heering Decl., Ex. II (Docket No. 117-40).) This court preliminarily enjoined the warning requirement on February 26, 2018 (Docket No. 75), and thus at no time have plaintiffs been required to post glyphosate Proposition 65 warnings for their products.

II.  Procedural History

After a hearing, the court preliminarily enjoined the

---

[6]  Notably, the OEHHA had previously determined that there was insufficient evidence of glyphosate's carcinogenicity. (See Heering Decl., Exs. P, Q (Docket Nos. 117-20, 117-21).)

5

1   Attorney General from enforcing California Health & Safety Code §
2   25249.6's requirement that any person in the course of doing
3   business provide a clear and reasonable warning before exposing
4   any individual to glyphosate as against plaintiffs, plaintiffs'
5   members, and all persons represented by plaintiffs.  (Docket No.
6   75.)  In doing so, the court first found that plaintiff's First
7   Amendment challenge was ripe, because plaintiffs faced a
8   significant risk of injury based on, among other things, the
9   threat of private suits and the costs of testing their products
10  to avoid or defend such suits.

11          The court then found that a Proposition 65 warning for
12  glyphosate was not purely factual and uncontroversial under the
13  First Amendment, as required for compelled commercial speech
14  under Zauderer v. Office of Disciplinary Counsel of Supreme Court
15  of Ohio, 471 U.S. 626, 651 (1985), and CTIA-The Wireless
16  Association v. City of Berkeley, 854 F.3d 1105, 1117-19 (9th Cir.
17  2017) ("CTIA I").[7]  The court explained, among other things, that
18  Proposition 65 and its regulations required a warning stating
19  that the chemical was known to the State of California to cause
20  cancer, and this warning would be misleading to the ordinary
21  consumer because "[i]t is inherently misleading for a warning to

22
23  _____

24      [7]    The Ninth Circuit's 2017 decision in CTIA I was vacated
    by the Supreme Court and remanded for further consideration in
25  light of National Institute of Family and Life Advocates v.
    Becerra, 138 S. Ct. 2361 (2018) ("NIFLA").  138 S. Ct. 2708
26  (2018).  However, on remand, the panel issued a new decision that
    once again explained that "a statement may be literally true but
27  nonetheless misleading and, in that sense, untrue."  CTIA-The
    Wireless Ass'n v. City of Berkeley, 928 F.3d 832, 847 (9th Cir.
28  2019) ("CTIA II"), cert. denied, 140 S. Ct. 658 (2019).

state that a chemical is known to the state of California to cause cancer based on the finding of one organization . . . when apparently all other regulatory and governmental bodies have found the opposite." Id. at 16-17.  In doing so, the court did not determine, and was not required to determine, (1) whether glyphosate in fact caused cancer, (2) whether a statement that glyphosate was known to cause cancer would be factual and uncontroversial where there was more evidence in support of the chemical's carcinogenicity, or (3) whether Proposition 65's statutory and regulatory regime was good policy.

The court subsequently denied defendant's motion for reconsideration under Federal Rule of Civil Procedure 59(e). (Docket No. 97.)  The court first held that it had not committed clear error in its order granting a preliminary injunction. Second, the court found that the much of the "new evidence" introduced by defendant could have been presented in opposition to the motion for a preliminary injunction, and the evidence defendant relied on did not change the court's conclusion that the Proposition 65 warning as to glyphosate violated the First Amendment.  In doing so, the court rejected two alternative warnings proposed by defendant because those warnings still conveyed the message that glyphosate was known to cause cancer or suggested that there was equal or more weight for the proposition that glyphosate caused cancer than for the proposition that it did not.

Plaintiffs now seek a permanent injunction barring enforcement of the Proposition 65 warning as to glyphosate. Defendant in response seeks a determination that plaintiffs'

1    First Amendment claim fails as a matter of law.[8]

2    III. <u>Ripeness</u>

3               Defendant continues to argue that plaintiffs' First

4    Amendment challenge is not ripe, despite the court's prior

5    determination of ripeness in granting the preliminary injunction.

6    Courts must examine whether a case is ripe because their role "is

7    neither to issue advisory opinions nor to declare rights in

8    hypothetical cases, but to adjudicate live cases or controversies

9    consistent with the powers granted the judiciary in Article III

10   of the Constitution."  <u>Thomas v. Anchorage Equal Rights Comm'n</u>,

11   220 F.3d 1134, 1138 (9th Cir. 2000).

12              The ripeness inquiry includes both "constitutional" and

13   "prudential" components.  <u>Id.</u>  Under the constitutional component

14   of standing, courts consider "whether the plaintiffs face a

15   realistic danger of sustaining direct injury as a result of the

16   statute's operation or enforcement, or whether the alleged injury

17   is too imaginary or speculative to support jurisdiction."  <u>Id.</u>

18   (citations and internal quotations omitted).  Under the

19   prudential component, courts consider (1) the fitness of the

20   issues for judicial decision and (2) the hardship to the parties

21   of withholding court consideration.  <u>Id.</u> at 1142.  Here, the

22   court once again finds that plaintiffs' First Amendment challenge

23   is ripe under both the constitutional and prudential inquiries.

24              First, plaintiffs still face a significant risk of

25

26          [8]   Plaintiffs do not address the other causes of action in
     the First Amended Complaint, specifically its claims under the
27   Supremacy Clause of the U.S. Constitution and the Due Process
     Clause of the Fourteenth Amendment.  The court expresses no
28   opinion on those claims.

1   injury notwithstanding defendant's claim that no warnings are

2   required for plaintiffs' products because they likely contain

3   glyphosate levels below the "no significant risk level" ("NSRL"

4   or "safe harbor" level) that was adopted after the filing of this

5   case.  The court recognizes that (1) Proposition 65 provides that

6   no warning is required for a product where an exposure poses no

7   significant risk assuming lifetime exposure at the level in

8   question, Cal. Health & Safety Code § 25249.10; (2) no warnings

9   are required if the daily exposure caused by a product is below

10  the OEHHA's safe harbor level under Cal. Code Regs. tit. 27 §

11  25705; (3) the OEHHA adopted a safe harbor level of 1,100

12  micrograms per day for glyphosate on July 1, 2018, Cal. Code

13  Regs. tit. 27, § 25705; (4) some testing of certain foods has

14  found glyphosate levels that would lead to expected daily

15  exposure levels well below that threshold (Lee Decl. ¶¶ 13-21

16  (Docket No. 129)); and (5) some evidence indicates that consumer

17  use of glyphosate from home and garden use of glyphosate would

18  lead to daily exposure levels well below that threshold (Sandy

19  Decl. ¶ 5 (Docket No. 127)).[9]

20          Nevertheless, assuming plaintiffs' products were tested

21  and found to contain concentrations of glyphosate below the safe

22  harbor level as set by Cal. Code. Regs. tit. 27 § 25705,

23  plaintiffs would still have no reasonable assurance that they

24  would not be subject to enforcement actions.  Plaintiffs have

25  provided evidence that private plaintiffs have brought

26  _____

27          [9]    Plaintiffs dispute the calculations of daily and
    lifetime exposure levels, as well as the cost and difficulty of
    testing products, though the court does not reach this issue.

28

enforcement actions for various chemicals notwithstanding a
defense of compliance with the safe harbor level for those
chemicals, including where the California Attorney General said a
proposed enforcement suit had no merit.[10]  The fact that the
statute allows any person to file an enforcement suit makes the
threat of such suits more credible.  See, e.g., Susan B. Anthony
List v. Driehaus, 134 S. Ct. 2334, 2345 (2014) (plaintiffs showed
credible risk of enforcement because, inter alia, the law at
issue allowed complaints from private parties who were not
"constrained by explicit guidelines or ethical obligations");
Italian Colors Rest. v. Becerra, 878 F.3d 1165, 1173 (9th Cir.
2018) (party had standing because "even if the Attorney General
would not enforce the law" at issue, private citizens had a right

---

[10]  (See, e.g., Norris Decl. ¶¶ 10-12 (Docket No. 117-62) (discussing Physicians Comm. for Responsible Med. v. McDonald's Corp., Los Angeles Superior Court, Case No. BC383722, a lawsuit lasting for 6 years brought against restaurants based on allegations that their cooked chicken exposed Californians to the listed carcinogen "PhIP," despite a California Attorney General determination that the level of PhIP in cooked chicken fell far below the level that would require a warning under Proposition 65); Norris Decl. ¶¶ 30-33 (discussing Proposition 65 actions brought against restaurants and food companies notwithstanding safe harbor level for acrylamide set in 1990).)  See also Sciortino v. PepsiCo, Inc., 108 F. Supp. 3d 780 (N.D. Cal. 2015) (denying motion to dismiss in Proposition 65 enforcement action where parties disputed whether defendant's products exceeded the safe harbor level); Envtl. Law Found. v. Beech-Nut Nutrition Corp., 235 Cal. App. 4th 307, 314 (1st Dist. 2015) (discussing Proposition 65 enforcement action where safe harbor defense was litigated at trial and noting that defendants had the burden of showing that the level of chemicals in their products did not exceed the safe harbor); CKE Rests., Inc. v. Moore, 159 Cal. App. 4th 262 (2d Dist. 2008) (affirming dismissal of suit seeking declaration that private party could not initiate Proposition 65 litigation because safe harbor level was not exceeded).

1   of action to sue for damages).

2          Such suits, which can be brought notwithstanding the

3   Attorney General's finding of no merit, are enabled by the

4   statute itself, as defendants in Proposition 65 enforcement

5   actions have the burden of showing that their product's

6   glyphosate exposure falls below the no significant risk level in

7   a Proposition 65 enforcement action.  Cal. Health & Safety Code §

8   25249.10(c).  Thus, plaintiffs, who have stated they intend to

9   give no warning based on their constitutional right against

10  compelled speech, face a credible threat of enforcement as a

11  result of exercising such right, regardless of the enactment of

12  the safe harbor level for glyphosate.[11]  See Susan B. Anthony

13  List, 134 S. Ct. at 2342-46 (plaintiff may bring pre-enforcement

14  suit where he has an intention to engage in a course of conduct

15  with an arguable constitutional interest but proscribed by law,

16  "and there exists a credible threat of prosecution").

17         Defendant claims that enforcement actions would be

18  unlikely in the event that a product did not exceed the safe

19  _____

20  [11]   The court also rejects the Attorney General's
    contentions, raised for the first time in his reply in support of
21  his cross motion, that plaintiffs have provided no evidence of
    any concrete plans to violate the law and that the First
22  Amendment dispute is more appropriate for a state court
    enforcement action.  (See Docket No. 150 at 4-7.)  Even assuming
23  these arguments were properly raised, (1) plaintiffs have already
    shown and continue to credibly claim that they have no intention
24  of providing Proposition 65 warnings for glyphosate, and (2)
    plaintiffs need not wait for an enforcement action to challenge a
25  state law on First Amendment grounds, notwithstanding the ability
    to raise the challenge as a defense to the enforcement action.
26  Given the credible threat of enforcement, it is not necessary
    that plaintiffs first expose themselves to liability before
27  challenging Proposition 65 on constitutional grounds.  See Susan
    B. Anthony List, 134 S. Ct. at 2342-46.
28

1    harbor level for glyphosate, citing both the steps required to

2    file suit (which require 60 days' notice and the filing of a

3    certificate of merit) and the fact that the Attorney General will

4    likely inform the private enforcer that (1) there was no

5    violation, (2) an action was not in the public interest, and (3)

6    the action would not warrant civil penalties and fees.  Defendant

7    also notes that if the private enforcer refused to withdraw its

8    notice of violation, the Attorney General would then post a

9    letter on the Attorney General website stating that there was no

10   merit to the proposed enforcement action, and that plaintiffs may

11   be ordered to pay attorney's fees and costs for frivolous

12   enforcement actions under Cal. Health & Safety Code §

13   25249.7(h)(2) and Cal. Code Civ. Proc. § 128.5.

14          Notwithstanding these purported barriers, one

15   California Court of Appeal has explained that the instigation of

16   Proposition 65 enforcement actions is "easy -- and almost

17   absurdly easy at the pleading stage and pretrial stages."  See

18   Consumer Def. Grp. v. Rental Hous. Indus. Members, 137 Cal. App.

19   4th 1185, 1215 (4th Dist. 2006).  At best, the possible sanction

20   of attorney's fees appears to be a modest deterrence to suits, if

21   any, given that this sanction is only available if the trial

22   court "determines that there was no actual or threatened exposure

23   to a listed chemical" at any level and also finds that "there was

24   no credible factual basis for the certifier's belief that an

25   exposure to a listed chemical had occurred or was threated."  See

26   Cal. Health & Safety Code § 25249.7(h)(2).  In other words, to

27   bring suit and avoid sanctions, a private plaintiff need only

28   credibly allege that that a product has some amount of the

12

1    chemical at issue, not that the amount of the chemical is harmful

2    or that it exceeds the safe harbor level.

3           Further, in order to take advantage of the safe harbor,

4    plaintiffs would be required to test their products to determine

5    whether their products exceeded the safe harbor level, incurring

6    the attendant costs, which is in itself is a cognizable injury.

7    See, e.g., Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139,

8    154-55 (2010) (farmers seeking injunctive relief had standing

9    based on, inter alia, the cost of testing crops that would be

10   required if an injunction was not granted).

11          The court also rejects defendant's contention that the

12   First Amendment challenge is unripe because defendants may defend

13   any enforcement action by showing their products do not pose a

14   significant cancer risk, even if their products exceed the safe

15   harbor level.  Facing enforcement actions, or even the possible

16   risk of enforcement actions, are cognizable injuries, even if a

17   business can ultimately prove that its product is not a cancer

18   risk.  See, e.g., Susan B. Anthony List, 134 S. Ct. 2334 at 2342-

19   46.[12]

20          Based on the foregoing, the court will deny

21   defendant's motion for summary judgment to the extent it seeks

22   dismissal based on ripeness.

23   IV.  Merits

24          To determine whether the Proposition 65 requirement for

25

26          [12]   As they did in their motion for a preliminary
     injunction, plaintiffs claim that they will lose sales if they
27   decline to provide warnings for their products.  The court
     expresses no opinion as to this claim in determining that
28   plaintiffs' First Amendment claim is ripe.

1  glyphosate violates the First Amendment, the court must first

2  determine the level of scrutiny to apply -- intermediate scrutiny

3  under Central Hudson Gas & Electric Corp. v. Public Service

4  Commission, 447 U.S. 557 (1980), or a lower level of scrutiny

5  under Zauderer v. Office of Disciplinary Counsel of Supreme Court

6  of Ohio, 471 U.S. 626 (1985).

7        Under Central Hudson, the government may restrict

8  commercial speech "that is neither misleading nor connected to

9  unlawful activity, as long as the governmental interest in

10 regulating the speech is substantial."  Am. Beverage Ass'n v.

11 City & Cty. of San Francisco, 916 F.3d 749, 755 (9th Cir. 2019)

12 (quoting Central Hudson, 447 U.S. at 564).  Under this

13 intermediate level of scrutiny, the law at issue "must 'directly

14 advance the governmental interest asserted' and must not be 'more

15 extensive than is necessary to serve that interest.'"  Id.

16 (quoting Central Hudson, 447 U.S. at 566).

17       However, a lower standard applies to certain compelled

18 commercial speech.  In Zauderer, 471 U.S. at 651, the Supreme

19 Court held that the government may require commercial speakers to

20 disclose "purely factual and uncontroversial information" about

21 commercial products or services, as long as the disclosure

22 requirements are "reasonably related" to a substantial government

23 interest and are neither "unjustified [n]or unduly burdensome."

24 See also CTIA II, 928 F.3d at 842-43 (quoting Zauderer); Am.

25 Beverage Ass'n, 916 F.3d at 755 (same).

26       The case law on the level of scrutiny for compelled

27 commercial speech is somewhat unsettled.  Plaintiffs argue that

28 compelled commercial speech is subject to Central Hudson's

14

1    intermediate scrutiny if it cannot meet all the requirements of

2    Zauderer.  In other words, according to plaintiffs, a court

3    should first examine whether the compelled commercial speech

4    meets Zauderer's lower standard, and if not, the court should

5    then proceed to examine whether it meets Central Hudson's

6    requirements.

7          However, neither the Supreme Court nor the Ninth

8    Circuit have elaborated such a rule, though they have hinted at

9    one.  In NIFLA, the Supreme Court reviewed certain disclosure

10   requirements that applied to pro-choice pregnancy centers.  The

11   court applied Zauderer's lower scrutiny to one required

12   disclosure and found that the state had not shown that the

13   disclosure was not unjustified or unduly burdensome.  Having made

14   that determination, the court held that the disclosure violated

15   the First Amendment, without proceeding to examine whether the

16   provision also failed intermediate scrutiny.  138 S. Ct. at 2377-

17   78.  At the same time, the NIFLA court examined a separate but

18   related disclosure rule under intermediate scrutiny, holding that

19   the Zauderer standard did not apply because "[t]he notice in no

20   way relates to the services that licensed clinics provide.

21   Instead, it requires these clinics to disclose information about

22   state-sponsored services -- including abortion, anything but an

23   'uncontroversial' topic."  138 S. Ct. at 2372.[13]

24   ───────────────

25         [13]   In NIFLA, the court applied the Zauderer standard to a
     provision that required unlicensed pregnancy centers to disclose
26   on-site and in all advertising that they were not licensed
     medical providers.  The court applied intermediate scrutiny to a
27   provision that required licensed pregnancy centers to disclose
     on-site and to all clients that the State of California provided
28   free or low-cost family planning services, including abortion, as

                                   15

1    After NIFLA was issued, the Ninth Circuit in American

2   Beverage explained that "Zauderer provides the appropriate

3   framework to analyze a First Amendment claim involving compelled

4   commercial speech."  916 F.3d at 756.  The en banc panel in

5   American Beverage reviewed the denial of a preliminary injunction

6   of an ordinance requiring warnings on advertisements for certain

7   sugar-sweetened beverages.  The court held that the requirement

8   that the warning cover 20% of the advertisement imposed an undue

9   burden and thus failed Zauderer.[14]  Having made this

10  determination, the court reversed the denial of a preliminary

11  injunction, without proceeding to determine whether the ordinance

12  withstood intermediate scrutiny under Central Hudson.  Id. at

13  756-58.

14    In light of these cases, it appears that the court

15  should proceed to examine the warning requirement for glyphosate

16  under Zauderer's lower standard only if the requirement is purely

17  factual and uncontroversial.  If "[t]he Zauderer standard does

18  not apply here" because the warning requirement is not purely

19  factual and uncontroversial, see NIFLA, 138 S. Ct. at 2372, the

20  court should then proceed to examine the warning requirement

21  under Central Hudson's intermediate scrutiny.

22  _____

well as a telephone number to obtain information about such

23  services.  138 S. Ct. at 2368-78.

24    [14]  Finding that the warning requirement was unduly
burdensome, the American Beverage en banc panel declined to
25  examine whether the warning was factual and uncontroversial.  916
F.3d at 757.  This determination follows NIFLA's implied holding
26  that if a disclosure requirement is unjustified or unduly
burdensome, a court may assume that the Zauderer standard applies
27  and need not examine the disclosure requirement under
intermediate scrutiny.  See NIFLA, 138 S. Ct. at 2376-77.

28

16

1        A.   Does _Zauderer_ apply?

2             Before determining whether the Proposition 65 warning

3   requirement survives under _Zauderer_'s lower scrutiny, the court

4   must determine whether _Zauderer_ even applies.  As discussed

5   above, _Zauderer_ applies where the government requires speakers to

6   disclose "purely factual and uncontroversial information" about

7   commercial products or services.  _Zauderer_, 471 U.S. at 651;

8   _NIFLA_, 138 S. Ct. at 2372.  The primary dispute in the present

9   case is whether the compelled disclosure is of purely factual and

10  uncontroversial information.  The State has the burden of

11  demonstrating that a disclosure requirement is purely factual and

12  uncontroversial, not unduly burdensome, and reasonably related to

13  a substantial government interest.  See _Zauderer_, 471 U.S. at

14  641; _Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of_

15  _Accountancy_, 512 U.S. 136, 146 (1994); _Am. Beverage_, 916 F.3d at

16  756

17             What "purely factual and uncontroversial" means has not

18  been completely explained by the Supreme Court or the Ninth

19  Circuit.  The Ninth Circuit previously stated in this context

20  that "uncontroversial" "refers to the factual accuracy of the

21  compelled disclosure, not to its subjective impact on the

22  audience."  _CTIA I_, 854 F.3d at 1117-18; see also _Nationwide_

23  _Biweekly Admin., Inc. v. Owen_, 873 F.3d 716, 732 (9th Cir. 2017)

24  (quoting _CTIA I_).  But see _Nat'l Ass'n of Mfrs. v. S.E.C._, 800

25  F.3d 518, 527-530 & n.28 (D.C. Cir. 2015) (stating a "purely

26  factual" proposition must also be accurate, and thus

27  controversial must mean "communicating a message that is

28  controversial for some reason other than [a] dispute about simple

17

1   factual accuracy") (quoting *Am. Meat Inst. v. U.S. Dep't of*

2   *Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (internal punctuation

3   omitted)).  However, that decision was reversed and remanded by

4   the Supreme Court for further consideration in light of NIFLA,

5   and the panel's opinion on remand did not repeat its prior rule

6   that "controversial" under *Zauderer* means factually accurate.

7   See CTIA II, 928 F.3d at 846-48.

8           In NIFLA, the Supreme Court held that a state law

9   requiring pro-life pregnancy centers to post information about

10  state-provided pregnancy services, including abortion, was

11  controversial.  138 S. Ct. at 2372.  However, the Ninth Circuit

12  explained in CTIA II that NIFLA did not state "broadly that any

13  purely factual statement that can be tied in some way to a

14  controversial issue is, for that reason alone, controversial."

15  CTIA II, 928 F.3d at 845.  Rather, the compelled notice was

16  controversial under *Zauderer* because the disclosure, while

17  factual, "took sides in a heated political controversy, forcing

18  the clinic to convey a message fundamentally at odds with its

19  mission."  Id.  The CTIA II court also explained, once again,

20  that "a statement may be literally true but nonetheless

21  misleading and, in that sense, untrue" and therefore not meet

22  *Zauderer*'s requirements.  CTIA II, 928 F.3d at 847; CTIA I, 854

23  F.3d at 1119; see also Am. Meat Inst., 760 F.3d at 27

24  (recognizing the possibility that "some required factual

25  disclosures could be so one-sided or incomplete that they would

26  not qualify as 'factual and uncontroversial'") (citation

27  omitted).

28          This court has previously found that the Proposition 65

18

1   warning requirement for glyphosate was false and misleading given

2   the weight of authority showing that glyphosate was not known to

3   cause cancer and did not cause cancer.  (Docket No. 75 at 13-17

4   (and citations therein); Docket No. 97 at 4-9.)  While there have

5   been some new developments since the court granted the

6   preliminary injunction, these developments do not change the

7   court's conclusion that the Proposition 65 warning requirement

8   for glyphosate is misleading and therefore not purely factual and

9   uncontroversial.

10          First, the court continues to find that the current

11  language of the full "safe harbor" warning is false and

12  misleading when used for glyphosate.  That warning would require

13  a business to state that glyphosate "is known to the state of

14  California to cause cancer."  Cal. Code Regs. tit. 27, §

15  25603(a).  The "short form" safe harbor warning, which requires

16  language stating "WARNING: Cancer - www.P65Warnings.ca.gov.",

17  Cal. Code Regs. tit. 27, § 25603(b), similarly conveys the

18  message glyphosate is known to cause and actually causes cancer.

19          The court's initial conclusion remains the same.

20  Notwithstanding the IARC's determination that glyphosate is a

21  "probable carcinogen," the statement that glyphosate is "known to

22  the state of California to cause cancer" is misleading.  Every

23  regulator of which the court is aware, with the sole exception of

24  the IARC, has found that glyphosate does not cause cancer or that

25  there is insufficient evidence to show that it does.  (See

26  Heering Decl., Exs. N, R, S, T, U, Z, AA, MM, NN, OO, PP, QQ, RR,

27  SS, WW, XX, CCC.)  While it may be literally true that California

28  technically "knows" that glyphosate causes cancer as the State

has defined that term in the statute and regulations, the
required warning would nonetheless be misleading to the ordinary
consumer.  See, e.g., CTIA-The Wireless Ass'n v. City & Cty. of
San Francisco, 827 F. Supp. 2d 1054, 1062-63 (N.D. Cal. 2011),
aff'd, 494 F. App'x 752 (9th Cir. 2012) (granting preliminary
injunction in part because required fact sheet was misleading
because it failed "to explain the limited significance of WHO
'possible carcinogen' classification," which implied that
radiofrequency energy from cell phones was "more dangerous than
it really is," and explaining that the fact sheet should state
that "RF Energy has been classified by the World Health
Organization as a possible carcinogen rather than as a known
carcinogen or a probable carcinogen and studies continue to
assess the potential health effects of cell phones.").

        As the court stated in granting a preliminary
injunction,

> Ordinary consumers do not interpret warnings in
> accordance with a complex web of statutes,
> regulations, and court decisions, and the most obvious
> reading of the Proposition 65 cancer warning is that
> exposure to glyphosate in fact causes cancer.  A
> reasonable consumer may understand that if the warning
> says "known to cause cancer," there could be a small
> minority of studies or experts disputing whether the
> substance in fact causes cancer.  However, a
> reasonable consumer would not understand that a
> substance is "known to cause cancer" where only one
> health organization had found that the substance in
> question causes cancer and virtually all other
> government agencies and health organizations that have
> reviewed studies on the chemical had found there was
> no evidence that it caused cancer.  Under these facts,
> the message that glyphosate is known to cause cancer
> is misleading at best.

(Docket No. 97 at 14.)

        The D.C. Circuit's discussion in National Association

20

1   of Manufacturers v. S.E.C., 800 F.3d 518 (D.C. Cir. 2015), is

2   instructive.  There, the SEC enacted a rule mandating companies

3   using certain minerals originating in the Democratic Republic of

4   Congo to disclose on their website their products have "not been

5   found to be DRC conflict free."  Id. at 530.  The court explained

6   that the SEC could not rely on the statutory definition of

7   "conflict free" to prove that a disclosure was factual and

8   uncontroversial, because otherwise "there would be no end to the

9   government's ability to skew public debate by forcing companies

10  to use the government's preferred language."  Id. at 530.

11  Similarly, here, the State of California may not skew the public

12  debate by forcing companies to adopt the state's determination

13  that glyphosate is a carcinogen, relying solely on the IARC's

14  determination, when the great weight of evidence indicates that

15  glyphosate is not known to cause cancer.

16              1.   New Evidence

17          The new evidence introduced by defendant on summary

18  judgment does not change this determination that the warning

19  requirement as to glyphosate is misleading.  First, the fact that

20  there have been additional studies suggesting a link between

21  glyphosate and cancer, or the fact that there has been some

22  criticism of the EPA's finding that glyphosate was not a cancer

23  risk, does not establish that California knows that glyphosate

24  causes cancer.  (See Docket No. 124 at 14-25 (and citations

25  therein).)  Notwithstanding this additional evidence, the fact

26  remains that every government regulator of which the court is

27  aware, with the exception of the IARC, has found that there was

28  no or insufficient evidence that glyphosate causes cancer.

                                  21

1    Indeed, the EPA, which Proposition 65 relies on as one of five

2    authoritative bodies for identifying carcinogens, reaffirmed this

3    determination in 2019, noting its vigorous disagreement with the

4    IARC, and stating that a Proposition 65 warning for glyphosate

5    would be false and misleading and would violate the federal

6    herbicide labeling law, 7 U.S.C. § 136a.  (Heering Decl. Exs. E,

7    WW.)

8         This court does not express an opinion as to the

9    criticisms the parties lodge against the IARC on one hand, and

10   the EPA on the other.  "Once again, the court's analysis here is

11   not whether the IARC's determination is persuasive or supported

12   by competent evidence, but rather whether a warning conveying the

13   message that glyphosate causes cancer is factual and

14   uncontroversial."  (Docket No. 97 at 5.)

15        Second, the California Court of Appeal's decision in

16   Monsanto v. OEHHA, 22 Cal. App. 5th 534 (5th Dist. 2018), does

17   not affect the court's analysis.  Monsanto concerned the

18   placement of glyphosate on the Proposition 65 carcinogen list due

19   to the IARC classification of glyphosate as a probable

20   carcinogen.  However, this court has already pointed out on the

21   motion for a preliminary injunction that it is Proposition 65's

22   warning requirement that posed First Amendment concerns, not

23   Proposition 65's list of carcinogens, which is government speech.

24   (Docket No. 75 at 11.)  Also, this court already addressed the

25   Monsanto decision in its order denying defendant's motion to

26   reconsider, noting that that case did not address the First

27   Amendment and thus had no relevance as to whether the warning

28   requirement with respect to glyphosate was factual and

                                  22

1 | uncontroversial.  (Docket No. 97 at 4-5.)  This court has made no
2 | finding, and need not make any, as to the general trustworthiness
3 | or reliability of the IARC in order to determine that the
4 | glyphosate warning requirement is misleading, in light of the
5 | heavy weight of authority stating that glyphosate does not cause
6 | cancer.

7 |      Third, the OEHHA's formal adoption of a regulation
8 | setting a safe harbor level for glyphosate does not change the
9 | court's analysis.  As the court has already explained, the no
10 | significant risk level only provides an affirmative defense for a
11 | business when faced with a Proposition 65 enforcement action, and
12 | it has no relevance as to whether the warning requirement is
13 | factual and uncontroversial.  (Docket 97 at 4-5.)

14 |      Fourth, the fact that there have been three jury
15 | verdicts against Monsanto based on glyphosate does not render the
16 | warning purely factual and uncontroversial.  The juries in those
17 | cases were tasked with determining whether the evidence, as
18 | presented in those cases, showed that it was more likely than not
19 | that glyphosate caused cancer in those plaintiffs.  While those
20 | juries ultimately decided that it did, whether a reasonable juror
21 | could find that glyphosate causes cancer is a separate question
22 | facing the court today -- whether a statement that glyphosate is
23 | known to cause cancer is purely factual and uncontroversial.[15]
24 | Given the full body of evidence before the court, such a
25 | statement is at a minimum misleading and therefore not factual
26 | and uncontroversial.

27 | _____
28 |     [15]   Those cases are also on appeal, so it is not clear that the verdicts will ultimately stand.

1          2.   Alternative Warnings

2               Defendant attempts to salvage the Proposition 65

3    warning by noting that the statute only requires "clear and

4    reasonable" warnings, not the particular language of the safe

5    harbor warning.  However, at the preliminary injunction hearing,

6    counsel for defendant rejected multiple alternative warnings

7    suggested by the court which would provide more context or use

8    more accurate language, claiming that the additional language

9    would "dilute" the warning.  (Hr'g Tr. at 51 (Docket No. 72).)

10   Since then, the Attorney General has suggested three of his own

11   alternative warnings.  Each of these warnings are deficient on

12   their own, as will be discussed below.[16]  More important, however,

13   is the fact that the state simply cannot put the burden on

14   commercial speakers to draft a warning that both protects their

15   right not to speak and complies with Proposition 65.  Accord

16   Illinois ex rel. Madigan v. Telemktg. Assocs., Inc., 538 U.S.

17   600, 620 n.9 (2003) ("[T]o avoid chilling protected speech, the

18   government must bear the burden of proving that the speech it

19   seeks to prohibit is unprotected.") (citations omitted).

20               As this court has already stated, it appears that any

21   glyphosate warning which does not compel a business to make

22   misleading statements about glyphosate's carcinogenicity would

23   likely violate the Attorney General's own guidelines for approval

24   of Proposition 65 enforcement action settlements.  (See Docket

25   No. 97 at 9 n.7 (noting that under Cal. Code Regs. tit. 11 §

26

27        [16]   Although the court addressed the first two alternative
     warnings on the motion to reconsider, the court will revisit that
28   discussion on summary judgment, out of an abundance of caution.

24

1  3202(b), certain words and phrases are per se not clear and

2  reasonable, "such as (1) use of the adverb 'may' to modify

3  whether the chemical causes cancer" and "(2) additional words or

4  phrases that contradict or obfuscate otherwise acceptable warning

5  language").)

6       At the same time, the safe harbor regulations prohibit

7  providing any additional information in the warning other than

8  the source of the exposure or "information on how to avoid or

9  reduce exposure to the identified chemical."[17]  Cal. Code Regs.

10 tit. 27, § 25601.  Given that restriction, a business would not

11 enjoy the protection of the safe harbor warning and would still

12 face the threat of suits from private enforcers if it added, for

13 example, language discussing the debate regarding glyphosate's

14 carcinogenicity, unless the business was a party to a court order

15 approving the particular language.  See Cal. Code Regs. tit. 27,

16 § 25600(e) ("A person that is a party to a court-ordered

17 settlement or final judgment establishing a warning method or

18 content is deemed to be providing a 'clear and reasonable'

19 warning for that exposure for purposes of this article, if the

20 warning complies with the order or judgment.").

21      The court cannot condone the state's approach here,

22 where it continues to argue that the warning requirement poses no

23 First Amendment concerns and then repeatedly proposes iterations

24 of alternative warnings that the state would never allow under

25 normal circumstances, absent this lawsuit.  Even assuming the

26
      [17]  These regulations also distinguish the Proposition 65
27 warning from the regulation at issue in CTIA II, which allowed
   retailers to add to the compelled disclosure.  See 928 F.3d at
28 848.

1  state may continue to propose alternative warnings, as it has in

2  this case, none of them qualify as purely factual and

3  uncontroversial.

4          Defendant's first proposed warning states: "WARNING:

5  This product can expose you to glyphosate, a chemical listed as

6  causing cancer pursuant to the requirements of California law.

7  For more information go to www.P65Warnings.ca.gov."  (Docket No.

8  81-1 at 10).  Stating that a chemical is listed as causing cancer

9  "pursuant to the requirements of California law" conveys

10 essentially the same message to consumers as stating that a

11 chemical is known to the state of California to cause cancer, and

12 thus is misleading for the same reason as the safe harbor

13 warning.  Further, California cannot remedy this warning by

14 simply pointing consumers to a website discussing the debate.

15         Defendant's second proposed warning does provide

16 additional context regarding the debate as to glyphosate's

17 carcinogenicity, stating:

18         WARNING: This product can expose you to glyphosate, a
           chemical listed as causing cancer pursuant to the
19         requirements of California law.  The listing is based
           on a determination by the United Nations International
20         Agency for Research on Cancer that glyphosate presents
           a cancer hazard.  The U.S. Environmental Protection
21         Agency has tentatively concluded in a draft document
           that glyphosate does not present a cancer hazard.  For
22         more information go to www.P65warnings.ca.gov.

23 (Docket No. 81-1 at 12.)

24         As the court discussed on the motion for

25 reconsideration, this warning is deficient "because it conveys

26 the message that there is equal weight of authority for and

27 against the proposition that glyphosate causes cancer, or that

28

                                  26

1   there is more evidence that it does . . . when the heavy weight

2   of evidence in the record is that glyphosate is not known to

3   cause cancer."  (Docket No. 97 at 9.)

4          Defendant's third alternative warning fails for similar

5   reasons. That warning states:

6          WARNING: This product can expose you to glyphosate.
           The State of California has determined that glyphosate
7          is known to cause cancer under Proposition 65 because
           the International Agency for Research on Cancer has
8          classified it as a carcinogen, concluding that there
           is sufficient evidence of carcinogenicity from studies
9          in experimental animals and limited evidence in
           humans, and that it is probably carcinogenic to
10         humans.  The EPA has concluded that glyphosate is not
           likely to be carcinogenic to humans.  For more
11         information about glyphosate and Proposition 65, see
           www.P65warnings.ca.gov.
12

13  (Docket No. 124 at 59.)  This warning does give some context to

14  the IARC's findings, noting that there was "limited evidence in

15  humans" and that glyphosate is "probably carcinogenic."[18]

16  However, it once again states that glyphosate is known to cause

17  cancer and conveys the message that there is equal weight for and

18  against the authority that glyphosate causes cancer, when the

19  weight of evidence is that glyphosate does not cause cancer.

20          Defendant relies heavily on the Ninth Circuit's

21  decision in CTIA II, to support his contention that this third

22  warning is permissible under Zauderer, though that case is

23  distinguishable.  In CTIA II, the panel majority approved a

24  warning stating:

25  _____

26      [18]   Once again, the court questions whether a nuanced
    warning regarding glyphosate, especially one as lengthy as the
27  Attorney General's third alternative warning, can comply with the
    Proposition 65 regulations and the statute's requirements of a
28  "clear and reasonable" warning.

27

1

2

3

4

5

> To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

6

7

8

9

10

11

12

13

14

928 F.3d at 838.  Rather than stating that cell phones are known to cause cancer, or known to cause some other adverse health condition, the CTIA II warning only pointed to federal guidelines regarding radio-frequency guidelines, and stated that certain uses of cell phones would cause the user to exceed those guidelines.  The disclosure did not make any claims that failure to comply with those guidelines would cause any particular effect, other than imply that compliance with the guidelines was necessary for "safety."

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        In contrast, the original cell phone warning required by San Francisco in a related cell phone warning case would have stated, among other things, "ALTHOUGH STUDIES CONTINUE TO ASSESS POTENTIAL HEALTH EFFECTS OF MOBILE PHONE USE, THE WORLD HEALTH ORGANIZATION HAS CLASSIFIED RF ENERGY AS A POSSIBLE CARCINOGEN." CTIA-The Wireless Ass'n v. City & Cty. of San Francisco, 827 F. Supp. 2d 1054, 1058 (9th Cir. 2011), aff'd, 494 F. App'x 752 (9th Cir. 2012).  This warning, making a similar claim about an IARC probable carcinogen determination, was rejected as misleading by the district court, a determination that was affirmed by the Ninth Circuit in a memorandum disposition.  Id. at 1061-63. Thus, the Ninth Circuit's approval of the warning in CTIA II does not show that the third alternative warning proposed by defendant is purely factual and uncontroversial.

1    The law does not require a warning label to disclose in

2 full the debate regarding glyphosate's carcinogenicity, and there

3 need not be complete consensus among the scientific community

4 before a warning may be required.  See CTIA-The Wireless Ass'n v.

5 City of Berkeley, 139 F. Supp. 3d 1048, 1071-72 (N.D. Cal. 2015).

6 Given the evidence in the record, however, warnings which state

7 that glyphosate is known to cause cancer are not purely factual

8 and uncontroversial.  Accordingly, Zauderer's lower scrutiny does

9 not apply, and the Proposition 65 warning as to glyphosate must

10 satisfy intermediate scrutiny.[19]

11    B.    Intermediate Scrutiny

12    Having determined that Zauderer's lower standard does

13 not apply to the glyphosate warning requirement because it is not

14 purely factual and uncontroversial, the court deems it

15 appropriate to now consider whether the warning requirement

16 satisfies intermediate scrutiny.  See Am. Beverage, 916 F.3d at

17 755 (citing Central Hudson, 447 U.S. at 564).  Under intermediate

18 scrutiny, the law must "directly advance the governmental

19 interested asserted and must not be more extensive than is

20 necessary to serve that interest."  Id. (citing Central Hudson,

21 447 U.S. at 566).  The government has the burden to "demonstrate

22 that the harms it recites are real and that its restriction will

23 in fact alleviate them to a material degree."  Ibanez, 512 U.S.

24 at 136.

25

26    [19]    Because the court finds that Zauderer does not apply
because the warning is not purely factual and uncontroversial,
27 the court does not reach the question of whether the warning is
reasonably related to a substantial government interest or
28 imposes an undue burden.

1          Here, defendant has neither shown that Proposition 65's

2     warning requirement, as applied to glyphosate, directly advances

3     the asserted government interest, nor that it is not more

4     extensive than necessary to achieve that interest.   The purpose

5     for Proposition 65 warning requirement, as stated in preamble to

6     the proposed act, was to inform the people of California "about

7     exposures to chemicals that cause cancer."   (Zuckerman Decl., Ex.

8     WW (Docket No. 138-23).)   See also Cal. Chamber of Commerce v.

9     Brown, 196 Cal. App. 4th 233, 258 (1st Dist. 2011) (quoting

10    Proposition 65 Section 1).   The court agrees that this is a

11    substantial interest.   However, misleading statements about

12    glyphosate's carcinogenicity, and the state's knowledge of that

13    purported carcinogenicity, do not directly advance that

14    interest.[20]

15         Moreover, California has options available to inform

16    consumers of its determination that glyphosate is a carcinogen,

17    without burdening the free speech of businesses, including

18    advertising campaigns or posting information on the Internet.

19    See, e.g., NIFLA, 138 S. Ct. at 2376 (noting that even assuming

20    an advertising campaign would be less effective at broadcasting

21    California's message than mandated disclosures, the state may not

22    "co-opt" businesses "to deliver its message for it," because

23

24         [20]   Ironically, the Attorney General, while arguing that
      glyphosate is a carcinogen, has argued that the likely amount of
25    glyphosate that the average consumer will be exposed to is orders
      of magnitude lower than would be required to exceed the state's
26    no significant risk level.   In other words, defendant on the one
      hand proclaims the need to broadcast glyphosate's cancer risk
27    while at the same time declaring there is no risk for the vast
      majority of consumers.
28
                                    30

1   "[t]he First Amendment does not permit the State to sacrifice

2   speech for efficiency") (citation omitted).  Accordingly,

3   Proposition 65's warning requirement as to glyphosate fails

4   intermediate scrutiny under the First Amendment, and the court

5   will grant summary judgment for plaintiffs.[21]

6   V.   Permanent Injunction

7            Having determined that Proposition 65's warning

8   requirement as to glyphosate violates the First Amendment, the

9   court turns to whether a permanent injunction is appropriate.  To

10  obtain a permanent injunction, a plaintiff "must demonstrate: (1)

11  that it has suffered an irreparable injury; (2) that remedies

12  available at law, such as monetary damages, are inadequate to

13  compensate for that injury; (3) that, considering the balance of

14  hardships between the plaintiff and defendant, a remedy in equity

15  is warranted; and (4) that the public interest would not be

16  disserved by a permanent injunction."  eBay Inc. v. MercExchange,

17  L.L.C., 547 U.S. 388, 391 (2006).  The standard for a permanent

18  injunction is essentially the same as for a preliminary

19  injunction, with the exception that the plaintiff must show

20  actual success, rather than a likelihood of success.  See Amoco

21  Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987).

22  Here, the court's analysis of the permanent injunction factors

23  largely repeats its analysis from its order granting a

24  _____

25  [21]   The Attorney General also seeks summary judgment as to
    whether Proposition 65' warning requirement is unconstitutionally

26  vague.  However, the Amended Complaint does not assert a void for
    vagueness claim, and defendant did not assert a counterclaim

27  seeking declaratory relief as to whether the warning requirement
    was unconstitutionally vague.  Accordingly, the court will deny

28  defendant's cross motion for summary judgment as to vagueness.

1   preliminary injunction.

2          Because "[t]he loss of First Amendment freedoms, for

3   even minimal periods of time, unquestionably constitutes

4   irreparable injury," Valle Del Sol Inc. v. Whiting, 709 F.3d 808,

5   828 (9th Cir. 2013) (quoting Elrod v. Burns, 427 U.S. 347, 373

6   (1976)), and plaintiffs have prevailed on their First Amendment

7   claim, they have established that they will likely suffer

8   irreparable harm for which there are no adequate legal remedies

9   if the warning requirement is not enjoined as to glyphosate.[22]

10          When the government is a party, the balance of equities

11   and public interest factors merge.  Drakes Bay Oyster Co. v.

12   Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing Nken v.

13   Holder, 556 U.S. 418, 435 (2009)).  To determine the balance of

14   equities, the court must "balance the interests of all parties

15   and weigh the damage to each."  Stormans, Inc. v. Selecky, 586

16   F.3d 1109, 1138 (9th Cir. 2009) (citation omitted).

17          The court recognizes that the state has a significant

18   interest in protecting its citizens and informing them of

19   possible health risks, but the Ninth Circuit has "consistently

20   recognized the significant public interest in upholding First

21   Amendment principles."  Doe v. Harris, 772 F.3d 563, 583 (9th

22

23          [22]   Plaintiffs also contend that the warning requirement
    will cause several other irreparable harms, including damage to
24   the reputation and goodwill of plaintiffs and their products,
    loss of customers, and disruption to supply chains and existing
25   business practices.  Plaintiffs further claim that they have no
    legal remedies because California is not subject to damages under
26   sovereign immunity.  Because the court finds that plaintiffs have
    shown a likelihood of irreparable harm and inadequate legal
27   remedies based on the infringement of their First Amendment
    rights, the court need not specifically address these arguments.

28

1   Cir. 2014) (quoting Sammartano v. First Judicial Dist. Court, 303

2   F.3d 959, 974 (9th Cir. 2002)).  Further, California "has no

3   legitimate interest in enforcing an unconstitutional" law.  See

4   KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1272 (11th

5   Cir. 2006).  Providing misleading or false labels to consumers

6   also undermines California's interest in accurately informing its

7   citizens of health risks at the expense of plaintiffs' First

8   Amendment rights.  Accordingly, the balance of equities and

9   public interest weigh in favor of permanently enjoining

10  Proposition 65's warning requirement for glyphosate.

11          As plaintiffs have prevailed on the merits of their

12  First Amendment claim, are likely to suffer irreparable harm

13  absent an injunction, and have shown that the balance of equities

14  and public interest favor an injunction, the court will grant

15  plaintiffs' request to permanently enjoin Proposition 65's

16  warning requirement as to glyphosate.[23]

17          IT IS THEREFORE ORDERED that plaintiffs' Motion for

18  Summary Judgment (Docket No. 117) be, and the same hereby is,

19  ────────────────────────────

20          [23]  Plaintiffs' Notice of Motion and proposed order also
    request that the court permanently enjoin defendant or anyone in
21  privity with him from threatening to enforce Proposition 65's
    warning requirement for glyphosate.  (See Notice of Mot. Summ. J.
22  at 1 (Docket No. 117); Proposed Order (Docket No. 1117-79); see
    also Am. Compl. Prayer for Relief ¶ 4) (requesting injunction
23  against anyone enforcing or threatening to enforce the warning
    requirement as to glyphosate).)  This request may have been
24  inadvertently included, as it does not appear to have been
    mentioned in plaintiffs' memorandum in support of the motion or
25  plaintiffs' reply.  More importantly, plaintiffs provide no
    support for the contention that threats of enforcement should be
26  enjoined, and such request raises concerns about the First
    Amendment rights of defendant and those in privity with him.
27  Accordingly, the court's injunction does not address threats of
    enforcement of Proposition 65.
28

1  GRANTED.  Defendant's Cross Motion for Summary Judgment (Docket
2  No. 124) is DENIED.

3          IT IS FURTHER ORDERED that plaintiffs' request for a
4  permanent injunction enjoining the warning requirement of
5  California Health & Safety Code § 25249.6 as to glyphosate is
6  GRANTED.  Defendant, his agents and employees, all persons or
7  entities in privity with him, and anyone acting in concert with
8  him are hereby ENJOINED from enforcing as against plaintiffs,
9  plaintiffs' members, and all persons represented by plaintiffs,
10  California Health & Safety Code § 25249.6's requirement that any
11  person in the course of doing business provide a clear and
12  reasonable warning before exposing any individual to glyphosate.

13  Dated:  June 22, 2020

14                                WILLIAM B. SHUBB
15                                UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

34